

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAY 2 2 2012

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| CHRISTOPHER CHUBASCO WILKINS, §<br>§<br>Petitioner, §<br>§<br>§<br>§<br>- vs - §<br>§<br>§<br>§<br>RICK THALER, Director, §<br>Texas Department of Criminal Justice, §<br>Correctional Institutions Division, §<br>§<br>Respondent. § | Civil No. 04:12-cv-00270-A<br><br>THIS IS A DEATH PENALTY CASE |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON SENTENCED TO DEATH

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone/Fax: (512) 524 1371
HilarySheard@Hotmail.com

*Counsel for Christopher Chubasco Wilkins, Petitioner.*

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON SENTENCED TO DEATH

TABLE OF CONTENTS ...................................................................................i

I.      JURISDICTION.........................................................................................1

II.     PRIOR PROCEEDINGS ...........................................................................1

III.    PREAMBLE TO PETITION FOR WRIT OF HABEAS CORPUS ...................................3

        A.      Recent Developments in the Law Militate in Favor of Permitting
                Petitioner to Develop and Raise Unexhausted Claims Notwithstanding
                the Court's Earlier Order ...................................................................... 3

        B.      Petitioner Has Been Improperly Deprived of His Own Legal Files In
                Preparing This Petition ......................................................................... 6

IV.     THE STATE APPLICATION FOR WRIT OF HABEAS CORPUS ...........................11

        A.      State Habeas Counsel Labored Under Multiple Conflicts of Interest .........11

        B.      Petitioner Made Diligent Efforts to Raise and Preserve Potentially
                Legitimate Claims ..............................................................................14

V.      REQUIREMENTS FOR GRANTING HABEAS RELIEF .............................................15

VI.     PRELIMINARY STATEMENT OF FACTS ................................................................16

        A.      Trial on the Merits ...............................................................................16

        B.      Sentencing Phase ................................................................................19

VII.   CLAIMS FOR RELIEF ....................................................................24

CLAIM FOR RELIEF NUMBER 1

Petitioner's counsel failed to conform to prevailing professional norms
with regard to the sentencing phase of trial because they failed to conduct
a reasonable pretrial mitigation investigation, thereby violating Petitioner's
Sixth Amendment right to effective assistance of counsel, and prejudicing
the outcome of the case, in that Petitioner received a death sentence instead
of life without parole............................................................................24

A.   Trial Counsel conducted a belated inadequate and cursory investigation
     into Petitioner's mental health, background and life history, failing to
     ensure that the jury had a full and true picture of Petitioner's mental
     status, and of those factors in his background that would have inclined
     the jury to sentence Petitioner to life not death ...................................24

     i.     Prevailing Legal Standards at the Time of Petitioner's Trial ..................32

     ii.    Early attempts at investigation were abandoned, and then resumed
            too late ...............................................................................43

     iii.   Counsel failed to prepare for or to investigate the mitigation
            case that was available..........................................................45

     iv.    Mr. Wilkins was cooperative in the mitigation investigation ...................54

     v.     Counsel failed to follow through on the recommendations of
            their retained psychologist .....................................................56

     vi.    Counsel's investigation and decision-making was unreasonable ..............57

B.   Trial Counsel conducted an inadequate investigation of Petitioner's
     future conditions of confinement, presented inaccurate testimony,
     and failed to ensure that the jury had a true picture of the security
     measures to which Petitioner would be subject if sentenced to life,
     thereby violating Petitioner's Sixth Amendment right to effective
     assistance of counsel, and prejudicing the outcome of the case ...........................68

i.      Ms. Perryman-Evans' testimony was factually incorrect ............................70

ii.     Ms. Perryman-Evans was not prepared to testify to how
        Petitioner would in fact be classified were he to receive
        a life sentence ..............................................................73

iii.    Ms. Perryman-Evans was not prepared to testify about
        security improvements made since the notorious escapes
        about which she testified ..................................................73

C.   Trial Counsel failed to prepare to adequately contest the introduction
     of pictures of Petitioner's tattoos, and evidence about them, despite
     the nature of the tattoos, and counsel's awareness that the State would
     seek to introduce evidence concerning that topic. ................................76

i.      Defense Counsel failed to prepare to address the issue
        of Petitioner's tattoos ....................................................79

ii.     Defense Counsel failed to move to exclude Almendariz'
        testimony under Tex. R. Evid. 702 or to discover the
        underlying facts under Tex. R. Evid. 705 ..................................81

iii.    Defense Counsel failed to move to exclude irrelevant
        evidence of a purported gang affiliation ..................................84

D.   Trial Counsel failed to conduct an investigation into the evidence
     the State would introduce at sentencing in seeking to have
     Petitioner sentenced to death .................................................87

CLAIM FOR RELIEF NUMBER 2

Petitioner was denied the right to unconflicted counsel at trial, because trial
counsel had previously represented the victim of an extraneous homicide,
thereby violating Petitioner's Sixth Amendment right to effective
assistance of counsel.............................................................91

A.   Mr. Ball labored under a conflict of interest ..................................96

B.   The adverse effect of the conflict on counsel's representation ...............97

iii

CLAIM FOR RELIEF NUMBER 3

Petitioner was denied the right to counsel at a critical stage of the
proceedings, because he was functionally without counsel during a
hearing on whether his trial counsel had labored under a conflict of interests,
having previously represented the victim of an extraneous homicide of
which evidence was introduced by the State, thereby violating Petitioner's Sixth
Amendment right to the assistance of counsel.................................................................. 99

CLAIM FOR RELIEF NUMBER 4

A.     Petitioner's plea of not guilty was not voluntary: he had expressed
       his wish to plead guilty to counsel, but at counsel's insistence the
       trial on the merits went forward, thereby violating Petitioner's Sixth
       Amendment right to the effective assistance of counsel and to due
       process of law under the Fourteenth Amendment ................................................104

B.     Petitioner's plea of not guilty was not voluntary:  counsel knew that
       Petitioner wished to plead guilty but insisted on the trial going ahead
       because it would benefit counsel to do so, thereby violating Petitioner's
       Sixth Amendment right to the assistance of unconflicted counsel and
       to due process of law under the Fourteenth Amendment.......................................104

       i.     Counsel entered a plea of not guilty that did not reflect
              Petitioner's voluntary and intelligent choice ...............................................110

       ii.    Counsel entered a plea of not guilty that did not reflect
              Petitioner's voluntary and intelligent choice, because it
              was in counsel's financial interest to do so ...............................................113

CLAIM FOR RELIEF NUMBER 5

A.     Petitioner was not competent to enter a plea or to stand trial since
       he lacked the ability to protect his own interests, was self-destructive
       and was incapable of making a reasoned choice between legal strategies
       and options; being subjected to trial while incompetent violated Petitioner's
       right to due process of law under the Fourteenth Amendment ...........................116

B.      Petitioner was not competent to enter a plea or to stand trial since he
        lacked the ability to protect his own interests, was self-destructive
        and incapable of making a reasoned choice between legal strategies
        and options; counsel's decision to continue to trial while Petitioner was
        incompetent violated Petitioner's Sixth Amendment right to the
        effective assistance of counsel and to due process of law under the
        Fourteenth Amendment.............................................................................116

i.      Petitioner was not competent to enter a plea or to stand trial ...............121

ii.     Trial counsel were ineffective for allowing Petitioner to go to trial
        when he was not competent to do so ..............................................................123

CLAIM FOR RELIEF NUMBER 6

Petitioner's counsel failed to conform to prevailing professional norms
with regard to the trial on the merits because they failed to conduct
reasonable pretrial preparation and investigation, thereby violating Petitioner's
rights under the Sixth, Eighth and Fourteenth
Amendments.................................................................................................125

a.      Toolmark ...........................................................................................128

b.      DNA ..................................................................................................129

c.      Tape protocols and analysis ...............................................................129

d.      Fingerprint Evidence .........................................................................130

e.      Physical Evidence and Crime Scenes ..................................................130

f.      Security cameras/Surveillance videos at Fiesta Store &
        Fina Gas Station ...............................................................................130

g.      Eyewitness Identification Procedures .................................................131

h.      Witness reliability .............................................................................132

## CLAIM FOR RELIEF NUMBER 7

Petitioner's counsel failed to conform to prevailing professional norms
because they failed to strike two venire persons who would be unable
to render an impartial verdict or sentence, thereby violating Petitioner's
rights under the Sixth, Eighth and Fourteenth Amendments .........................................134

A.  Defense counsel were ineffective for accepting a juror who had a family
    member who was a prosecutor, who had met the assistant prosecutor
    socially  and who would be predisposed to sentence Petitioner to death
    because of the subject matter of his tattoos ....................................................134

B.  Defense counsel were ineffective for accepting a juror who had been exposed
    to unauthorized information about Petitioner's case, was impaired in her
    ability to follow the law and who was related to a member of the court
    personnel ...........................................................................................135

C.  Petitioner should now be afforded the time and resources necessary
    to conduct jury interviews .......................................................................137

## CLAIM FOR RELIEF NUMBER 8

Petitioner was denied the right to a public trial, to be present during the
course of his own trial, and denied the right to counsel at a critical stage of
the proceedings, when the trial court issued supplementary jury instructions
in response to notes from the jury without notifying Petitioner or counsel or
reconvening the court, thereby violating Petitioner's rights under the Sixth
and Fourteenth Amendment ...........................................................................138

A.  Petitioner was denied the effective assistance of appellate counsel,
    since these issues could have been, but were not, raised on
    direct appeal ......................................................................................143

## CLAIM FOR RELIEF NUMBER 9

The presentation of factually inaccurate testimony violated Petitioner's
right to Due Process under the Eighth and Fourteenth Amendments to
the United States Constitution..........................................................................144

CLAIM FOR RELIEF NUMBER 10

Petitioner's counsel failed to conform to prevailing professional norms
with regard to the sentencing phase of trial because they failed to object
to excessive and prejudicial security measures adopted by the trial court,
which were not justified by any essential state interest specific to Petitioner,
in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth
Amendments ............................................................................................147


CLAIM FOR RELIEF NUMBER 11

The jury instruction that mitigating evidence must reduce "moral
blameworthiness" violates the Eighth Amendment by precluding
consideration of evidence regarding a defendant's character and
background that a juror could find to be mitigating ......................................149

Claims Exhausted on Direct Appeal

CLAIM FOR RELIEF NUMBER 12

Petitioner was denied the right to present evidence in his own defense
when the trial court excluded evidence of a confession to an extraneous
murder, thereby violating Petitioner's right under the Sixth and
Fourteenth Amendments to a meaningful opportunity to present a defense ...................157

CLAIM FOR RELIEF NUMBER 13

Petitioner's challenge to the admission of one of his statements to law
enforcement was erroneously denied; the State had failed to meet its burden
of showing a voluntary waiver of counsel, thereby violating Petitioner's
rights under the Fifth Amendment ..............................................................160

CLAIM FOR RELIEF NUMBER 14

Petitioner's challenges to two potential jurors were erroneously denied
even though one would have automatically found Petitioner to be a future
danger and the other would have placed a burden on Petitioner to present
evidence in his defense, thereby violating Petitioner's rights under the
Sixth, Eighth and Fourteenth Amendments ..................................................162

A.   Venireperson Kitchen ........................................................................162

B.   Venireperson Peterson........................................................................164

<u>Challenges to the Texas Death Penalty Scheme and Jury Instructions</u>

CLAIM FOR RELIEF NUMBER 15

Petitioner's rights under the Fifth and Fourteenth Amendments to the
United States Constitution were violated by the failure of Texas law to
require grand juries to pass on the death penalty eligibility factors in
this case ...................................................................................................169

CLAIM FOR RELIEF NUMBER 16

Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments
to the United States Constitution were violated because the jury was misled
by instructions concerning the so-called "10-12 rule" in the Texas death
penalty statute ........................................................................................172

CLAIM FOR RELIEF NUMBER 17

Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments
to the United States Constitution were violated because the Texas  death
penalty scheme fails to instruct the jury that if a single juror "holds out"
for life the defendant will receive a sentence of life imprisonment by
operation of law ......................................................................................176

CLAIM FOR RELIEF NUMBER 18

Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments
to the United States Constitution were violated because the Texas death
penalty scheme does not place the burden of proof on the state on the
mitigation special issue ...........................................................................179

CLAIM FOR RELIEF NUMBER 19

Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments
to the United States Constitution were violated because the Texas death
penalty scheme fails to instruct the jurors that a "Yes" answer to the
mitigation evidence special issue is required unless the jurors determined
that the aggravating evidence outweighs the mitigating evidence ................................. 182

CLAIM FOR RELIEF NUMBER 20

Petitioner's rights under the Eighth and Fourteenth Amendments to the
United States Constitution were violated because the Texas death penalty
scheme fails to require the jury to consider mitigation in answering
special issue two ......................................................................................................... 184

CLAIM FOR RELIEF NUMBER 21

Petitioner's rights under the Eighth and Fourteenth Amendments to the
United States Constitution were violated because the Texas death penalty
scheme fails to adequately define "mitigating circumstances" ....................................... 185

VIII. CONCLUSION AND PRAYER FOR RELIEF ................................................. 191

VERIFICATION.................................................................................................... 194

CERTIFICATE OF SERVICE ...................................................................................... 194

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON SENTENCED TO DEATH

Petitioner Christopher Chubasco Wilkins, currently confined to death row in the Texas Department of Corrections, respectfully requests that this Court issue a writ of habeas corpus and grant him relief from his unconstitutional conviction and sentence of death.

## I.   JURISDICTION

This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 2241(d) and 28 U.S.C. § 2254, because a jury convicted and sentenced Petitioner to death in the 297th District Court of Tarrant County, Texas.

## II.   PRIOR PROCEEDINGS

Christopher Wilkins was tried and convicted for capital murder in the 297th District Court of Tarrant County, Texas, the Hon. Everett Young presiding. A sentence of death was returned on March 11, 2008. The conviction and sentence were affirmed by the Texas Court of Criminal Appeals on October 20, 2010, *Wilkins v. State*, No. AP-75,878 (Tex. Crim. App. 2010)(not designated for publication). Mr. Wilkins' *pro se* petition for a writ of certiorari was filed with the United States Supreme Court and denied on May 23, 2011.[1] *Wilkins v.*

---

[1] Appointed appellate counsel David Richards attempted to file a petition for writ of certiorari but failed to attach the necessary *In Forma Pauperis* affidavit, *see Petition Exhibit 1*, Letter from U.S. Supreme Court 01.26.2011, hence the fact that it was Mr. Wilkins' own petition, filed on January 4, 2011, that was ruled upon. *See Petition Exhibit 2*, United States Supreme Court docket sheet.

1

*Texas,* No. 10-8641, *cert. denied,* May 23, 2011.

An Application for Writ of Habeas Corpus was filed in the 297th District Court of Tarrant County, Texas, pursuant to TEX. CODE CRIM. PROC. art. 11.071, on June 8, 2010. The convicting court recommended that relief be denied, and the Texas Court of Criminal Appeals denied habeas corpus relief on February 2, 2011. *Ex Parte Wilkins,* No. WR-75,229-01 (Tex. Crim. App. 2011)(not designated for publication).

TEX. CODE CRIM. PROC. Article 11.071 requires counsel for the Applicant in the State Habeas proceedings to move to be appointed as counsel in Federal Court within fifteen (15) days of the Court of Criminal Appeals' denial of relief. TEX. CODE CRIM. PROC. ART. 11.071 § 2 (e). Because state habeas counsel Jack V. Strickland, who had been appointed on March 13, 2008, had commenced employment at the Tarrant County District Attorney's office at the time that habeas relief was denied, attorney John W. Stickels was substituted and duly moved for appointment in this Court. *See Wilkins v. Thaler,* No. 04:11-cv-00072-A (Document # 1, filed February 7, 2011). Mr. Stickels thereafter moved to abate the Motion for Appointment. No. 04:11-cv-00072-A (Document # 9, filed March 8, 2011). The Motion to Abate was granted and the cause dismissed without prejudice. No. 04:11-cv-00072-A (Documents # 10 and 11, filed March 8, 2011).

Undersigned counsel filed a notice of appearance on May 1, 2012. *See Wilkins v. Thaler,* No. 04:12-cv-00072-A (Document # 2, filed May 1, 2012). Petitioner was granted

leave to proceed *In Forma Pauperis* on May 2, 2012 (Document # 9, filed May 2, 2012).

## III. PREAMBLE TO PETITION FOR WRIT OF HABEAS CORPUS

A. <u>Recent Developments in the Law Militate in Favor of Permitting Petitioner to Develop and Raise Unexhausted Claims Notwithstanding the Court's Earlier Order.</u>

Prior to stating Petitioner's Claims for Relief, it is necessary to explain its current status and why Petitioner is compelled, because of the circumstances of his representation in state court proceedings and other factors, to present unexhausted claims despite the Court's Order (Docket No. 14, filed May 2, 2012) that only exhausted claims should be raised. Petitioner must also seek leave to amend this Petition in due course, in addition to currently seeking sufficient funding to enable him to develop his case.

This case is affected by recent and significant developments in the law concerning the impact in federal habeas corpus proceedings of the failings of defense counsel in the preceding state habeas corpus litigation. As discussed in Petitioner's Motion for Scheduling Order,[2] (Document # 10, filed May 1, 2012), the United States Supreme Court in *Martinez*

---

[2] *See* "Motion For, and Brief in Support of Motion: (1) for a Scheduling Order That Gives Effect to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and *Maples v. Thomas*, 132 S.Ct. 912 (2012), and (2) for Leave to File an *ex Parte* Sealed Request for Necessary Funds for Expert and Investigative Assistance." (Document # 10, filed May 1, 2012). The Motion for Scheduling Order was denied on May 3, 2012 (Document # 17, filed May 3, 2012), but is herein incorporated by reference. The Motion for Leave to File an *ex Parte* Sealed Request for Necessary Funds for Expert and Investigative Assistance remains pending. Exhibits filed with the Motion for Scheduling Order will be designated as "Motion Exhibits." Exhibits filed with this Petition will be designated "Petition Exhibits." A "Hearing to Determine Conflict of Interest" held on March 9, 2009, will be referred to by the abbreviation "HDCI" when cited to below.

*v. Ryan*, 132 S.Ct. 1309 (2012), has qualified its position in *Coleman v. Thompson*, 501 U.S. 722, 757 (1991) that a defense attorney's ignorance or inadvertent mistake in state habeas proceedings cannot qualify as "cause" to excuse a procedural default in federal habeas proceedings.

*Martinez* protects prisoners with potentially legitimate claims that would otherwise be barred, where the performance of counsel in "initial-review collateral proceedings" is inadequate. Similarly, where attorney abandonment, or other "extraordinary circumstances" have resulted in the default, that default may be excused. *Maples v. Thomas*, 132 S.Ct. 912 (2012), just as where "extraordinary circumstances" prevent the timely filing of a federal petition for habeas corpus under 28 U.S.C. 2244(d)(1), equitable principles may permit the tolling of the statute of limitations. *Holland v. Florida*, 130 S.Ct. 1549 (2010).

In Petitioner's case, the performance of state habeas counsel was such that numerous potentially legitimate claims were ignored or left undiscovered. Petitioner therefore respectfully requests the Court to allow him the opportunity to vindicate the constitutional rights in whose protection the writ of habeas corpus plays such a "vital role[.]" *Holland* at 2562. [3]

Petitioner is entirely mindful of the Court's Order Fixing Schedule For Filing of

---

[3] The Supreme Court has emphasized that the "writ of habeas corpus plays a vital role in protecting constitutional rights." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *see also Holland v. Florida*, 130 S.Ct. 2549 (2012), reaffirming "[t]he importance of the Great Writ, [as] the only writ explicitly protected by the Constitution, Art. I, §9, cl. 2 ...". *Id.* at 2562.

4

Habeas Papers (Docket No. 14, filed May 14, 2012) wherein the Court ordered that: "Petitioner [must] file, by June 22, 2012, his 28 U.S.C. § 2254 petition for writ of habeas corpus, presenting therein only grounds that have been exhausted in the state court[.]" Petitioner is well aware that the Court enters such orders in habeas corpus cases as a matter of long-standing policy.   However, because of the circumstances of Petitioner's representation during state habeas corpus proceedings, Petitioner was effectively deprived by his own attorney of the opportunity to investigate and raise claims concerning the conduct of this trial and direct appeal.  Now, with the advent of changes in the law brought about by the United States Supreme Court's decisions in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and *Maples v. Thomas*, 132 S.Ct. 912, (2012), it is feasible for Petitioner to ask the Court to entertain claims that are unexhausted due to the default of state habeas counsel, and such claims have therefore been pleaded herein.

Undersigned counsel believes that it is simply her ethical duty to bring these claims before the Court, since they would otherwise be time-barred due to the operation of the statute of limitations, and that they are "warranted by existing law" and the factual contentions are either warranted by the evidence or "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11 (b)(2) and (3).

Petitioner, through undersigned counsel, therefore has no other option than to most respectfully ask this Honorable Court to excuse his inclusion in this Petition of claims that

5

he has had no opportunity to exhaust, and to afford him time, in addition to the funding for which his Motion for Leave to File an *ex Parte* Sealed Request for Necessary Funds for Expert and Investigative Assistance is already pending, and to permit him thereafter to amend and supplement this Petition. Without adequate funding, even if a potentially meritorious claim can be identified, Petitioner would be unlikely to be able to prevail since he would be without the means to prove that he was prejudiced by the violation of his rights.[4] Petitioner will almost certainly also seek equitable tolling for supplemental claims at an appropriate time, but that request is currently premature, since Petitioner has not yet been able to identify or develop all his potential claims.

As argued in Petitioner's Motion for Scheduling Order, if those resources are not made available to Petitioner as requested, no court will ever be able to fully and fairly review Petitioner's claims. *Cf. Martinez*, 182 L.Ed 2d at 283: "And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, *no court will review the prisoner's claims.*" (emphasis added).

B.    Petitioner Has Been Improperly Deprived of His Own Legal Files In Preparing This Petition.

In addition to a dearth of investigation conducted during the preparation of Petitioner's state Application for Writ of Habeas Corpus, undersigned counsel's task in preparing this Petition has been hampered by the late and incomplete provision of former

---

[4]This is particularly true of claims concerning the ineffective assistance of counsel with regard to the preparation and investigation of the case.

counsel's files.

Undersigned counsel began requesting the release of Mr. Wilkins' files by his former counsel on March 13, 2012, having undertaken Petitioner's representation on March 9, 2012. As detailed in a Motion for Order to Preserve Evidence and Directing Release of Client's Legal Files, filed in this court on May 1, 2012, (Docket No. 5), former counsel as of that date had not provided their files and were proposing to withhold discovery materials that had been previously provided by the Tarrant County Criminal District Attorney's office. That same day, and with no notice to undersigned counsel, the Tarrant County Criminal District Attorney's Office moved for, and was granted, a Protective Order from the state court, preventing former counsel Mr. Ball, Mr. St. John and Mr. Strickland from releasing to Petitioner or to undersigned counsel discovery materials that had been previously provided by the District Attorney's office.[5]

The Tarrant County Criminal District Attorney's office has subsequently sought a similar Protective Order in this Court also, based on an "Open File Policy" that limits counsel's ability to make open records request to "any law enforcement agency" concerning the case, and requires the return of the discovery material to the Tarrant County Criminal District Attorney's office "at any time within its sole discretion." (Docket Nos. 18 and 19,

---

[5]Both Motion and Order were filestamped at the same time, 2:44, on May 1, 2012.

filed May 8, 2012).[6] Petitioner has responded, opposing that motion, and again requesting the release of Petitioner's entire files. *See* Petitioner's Motion in Opposition to the Tarrant County District Attorney's Motion for Protective Order for Attorneys' Records, and Motion for Order to Release Petitioner's Files to His Current Counsel (Docket No. 24, filed May 14, 2012).[7]

To date, undersigned counsel has received only part of Petitioner's files from former counsel. Ms. Harmony Schuerman, an associate of Mr. Strickland's, provided some materials to undersigned counsel on March 22, 2012. Parts of trial counsel Mr. Ball and Mr. St. John's files were received on May 5, 2012, and part of Mr. Strickland's files was received on May 8, 2012.[8] The file of Mr. Strickland's investigator, Mr. Pendergraf, was only received on May 17, 2012. The file of the trial investigator Clifford Ginn is still being withheld, Mr. Ginn stating "I was informed by both Wes Ball and Warren St. John I am under their privladge (sic) so I was out of order in talking to you." *Petition Exhibit 3 - E-*

---

[6]The Motion was styled: "The State of Texas' Motion for Protective Order for Attorney's Records." As Respondent had clarified, (Document # 26 at 2), the Tarrant County Criminal District Attorney's Office does not represent the State of Texas in these proceedings. *Saldano v. Roach,* 363 F.3d 545, 551 (5th Cir. 2004).

[7]While some discovery material was contained in a file obtained from a trial psychologist, undersigned counsel has no idea what proportion of the actual discovery material that represents. It does not include any photographs or audio or video recordings.

[8]The files provided do not seem to be complete, since they do not contain copies of electronic communications, or complete billing and timesheets, work product, correspondence to and from Petitioner, or complete correspondence or communications concerning Petitioner created after the time that representation terminated.

mail of Clifford Ginn at 7.

Mr. Ball, Mr. St. John and Mr. Strickland have withheld discovery materials provided by the prosecution, and have not provided even an inventory of the withheld items.[9] Because of the late provision of the files, undersigned counsel has had insufficient opportunity to sift through the material to identify potentially legitimate claims, let alone to develop and investigate them. Given the critical role that the files of former counsel play in habeas corpus proceedings as potential evidence concerning counsel's decision-making and actions, Petitioner's ability to develop this Petition for Writ of Habeas Corpus has been impeded both by his adversary and by his former counsel.

---

[9]This is inconsistent with counsel's duties under the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.13, The Duty to Facilitate the Work of Successor Counsel,:

In accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client and should cooperate fully with successor counsel. This duty includes, but is not limited to:

A.  Maintain the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation;

B.  Providing the client's files, as well as information regarding all aspects of the representation, to successor counsel;

C.  Sharing potential further areas of legal and factual research with successor counsel; and

D.  Cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

It is also inconsistent with the equivalent provision of the State Bar of Texas: Guidelines and Standards for Texas Capital Counsel, Guideline 11.8.

Petitioner was "impeded [and] obstructed" by his own appointed state habeas counsel in his attempts to raise potentially legitimate claims in the Texas courts, *cf. Strickler v. Greene*, 527 U.S. 263, 289 (1999)(interference by state officials may excuse the prisoner from an otherwise applicable procedural default). Petitioner's former counsel did not release his legal files when requested, and he has been further hindered by the agency that prosecuted him, the Tarrant County Criminal District Attorney's Office, from obtaining the entirety of those files. He is now compelled to file this Petition without access to significant information concerning the proceedings against him. In these circumstances it would be an appropriate exercise of the Court's equitable powers to permit Petitioner the time and resources necessary to develop and plead claims that may never otherwise have a forum in which to be heard. *See Martinez v. Ryan*, 132 S.Ct. 1309, 1318 (2012)(acknowledging "as an equitable matter ... the initial-review collateral proceeding, if conducted without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim.")

Petitioner will therefore request leave to amend this Petition six months after the provision of funding and the delivery to him of the entirety of the files of former counsel and the trial investigator, Mr. Ginn.

## IV.  THE STATE APPLICATION FOR WRIT OF HABEAS CORPUS.

As was explained in Petitioner's Motion for Scheduling Order, the State

Application for Writ of Habeas Corpus raised fourteen issues based on the trial record and

four issues related to lethal injection procedures. *See* Motion for Scheduling Order at 6.

The lethal injection issues were held not to be cognizable and not ripe for decision. *Id.*

All of the record-based issues were held to be barred, having already been raised on direct

appeal, or waived or not having been raised earlier, either at trial or on direct appeal.

Claims concerning the Texas Constitution were held to be both waived for failure to raise

them earlier, and were insufficiently argued. *See Motion Exhibit B:* State's Proposed

Findings of Fact and Conclusions of Law Adopted by the District Court.   The State

habeas application was, in effect, a nullity.

No claims were raised concerning factual issues outside the existing record. The

Application does not indicate the existence of any independent investigation into the case.

A.     State Habeas Counsel Labored Under Multiple Conflicts of Interest.

As explained in the Motion for Scheduling Order, the trial court appointed Jack V.

Strickland, Jr., as counsel for Petitioner's state habeas corpus application,

notwithstanding a history of failure to carry out his professional duties on behalf of his

clients. *Id.* at 9.   Having received his appointment to Petitioner's case on March 13,

2008, Mr. Strickland's statutory duty to "expeditiously" investigate the possible "factual

11

and legal grounds for relief" was clear. TEX. CODE CRIM. PROC. art. 11.071§ 3(a). *Id.* at

10. Mr. Strickland's investigator does not appear to have conducted any actual witness

interviews until May 29, 2010, ten days before the Application for Habeas Corpus was

filed. *Id.* Although the trial court granted funding for such services, no mitigation

specialist or psychologist was retained. *Id.* at 13.

Petitioner sought repeatedly to bring his concerns about Mr. Strickland before the

state courts. *Id.* at 23-33. He made particular reference to his fear that Mr. Strickland

would decline to raise claims concerning the ineffective assistance of his trial attorneys,

one of whom had had a potential conflict of interest, having previously represented the

victim of an extraneous offense introduced at Petitioner's sentencing. *Id.*

As Petitioner belatedly discovered, Mr. Strickland also had conflicts of interest:

even before filing Petitioner's Application for Writ of Habeas Corpus, Mr. Strickland had

committed to go to work at the Tarrant County Criminal District Attorney's office, to

which he had long-standing connections. *Id.* at 30. Mr. Strickland did not, however,

withdraw from Petitioner's case until February 16, 2011, after habeas relief had already

been denied. *Id.* at 33. As detailed in the Motion for Scheduling Order, Mr. Strickland

also had relationships with Petitioner's trial and appellate counsel and with the trial court

that prevented him from pursuing, and even caused him to hinder, the proper litigation of

Petitioner's claims. *Id.* at 18. Mr. Strickland even sought to block Petitioner's *pro se*

attempts to draw attention to his situation, arguing that he was not entitled to "hybrid"

representation. *Id.* at 26-28.

Mr. Strickland and appellate counsel David Richards had professional connections that should have been disclosed to Petitioner: both working as colleagues on one death penalty case, and also acting habeas counsel in successive cases, where their task was to scrutinize and potentially raise criticisms of each other's work, a situation creating the temptation for one attorney to pull his punches on the other in the hope of receiving the same treatment in return. *Id.* at 18-20. Mr. Strickland also demonstrated reluctance to criticize the trial lawyers' performance, defending their decision-making when he had not himself fully investigated the case.[10] *See Petition Exhibit 4* - Strickland letter to Wilkins, March/May 25, 2010 at 16-17[11] When Petitioner made allegations against the trial judge in the course of his *pro se* filing efforts, Mr. Strickland actually tried to have the filings sealed, rather than provide his client with zealous and competent representation. Motion for Scheduling Order at 18-20. Throughout, Mr. Strickland persisted in "representing" Petitioner in the face of repeated requests to withdraw and motions by Petitioner to fire him, without candidly disclosing his loyalties to the other attorneys, the prosecution and the trial court. *Id.* at 21-22. Not only did Mr. Strickland render ineffective assistance of

---

[10]Undersigned counsel has not had the opportunity to fully explore the extent of Mr. Strickland's relationships with trial and appellate counsel, or with the trial court, and the facts stated here may not represent a full picture.

[11]This letter bears two dates - March 15 and May 15, 2010 - on different pages.

counsel,[12] but he labored under significant, undisclosed conflicts of interest.[13]

B.  Petitioner Made Diligent Efforts to Raise and Preserve Potentially Legitimate
    Claims.

As Petitioner stated in one of his many *pro se* pleadings:

Appellate [sic] has tried and tried and tried and tried and tried to compell
(sic) appointed state habeas 11.071 counsel Jack V. Strickland to include all
his      meritorious claims in 11.071 writ of habeas corpus ...[14]

Petitioner consistently attempted to ensure that Mr. Strickland was representing

him vigorously, and to call the attention of the courts to his concerns when it became

apparent that Mr. Strickland was not doing so.  Those attempts are described in detail in

Petitioner's Motion for Scheduling Order, and included repeated filings in the trial court,

letters to and filings in the Court of Criminal Appeals, grievances filed with the State Bar

of Texas, attempts to bring his concerns to the notice of the presiding judge of the Eighth

Administrative Judicial Region, and a *pro se* Petition for Writ of Certiorari in the United

States Supreme Court.

Petitioner repeatedly urged Mr. Strickland to file all available claims in the state

---

[12]*See Strickland v. Washington*, 466 U.S. 668, 687 (1984)(ineffective assistance of
counsel is established when counsel's performance was deficient and that the deficient
performance prejudiced the defense.)

[13]*See Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980)(defense counsel has obligation to
avoid conflicting interests and to advise court promptly when a conflict of interest arises).

[14]*See Motion Exhibit V* - Motion for Rehearing 12.30.10 at 288, filed in the trial court.

habeas corpus litigation, soon began urging him to withdraw, and repeatedly tried to fire

him, to no avail.  Upon the denial of Petitioner's Application for Writ of Habeas Corpus

by the Texas Court of Criminal Appeals, attorney John W. Stickels was appointed by the

Texas Court of Criminal Appeals for the purpose of seeking appointment as counsel in

this Honorable Court.  Mr. Stickels duly moved for appointment, but upon receiving

confirmation that the Court's practice is to require that a petition for writ of habeas corpus

be filed within 45 days, Petitioner indicated that he would prefer to wait before

commencing the 45-day period.  The Court ruled that a motion to dismiss the Motion for

Appointment should be filed.[15]  Mr. Stickels moved for abatement, and the matter was

dismissed without prejudice the following day, March 8, 2011.  On March 9, 2012, the

undersigned undertook Petitioner's representation, and initial motions on Petitioner's

behalf were filed on May 1, 2012.

## V.   REQUIREMENTS FOR GRANTING HABEAS RELIEF

This Petition is filed after the effective date of the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA) amendments to 28 U.S.C. § 2254.  Under AEDPA,

a federal district court may grant habeas relief on a claim adjudicated in state court when

that adjudication "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

---

[15]*See Motion Exhibit MMM* - Christopher Chubasco Wilkins Telephonic Conference.

Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented during the state

court proceedings." *Id.* With regard to those claims not adjudicated on the merits in state

proceedings, a *de novo* standard of review would apply. *Miller v. Johnson,* 200 F.3d 274,

281 n.4 (5th Cir. 2000).

## VI.  PRELIMINARY STATEMENT OF FACTS

A.    Trial on the Merits

Petitioner was charged and convicted of the October 27, 2005, murders of Mike

Silva and Willie Freeman.[16]  Their bodies were found on the side of a road on the

morning of October 28, 2005.  Freeman died of a single gunshot to the head. 29 RR 31.

Silva received three gunshot wounds.  26 RR 74-76.  According to Silva's wife Rachel,

Silva was addicted to crack cocaine and Freeman would act as his intermediary with drug

dealers, in exchange for receiving some crack for his own use.  26 RR 101-102; 128.

When she arrived home on the evening of October 27, Silva was not there and nor was

their 1987 Chevrolet Blazer.  26 RR 105.  When she called Silva's cellphone a man she

did not know, calling himself James and who sounded black, answered. 26 RR 105-06.

Eventually her calls just went to voicemail. 26 RR 120.

On November 4, 2005, Patrol Officer Raymond Bush spotted a grey Blazer on

---

[16]Petitioner will also be referred to as "Chris" and "Mr. Wilkins," depending on context.

Eighth Avenue in Fort Worth.  He followed it to a Fiesta grocery store where a passenger

got out of the right front door, entering the store. 26 RR 135-8.  Having checked the

license plates and discovered they did not match the Blazer, Bush activated his lights and

the Blazer moved off.  26 RR 137.  A chase ensued.  Other than believing the driver was

a white male, Bush could not identify the driver. 26 RR 140.  The chase progressed until

the Blazer hit other vehicles and stopped. 26 RR 142-43.  When Bush approached, the

vehicle was empty. 26 RR 144.  The driver was not found at the time.  26 RR 144.

Petitioner later admitted to being the driver.  28 RR 176.

Latent prints were located on the vehicle, and a box of .38 caliber cartridges were

found in the glove box.  26 RR 199.  A pentagram and "666" were scratched on the hood.

26 RR 203.  Of fourteen fingerprints from the vehicle submitted for comparison, five

matched known prints of Petitioner.  27 RR 20-21.  The remaining prints have not been

identified 27 RR 31; 28 RR 60.  Physical items found in the same area as the bodies were

not analyzed by the Fort Worth Crime Lab.  27 RR 37.

A DNA analyst, Christina Capt, tested cigarette butts found in the area where the

bodies were found and in the Blazer, and also items found in the Blazer.  29 RR 72, 78.

Petitioner's DNA could not be excluded from some items, 29 RR 73, 78, but other DNA

profiles were found that did not match Petitioner, Freeman or Silva.  29 RR 89.

The following day, November 5, 2005, Officer Jay Parsons attempted a traffic stop

17

of a green Ford Explorer for which the police were looking. 27 RR 43. The driver did

not stop, and there was a pursuit. 27 RR 44-48, 56. The vehicle eventually came to a halt

and the driver fled on foot. When apprehended, the driver had to be tasered twice because

he resisted. 27 RR 51. No gun was found during the arrest. 27 RR 151; 28 RR 78. The

driver was identified as Petitioner who, according to Officer Deatric Sims, stated that he

was already in trouble and was facing a life sentence. 27 RR 95-96. That statement was

admitted over a defense objection that it was the product of custodial interrogation. 27

RR 93.

Petitioner was placed in a live line-up after his arrest, but Officer Bush, who had

chased the Blazer on November 4th failed to make an identification. 27 RR 166-8; 28 RR

53. Detective Cheryl Johnson spoke to Petitioner on many occasions. 27 RR 152, 166,

178. Petitioner initiated some conversations by sending the detective kites from the jail.

27 RR 173-75. According to Johnson, Petitioner initially denied being involved in the

chase on Eighth Avenue or being inside the Chevy Blazer. He later admitted both. 27 RR

156, 191-92. There were several recorded interrogations of Petitioner, but an interview

on November 30, 2005, and most of an interview on December 14 were not recorded,

supposedly because of human error. 27 RR 178, 181, 185. The State sought to preclude

the defense from going into statements Petitioner had made concerning other homicides

he claimed to have committed. 28 RR 102-03. The defense argued that these should be

admitted to demonstrate Petitioner's propensity to make false confessions. The State

18

eventually withdrew its objections and the statements were allowed into evidence. 28 RR 122.

Detective Johnson testified that Petitioner confessed to murders in many different states. 28 RR 136-49. Petitioner's trial attorneys were unaware that he was speaking to Detective Johnson and making confessions, until there was a leak to the media about a murder investigation in Albuquerque, New Mexico, which was covered on the television news. 28 RR 149. Johnson testified that she did not believe Petitioner had lied to her about all the homicides to which he confessed. 28 RR 170-71. Petitioner had sent her a letter offering information about homicides, a child porn ring, arson, drugs, and kidnaping in exchange for money being given to his children and the death penalty being taken off the table. He also proposed to plead guilty. 28 RR 181-82.

Defense counsel wanted to cross-examine Detective Johnson concerning another murder Petitioner was alleged to have committed, that of Gilbert Vallejo. 29 RR 7-10. Although there had been many witnesses who claimed to have seen Vallejo's assailant fleeing the scene, all but one of the attempted witness identifications was tentative or negative, including identifications of other individuals. 29 RR 9. That cross-examination was not allowed. 29 RR 10.

The defense rested without presenting any evidence or witnesses at the trial on the merits. 29 RR 102. During their deliberations on guilt, the jury sent out a note inquiring:

"Does the jury decision have to be unanimous or 10 out of 12?" They were told the

verdict had to be unanimous. 1 CR 268-69.[17]

B.      Sentencing Phase

The State called twenty-four witnesses during the punishment phase. 30 RR 10 -

33 RR 96. The first two witnesses discussed an incident in which they, and several other

people, were held at gunpoint at a known drug house while Petitioner took items out of

the house. 30 RR 10-68. The incident arose because the boyfriend of one of the

witnesses had allegedly stolen a radio belonging to Petitioner. 30 RR 39, 62. Next, two

Albuquerque, New Mexico police officers testified about an altercation which ensued

when Petitioner tried to pass a forged check at an Albuquerque bank. 30 RR 78-102.

When Petitioner was taken to a police substation, he ran from the room and escaped, only

to be stopped again a few blocks away. 30 RR 103-16.

Matthew Holm, who had worked at a Federal Bureau of Prisons correctional

institution in California, testified that he witnessed Petitioner kicking an Hispanic inmate

as he lay on the ground. 30 RR 121. Holm understood the attack occurred because the

inmate in question had brought contaminated methamphetamine into the prison, causing

an E-coli outbreak. 30 RR 137.

---

[17]The record does not reflect any discussion among counsel and the court about this
request, in spite of TEX. CODE CRIM. PROC. Art. 36.27's command that "All such proceedings in
felony cases shall be a part of the record and recorded by the court reporter."

Three Houston Police Department officers testified about a car chase through the streets of Houston. 31 RR 7-53. After throwing a loaded gun out of the vehicle, Petitioner fled on foot to a wooded area where he was eventually caught by a K-9 unit. 31 RR 17-20. Wesley Zurovec testified that Petitioner had left a half-way house in Houston on a pass, but never returned. 31 RR 54-69. Preston Byerly testified that on November 5, 2005, he was struck by a green Ford Explorer while walking down a sidewalk in Fort Worth, suffering a broken pelvis and internal bleeding as a result. 31 RR 78-81. He and his cousin had solicited cigarettes from Petitioner. 31 RR 73. Darcel Kauers identified Petitioner as the driver of the Ford Explorer, stating that he had picked her up as she walked down the street, and that he had later run down Preston Byerly while she was in the car. 31 RR 94-127.

The prosecution introduced evidence of two burglaries and an attempted robbery around the time of the Silva-Freeman homicides. 31 RR 151-302. Evidence from the burglaries was later found in the Chevy Blazer and the Ford Explorer. Mariann Brock testified that a man had approached her as she washed her car in her driveway in Fort Worth. 31 RR 197. The man pointed a gun at her and she sprayed him with the hose. 31 RR 198. She than ran into her house and called 911. 31 RR 199.

Seven witnesses testified about an extraneous homicide in which a man called Gilbert Vallejo was shot outside the Lady Luck Lounge in Fort Worth on the morning of October 26, 2005. 32 RR 7-96. Vallejo was shot while walking to his truck after leaving

21

the lounge. 32 RR 14-15. He stumbled back into the bar and fell to the ground. 32 RR 17. Mary Eubank worked at an office across the street . She heard gunshots and saw a white male with a gun shoot an hispanic male. 32 RR 42-46. She turned away to get some paper on which to write a license plate number, but when she returned the white male was gone. 32 RR 46. Eubanks was later unable to identify Petitioner in a line-up. 32 RR 58. Fingerprints taken from the scene of the Vallejo murder could not be linked to Petitioner. 33 RR 20-22. Terri Gleason, a former Fort Worth Police Department firearm and toolmark examiner testified that she had compared projectiles from the Silva-Freeman homicides and from the Vallejo murder, and had concluded that they were fired from the same firearm. 32 RR 87.

The State next introduced the testimony of Deputy Richard Almendariz of the Tarrant County Sheriff's Office, who was permitted to testify as an expert, over defense objections about a lack of notice concerning his testimony. 34 RR 7-49. Almendariz testified about the meaning and significance of Petitioner's tattoos, some of which he claimed were the insignia of the "Confederate Hammerskin" gang, and about the problem that gangs present in correctional institutions. 34 RR 50-81.

John Parker, a correctional officer from the Tarrant County Sheriff's Department testified that Petitioner had been found in possession of a handcuff key, which he had then swallowed. 34 RR 85-89. Petitioner had been transported to the infirmary where he was given laxatives until the key passed. 34 RR 121-22. Detention officer Rhonda

Samson from the Tarrant County jail testified that shakedowns of Petitioner's cell had revealed a shank, homemade alcohol and a letter addressed to Detective Johnson.  34 RR 143, 152.

Having presented no evidence at the trial on the merits, defense counsel then presented mitigation evidence at sentencing consisting largely of the testimony of five immediate family members and Petitioner himself, and brief testimony from five correctional officers.  The only expert testimony offered by the defense was that of a former prison warden, Susan Perryman-Evans.  The mitigation case will be discussed in greater detail below, within the Petition itself.

## CLAIMS FOR RELIEF

### Claim for Relief Number 1

**Petitioner's counsel failed to conform to prevailing professional norms with regard to the sentencing phase of trial because they failed to conduct a reasonable pretrial mitigation investigation, thereby violating Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.**

A.  Trial Counsel conducted a belated inadequate and cursory investigation into Petitioner's mental health, background and life history, failing to ensure that the jury had a full and true picture of Petitioner's mental status, and of those factors in his background that would have inclined the jury to sentence Petitioner to life not death.

That trial counsel has a duty to make reasonable decisions regarding investigation is well-established: "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 690-91 (1986); *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). Preparation for Mr. Wilkins' trial, however, was not conducted reasonably. It was tardy, disjointed, failed to address important questions presented by the facts of the case, and failed to comport with reasonable professional norms.

The State presented twelve witnesses at the trial on the merits, including both lay and law enforcement witnesses, a pathologist, and experts on toolmarks, fingerprints and DNA. The State's sentencing case consisted of twenty-eight witnesses: complainants from extraneous offenses and incidents, law enforcement witnesses and correctional officers who testified about escape attempts and about contraband found in Mr. Wilkins'

24

cell and on his person, an "expert" on gangs and tattoos who purported to identify and

interpret the numerous tattoos on Mr. Wilkins's head and body, and a firearm/toolmark

expert whose testimony served to connect Mr. Wilkins to an extraneous homicide.

In contrast, trial counsel for the defense presented no evidence at the guilt phase,

and their mitigation evidence at sentencing consisted largely of the testimony of five

immediate family members and of Mr. Wilkins himself, and brief testimony from five

correctional officers.  The thrust of the family members' testimony was that Mr. Wilkins

had had a fairly stable early life, apart from disruptions caused by his mostly absentee

father, but had become involved with drugs and the wrong people.  No expert testimony

was offered by the defense, other than from one former prison warden, who testified

concerning the functioning of the Texas prison system.

Lynda Koepnick, Chris' mother, told the jury that Chris' father was Reginald

Wilkins, who she met when she was 16, and he was 25.  Chris was born five days before

her eighteenth birthday, and the marriage only lasted two years.  Reginald could not take

responsibility for the baby, and did not pay child support.  Lynda's parents took her and

the baby in, and helped her out.  Reginald's contact with Chris was sporadic, he had been

"in trouble with the law," and he created a scene at Chris' seventh birthday party, turning

up when he was high on drugs.  He did not have any further contact with his son until

Chris tried to find him when he was 14 or 15.  33 RR 109.  Lynda admitted that Reginald

had been in the penitentiary, but said she did not know if that was on more than one

occasion. She said "a couple of people came into my life after that", with two subsequent marriages, to Lloyd Ashton, lasting a year and a half, and a two-month marriage to Sonny Devillier, before marrying Bill Koepnick, which marriage only lasted two years. She subsequently married Michael Jones, father of Chris' half-sister Jacqueline, with that marriage taking place when Chris was nine and lasting seventeen years. She then remarried Bill Koepnick. 33 RR 112.

During her marriage to Michael Jones they had moved from south Houston to the Cy-Fair (Cypress-Fairbanks) area of northeast Houston, which involved a change to a larger school for Chris. The move was difficult for Chris because he was laughed at by more affluent children for riding the bus to school. Nonetheless, Lynda claimed that Chris "did good" in school. 33 RR 116. However, Chris began to run away from home, and on one of those occasions made contact with Reginald, who was arrested in a stolen car that night. 33 RR 118. Reginald called from the jail, wanting Chris to take responsibility for the car theft since he would receive a lesser sentence than an adult. 33 RR 119.

Lynda claimed she had tried disciplining Chris by spanking him and grounding him, but he ended up in the Texas Youth Commission facility at Gainesville, on the Texas-Oklahoma border. She could not visit much because Jacqueline was born around that time. On one occasion when Chris did come home, he and a friend went off on a motorcycle to look for a girl they were interested in, but there was a wreck, the friend was

26

killed, and Chris was in the hospital for six days.  Lynda could not recall whether Chris

then went back to TYC.  Eventually Chris met his partner Kelly Vaughn and lived with

her. 33 RR 124.  They had three children, twins Cash and Clay, and Russell, who were 18

and 14 respectively at the time of trial.   Kelly had a daughter, Austin, from a previous

relationship.  33 RR 138.  Chris lived with Kelly and her family at their farm outside

southwest Houston, and they then went to New Mexico.  He was convicted on criminal

charges there, but was allowed to re-establish his family in Houston before sentencing.

He later acquired further criminal charges in Houston and served time in different federal

prisons in California.  Lynda said that Chris had tried to behave well while waiting for the

New Mexico sentencing.  She showed the jury some family photos and went through

some school records.  (Defendant's Trial Exhibits 6-18).

Kelly Vaughn, the mother of Chris' children, testified that she and Chris had had

an immediate attraction when they met, which was through her cousin Darrell.  Her

decision to make a family with Chris, rather than pursue a career in her family's horse

business, had caused a "falling out," and she and Chris moved to New Mexico.  Chris had

done well, working as a house framer, but had become involved in drugs again, having

previously worked as a truck driver, a job where methamphetamine was readily available.

33 RR 149.  During his New Mexico criminal proceedings, Chris had gone through

counseling and resettled his family in Houston. When he was not on drugs he had always

"done right" by his children, and worked "harder than anybody I have ever seen in my

life." 33 RR 152. However, after his New Mexico sentence he acquired new criminal

charges in Houston. 33 RR 153. Kelly knew that Chris had been in prison before they

met, but did not know that he had received probation in Dallas and in Cedar Hill. 33 RR

161. At the time he was rearrested in Houston, they were no longer together:

> He was acting crazy ... He was totally scared of me, he was so strung out ...
> I was trying to tell him, I just needed him, to know he was okay, and it
> wasn't him anymore.

33 RR 163.

Chris's seventeen year old son, Clay, testified, 33 RR 165-171, and defense

counsel had him try to explain where he lived in relation to downtown Houston as well as

going into the fact that he was two years behind in school. He explained that he "liked"

his father "a lot," but that his father had had periods when he was absent because of

incarceration. Defense counsel elicited little more than that Clay and his father had

played ball games, but his father did not help him with his homework, and had had drug

problems, which he tried to keep from his children. Clay was apparently unprepared for a

question about what influence or guidance his father had provided: "I can't say, I'm not

sure. He could have, but he just – I don't know." 33 RR 168.[18]

Emma Lee Harris, Chris's 85 year old maternal grandmother, explained that she

_____

[18]It appears very possible that Clay had not been properly prepared by counsel to testify.
Defense counsel began one question with: "I've talked to you today in the hallway and our
investigators have talked to you in Houston ... Do you think your father is worthy of saving?" 33
RR 170.

used to pick him up from school and look after him at weekends if Lynda "had something

else to do." 33 RR 172-177.   She acknowledged that Chris had started getting into trouble

with the law, but only after Lynda had moved out to Cy-Fair and "not while I was being

close to him." 33 RR 175.   She attributed his behavior to getting involved in "drugs and

the wrong people." 33 RR 175-76.   Crying, she begged for his life: "Please don't, please

don't let him die.   Please let him live." 33 RR 177.

Chris's stepfather, Bill Koepnick, described himself as having the ability to

"interface" with Chris: " I'm the man that taught him to catch a ball.   I'm the man that

taught him to overcome his fear and learn to swim." 33 RR 180.   He spoke of having

visited Chris in prison in Lompoc, California, and in Beaumont, Texas, but mostly

described the impressions the prisons in question had made on him personally rather than

of the visits themselves or about Chris.   Likewise, he spoke of the impact of drugs on

Chris's life and his family, concluding: " My wife is an only child.   I'm concerned about

her.   But the children and their legacy is what I must also think about.   All of this impacts

me.   All of this impacts me." 33 RR 186.

Defense counsel also called five officers from the Tarrant County Sheriff's

Department, who testified briefly and indicated generally that Chris was courteous,

compliant and respectful.   *See* Testimony of Mary McGehee, 34 RR 167; Leonard

Chapman, 34 RR 171; Roger Russell, 34 RR 178; Kimberly Adams, 34 RR 184; and Jose

Ybarra, Jr., 34 RR 192.

In Chris' own testimony he insisted that his past actions were simply a product of

his own decision-making:

> It doesn't have anything to do with [my family.] It's just, you know, I think
> we have – all of us have – excuse me, we have choices that we make in our
> lives and they come from four categories, right?  In my opinion, it's good,
> bad, hard, and easy.  And the good ones are usually the hardest ones to
> make.  But I tend to – I tend to want to take the easy way out.  I make bad
> decisions, I know they're bad decisions when I'm making them, I make
> them anyway.

35 RR 13.

Chris frankly admitted extensive drug use, but in response to a question from trial

counsel, refused to blame his actions on substance abuse:

> [Mr. Ball]:   Do you claim [drugs] to be an excuse for bad conduct?
>
> [Petitioner]:   Oh, absolutely not.  Look, look we can blame drugs if you want to do
>                 that.  I'm not going to do it.  I use drugs, a lot of them all the time.
>                 But the things about drugs is they're just like – isn't that what
>                 everybody does?  They come in here all day long and they claim
>                 drugs, waa, boo-hoo, the drugs got me messed up.  So let's blame
>                 that, right?  ¶ [Y]ou can consider drugs if you want to.  But I
>                 wouldn't put too much weight on it.  I personally wouldn't.

35 RR 17-18.

Chris refused to criticize his family, 35 RR 64-66, and testified that he had not

wanted them called as witnesses. 35 RR 13-14.  He also said that he wanted to apologize

to Mariann Brock, who he had tried to rob but who had responded by turning her hose on

him.  35 RR 47-48.  He also candidly admitted to the offenses of which he was convicted,

30

as well as the murder of Gilbert Vallejo, 35 RR 26-28.   He also admitted confessing to

other crimes that he had not committed, and to having planned to escape. 35 RR 31-36.[19]

He further admitted that he would continue to try to escape. 35 RR 89-90.

While Chris stated that he had not wanted to be portrayed by mental health

professionals as "crazy," 35 RR 45-46, he admitted that a prosecution witness, Darcel

Kauers, who had testified that he had attempted to run someone down while driving a

stolen vehicle, had been right in one respect:[20]

> That was the only problem, the only thing that she said was true.  She made
> a fairly astute observation.  She said, if I recall correctly, she said that I
> didn't care whether I live or die.  And that's a fair statement. ¶ I've been,
> you know, I think subconsciously I've been trying to kill myself or get
> myself killed.  Hang on, you can't say kill yourself, they take all your
> sheets. ¶ I think I've been trying to subconsciously get myself killed since I
> was probably 12 or 13 years old.  But I know, I know consciously I've been
> after it since I lost – lost the love of my life.

35 RR 59.

Chris stated that it was own fault that he had lost Kelly, the love of his life and

mother of his three children. 35 RR 59.   He added that, when it came to which way the

jury should vote:

> [A]t this point, really, it doesn't matter what I want.  And, frankly, I'm as
> undecided as you are.  Don't ask me. ¶  I'm undecided, really.  I would like
> for you to win because I can tell – you said you was going to – you had

---

[19]He did contest some minor details stating, *e.g.*,  that Preston Byerly, the young man he
had run over, had stolen his sunglasses. 35 RR 76-77.

[20]*See* 31 RR 94-129.

some plans. But it's no big deal, no big deal. Just do whatever you do.

35 RR 61.

The final witness for the defense was Susan Perryman-Evans, the former warden

of a womens' prison who discussed the prison classification system and security

measures. She testified that if sentenced to life, after ten years incarceration Mr. Wilkins

could achieve a less restrictive "G-2" security status, whereby he could not only be

assigned to work placements outside the prison fence, but could live in a dormitory

outside the main prison buildings and take a wider variety of jobs than on first arrival. 35

RR 104-08.

With his own family attributing his behavior to: "drugs and the wrong people," and

Mr. Wilkins himself intent on taking complete responsibility for his decisions, the jury

was left with the impression that, as defense counsel put it in closing argument, Mr.

Wilkins had simply chosen "to do bad things. He chose to consume alcohol. He chose to

use drugs." 35 RR 180. Defense counsel more than once posed the rhetorical question,

"What happened to Chris along the way?" (35 RR 180-81). They failed, however, to

provide the jury with any real answer to that question because they themselves had barely

looked for it.

i.      Prevailing Legal Standards at the Time of Petitioner's Trial.

To establish a claim that a petitioner was deprived of effective assistance of counsel

in violation of the Sixth Amendment, he must show that counsel's performance was deficient

and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466

U.S. 668, 687 (1984).  The standards set forth in *Strickland* control the question of whether

trial counsel conducted a constitutionally sufficient mitigation investigation. *See Wiggins v.*

*Smith*, 539 U.S. 510, 537 (stating that *Strickland* applies to mitigation investigations).

*Strickland* states that "counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary." *Id*. at 691.

In cases where a petitioner alleges that trial counsel failed to discover mitigating

evidence, the inquiry therefore turns not on the single issue of whether counsel should have

presented a mitigation case, but whether the investigation supporting counsel's decision not

to introduce mitigating evidence is itself reasonable.  *Wiggins*, 539 U.S. at 523 (2003);

*Strickland*, 466 U.S. at 690-691 (strategic choices made after less than complete investigation

are reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation).

Prevailing norms of practice are guides to determining the reasonableness of counsel's

conduct. *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 395 (2000).  Under

these prevailing professional norms, it is "unquestioned" that trial counsel in a capital case

has a duty to conduct a "thorough investigation of the defendant's background." *Porter v.*

*McCollum*, 130 S. Ct. 447, 452 (2009).  Specifically, counsel must investigate such that they

may present "medical history, educational history, employment and training history, family

33

and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (citations omitted).

The Supreme Court recently issued two *per curiam* decisions reiterating the duty of trial counsel to conduct a diligent inquiry into a capital defendant's social background. *Sears v. Upton*, 130 S. Ct. 3259 (2010) and *Porter v. McCollum*, 130 S. Ct. 447 (2009). In *Porter*,

> [t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability. They learned about Porter's turbulent relationship with [the victim], his crimes, and almost nothing else. Had Porter's counsel been effective, the judge and jury would have learned of the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

130 S. Ct. at 454 (internal citation omitted). In finding that Porter's trial counsel were ineffective for failure to investigate and present mitigating evidence, the Supreme Court discussed at length the post-conviction testimony of life history witnesses, i.e., two siblings and Porter's company commander during the Korean War. *Id.* at 449, 450.

Likewise, the Court in *Sears* found that trial counsel were ineffective for conducting only a cursory investigation into petitioner's background. 130 S. Ct. at 3264, 3267. The Court concluded that there was a reasonable probability that Sears would have received a different sentence had the jury heard evidence that emerged during post-conviction proceedings. *Id.* at 3267. That evidence included information provided by life-history

witnesses, as well as information contained in documents about Sears' troubled childhood. *Id.* at 3263.

Previous caselaw from the United States Supreme Court teaches that even where the prosecution's case is strong: "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams v. Taylor*, 529 U.S. 362, 369 (2000). In *Williams*, the Court held that notwithstanding Williams' crimes, which included beating an unconscious man to death for $3, other violent assaults on elderly victims and an arson offense committed at the county jail, counsel's failure to introduce evidence of Williams' family background, borderline mental retardation and evidence of good deeds caused prejudice because the totality of the mitigating evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams*, 529 U.S. at 398. Williams also explains that it is not dispositive of the issue of ineffective assistance if "not all of the additional evidence [that counsel failed to discover] was favorable to" the defendant, where there was no tactical justification for failing to introduce that which did speak in the defendant's favor. *Id.* at 396.

Similarly, in *Wiggins v. Smith*, the Court explained that the question is not simply whether counsel should have presented a mitigation case but "on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable." *Id.* at 522-23. Wiggins' counsel had "abandoned their investigation of [his] background after having acqu33333ired only rudimentary knowledge of his history

35

from a narrow set of sources" and that decision was "unreasonable in light of what counsel actually discovered in the ... records." *Id.* at 524-25.  The Court concluded that counsel's conduct was unreasonable because it seemed to have resulted from "inattention, not reasoned strategic judgment," adding that "[i]n assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 526-27.

*Rompilla v. Beard*, 545 U.S. 374 (2005) stands for the proposition that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  545 U.S. at 377.  Similarly, even if  the defendant is uninterested in helping his own defense, even if the defendant is "actively obstructive by sending counsel off on false leads," *Id.* at 381, counsel has a duty to examine sources such as public records pertaining to the client.  In Rompilla's case, failure to examine a court file concerning a previous conviction  prevented counsel discovering "a range of leads that no other source had opened up," and:

> The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.  With this information, counsel would have become skeptical of the impression given by the five family members and

would unquestionable have gone further to build a mitigation case.  Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview.

*Id.* at 391.

Not only were Rompilla's trial-level experts deprived of useful information that derailed their effectiveness on his behalf, but the overlooked evidence "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test ... The undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Rompilla's] culpability ... and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing. " *Id.* at 393 (citations omitted).

In both *Wiggin* and *Rompilla* the Supreme Court recognized Guidelines promulgated by the American Bar Association as creating well-defined norms for the conduct of capital defense representation.  *Wiggins*, 539 U.S. at 524 (discussing 1989 guidelines); *Rompilla*, 545 U.S. at 387.  The ABA Guidelines state unequivocally that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."  American Bar Association Guidelines for the Appointment and

37

Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7 (rev. ed. 2003),

reprinted in 31 HOFSTRA L. REV. 913, 1015 (2003) ("ABA Guidelines"). The Commentary

to Guideline 10.7 emphasizes the importance of witness interviews and record collection.

It states in relevant part:

> It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and *virtually everyone else who knew the client and his family*, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. *Records – from courts, government agencies, the military, employers, etc. – can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections.* Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

*Id.* at 1024-25 (emphasis added).

The previous ABA Guidelines, adopted in 1989, similarly required counsel to begin

investigation immediately upon counsel's entry into the case and to "discover all reasonably

available mitigating evidence." 1989 ABA Guideline 11.4.1. The 1989 ABA Guidelines

were already recognized by the U.S. Supreme Court in *Wiggins* as "well-defined norms."

*Wiggins*, 539 U.S. at 524. The new ABA Guidelines adopted in 2003 simply explain in

greater detail than the 1989 Guidelines, the obligations of counsel to investigate mitigating evidence. *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).

The State Bar of Texas Guidelines and Standards for Texas Capital Counsel, which closely mirror the ABA Guidelines and were in effect at the time of Chris' sentencing, provide that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *State Bar of Texas: Guidelines and Standards for Texas Capital Counsel: Standing Committee on Legal Services to the Poor in Criminal Matters Adopted by the State Bar Board of Directors*, Guideline 11.1(B) (April 21, 2006), reprinted in 69 TEX. B. J. 966, 971 (2006) ("State Bar of Texas Guidelines"). Specifically, investigation at the penalty phase presents specific requirements:

> 3.  The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.
>
>    a.  Discovery - all efforts should be made to determine, well in advance of trial, the evidence the State intends to use during the punishment phase of the trial, extraneous offenses, prior criminal convictions, and expert witnesses.
>
>    b.  The investigation for the punishment phase of the trial should generally encompass the following aspects:
>
>        i.  Development of character witnesses and family background evidence, and where applicable, relevant records and witnesses from additional sources, including military, school, hospital, past employment, etc., to corroborate the mitigating theory;
>
>        ii.  Development of expert witnesses on mental health issues, if any;

    iii.    Development of rebuttal witnesses for State's extraneous evidence, if any;

    iv.    Development of the defendant's testimony, if necessary;

    v.    Planning of cross-examination of State witnesses;

    vi.    Preparation for jury charge issues; or

    vii.    Preparation for final argument.

State Bar of Texas Guideline 11.1(A)(3).

Finally, counsel could have found guidance in a relevant Texas precedent decided in 2006, from which prevailing professional standards can be discerned. In *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), post-conviction counsel discovered through interviews of Gonzales' family that their client had been physically and sexually abused as a child. *Id.* at 394. Although trial counsel had interviewed both Gonzales' mother and sister, with the latter testifying at his 1997 sentencing trial about Gonzales' difficult childhood and borderline mental retardation, counsel never specifically inquired into whether Gonzales had been abused, and thus did not present evidence of abuse at sentencing. *Id.* at 394-95. The Court of Criminal Appeals held that this failure to investigate and inquire into the subject of abuse fell below an objective standard of reasonableness for Texas capital trial counsel in 1997, and rendered trial counsel's mitigation investigation unreasonable.[21] *Id.* at 397.

---

[21]Judge Cochran wrote a concurring opinion, in she expanded upon the professional norms in place in Texas capital sentencing proceedings in 1997, and spoke approvingly of:

---

The underlying message of *Summerlin* [*v.Schriro*, 427 F.3d 623 (9th Cir. 2005) which] is that defense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself. Indeed, under *Rompilla v. Beard*, defense counsel may be required to investigate potential mitigating facts even when the defendant is "uninterested in helping" or is "even actively obstructive" in developing a mitigation defense.

Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]" ... like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic. Such topics might include:

- Trips to the emergency room;
- Serious illnesses at any time;
- Physical abuse to the defendant or any other member of the family;
- Any sexual abuse to the defendant or any other member of the family;
- Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
- The defendant's relationship with and attitudes toward every member of the family;
- Any mental health treatment of any member of the family, including the defendant;
- The cohesiveness of the family;
- The family's standard of living and living conditions;
- Any and all available school records;
- Any record of learning disabilities;
- Childhood and adult social relationships with members of the same and opposite sex;
- Any marriage, divorce, children, step-children; or surrogate family relationships, and their positive or negative influence upon the defendant;
- Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;
- Any and all traumatic experiences;
- Any and all especially proud moments;
- Membership in religious, social, educational, charitable organizations;
- The client's five best and worst memories;
- Childhood accidents and injuries.

*Gonzales*, 204 S.W.3d at 400-01 (Cochran, J., concurring).

41

As described below, trial counsel failed to attempt more than a small fraction of the work mandated by prevailing professional norms reflected in the decisions of the Supreme Court, Fifth Circuit and Texas Court of Criminal Appeals, and in relevant professional guidelines.   Even when confronted with many possible avenues to explore, were seriously pursued.   Thus, counsels' performance was unquestionably deficient.   *See Strickland,* 466 U.S. at 687.

The prejudice inquiry for an ineffective assistance of counsel claim is not outcome determinative.   The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case.   *Strickland,* 466 U.S. at 693-94.   Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.*"   *Id.* (emphasis supplied).   Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a still less onerous burden than the preponderance of the evidence standard.[22]   The Supreme Court reiterated this point

---

[22] In *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit observed that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Id.* at 595. Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id. See also Buckner v. Polk,* 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley,* 426 F.3d 368, 376 n. 18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court. *Id.* at 405-06 ("a state court's rejection of a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that … the result of the proceeding would have been different.")

ii.     Early attempts at investigation were abandoned, and then resumed too late.

What the jury heard did not give a true picture of Chris's early life and the influences on him. That is directly attributable to counsel's failure to ensure that an appropriate and timely investigation occurred. *See Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006)(counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations *well in advance* of trial.")(emphasis added). Chris was arrested on November 5, 2005 and Wessley T. Ball was appointed as counsel. 1 CR 12. On February 16, 2006, Warren St. John was appointed as second chair. 1 CR 19. Mr. Ball did not retain a mitigation specialist and an investigator until February 2006, and those individuals seem to have ceased to work on the case soon

after they were hired.[23]  The original investigator, Bruce Cummings, does not seem to have

submitted any billing and undersigned counsel has been unable to ascertain what work he

did, if any.[24]  Trial counsel hired another investigator, Clifford Ginn, for whom an order of

appointment was signed on January 8, 2008, but that was two days before jury selection

began in this case.  1 CR 212-14.  The initial jury call took place on January 10, 2008, and

individual jury selection began on January 25, 2008.[25]

A mitigation specialist, Melissa Robinson, was hired in the early part of 2006.  She

billed for work in March and April 2006 but then ceased to communicate with counsel and

stopped work on the case.[26]  Counsel did not reestablish contact until January 2008, at which

time Ms. Robinson stated that she had been "very ill and unable to work going on almost a

year now."  *See Petition Exhibit* 6 - Melissa Robinson - Wes Ball e-mails at 21.  Mr. Ball was

---

[23]Undersigned counsel has been considerably hampered in the preparation of this case by problems with access to the files of trial and habeas counsel.  As discussed above, the files of trial counsel were only obtained on May 5, 2012, and both trial counsel had removed virtually all discovery material in accordance with an "open file policy" agreement made between them and the Tarrant County District Attorney's Office, see above.  Habeas counsel's file was received on May 8, 2012, and had been similarly culled to remove discovery material.  These facts have therefore also been reconstructed from the trial record, billing records obtained through a Texas Public Information Act request, and such limited other records as counsel has been able to obtain.

[24]The initial order granting Cummings' appointment was signed on February 10, 2006, two months after the formal appointment of counsel and only in the amount of $1,000.  1 CR 14-16.  A sealed defense motion of March 28, 2006, is present in the record, but undersigned counsel has not yet been able to access it to see what it contains.

[25]There is no activity by defense counsel ascertainable from court records after February 2006 until a series of motions were filed on December 28, 2007.  See 1 CR 37-196.  Most of these, however, were "boilerplate" motions concerning the unconstitutionality of the Texas death penalty scheme.

[26]*See Petition Exhibit 5*- Melissa Robinson billing.

44

threatening to subpoena Ms. Robinson to court unless she would voluntarily hand over any records or files she had created. According to her e-mails, Ms. Robinson provided some records around January 8, 2008, but counsel also served her with a subpoena duces tecum on February 11, 2008, suggesting that not all her records had been turned over by then. *See Petition Exhibit 7* - Melissa Robinson subpoena.

Around January 8, 2008, trial counsel contacted and retained psychologist Kelly Goodness, apparently in a dual role. Dr. Goodness was to test and evaluate Mr. Wilkins' mental functioning and was also involved in gathering evidence and conducting interviews, as might be expected of a mitigation specialist. Dr. Goodness did not testify.

Trial counsel's billing reflects that counsel "conferred with experts" in 2006-2007, but no detail concerning names, subject matter or the nature of the interaction is available. *See Petition Exhibit* 8 - Warren St. John Billing at 28. The only defense expert to testify at either phase of trial, prison warden Susan Perryman-Evans, was not retained until late February 2008. Thus, counsel, having apparently lost interest in the case for eighteen months after some activity in the spring of 2006, only resumed preparation for Mr. Wilkins' sentencing on the eve of jury selection in January 2008.

iii.    Counsel failed to prepare for or to investigate the mitigation case that was available.

Mr. Wilkins' provided the trial team with the names of many family members, teachers, friends and employers, but only eight witnesses were interviewed concerning his

childhood and family life. Three of those witnesses were Chris's minor children. *See Petition Exhibit 9 - Self Report Survey* at 41 ; *Petition Exhibit 10 - List of contact names; Petition Exhibit 11 - Clifford Ginn billing* at 83-85. [27]  None of these witnesses were from the paternal side of Mr. Wilkins' family,[28] and virtually no information was obtained about that side of the family.

The defense failed to obtain basic records, such as school records that indicate that a child abuse referral had been made to Harris County Child Welfare. *See Petition Exhibit 12 - Broadway School records* at 98. While the initial defense investigator had obtained a Child Protective Services file running to 101 pages, it had apparently been mislaid, and a subsequent attempt to obtain it by subpoena did not succeed. *See Petition Exhibit 13 - List of documents obtained by Melissa Robinson* at 116; *Petition Exhibit 14  - CPS no records affidavit 02.28.2008.*[29]  Dr. Goodness supplied counsel with requests, both general and specific, for records and other information that she felt was necessary to the work she was doing. *See Petition Exhibit 15 Dr. Goodness - Records Needed List # 1; Petition Exhibit*

---

[27]Mr. Ginn interviewed Lynda and William Koepnick, Jacqueline Jones, Kelly Vaughn, Mr. Wilkins' three children Cash, Clay and Russell, and his grandmother, Emma Lee Harris.

[28]One friend of Mr. Wilkins' father was contacted, *see Petition Exhibit 11 -  Clifford Ginn billing for February 5, 2008,* at p. 83, but no report of that encounter is contained in the files that have thus far been disclosed to undersigned counsel. Dr. Goodness' materials indicate that Mr. Wilkins has at least two half-siblings on his father's side: *Petition Exhibit 19 - Collateral Interview, Lynda Koepnick* at 135.

[29]At present, the Record Management Office of the Texas Department of Family and Protective Services take 6-12 months to process a request for records, unless a subpoena or court order is used. Undersigned counsel has filed a renewed request for any records that still exist but it is still pending.

*16* - Records Needed List # 2.  Other than records of previous incarcerations and some school

records contained in a Texas Youth Commission file, it seems that none of the requested

materials were obtained.

The defense also failed to prepare to address the issue of the many tattoos on Chris's

head and body, on which topic the prosecution called a Tarrant County deputy sheriff as an

"expert."  The expert in question identified Chris's tattoos as indicating membership of a

specific neo-Nazi organization, the Confederate Hammerskin, as well as being a Satanist.

34 RR 7-81.  That the tattoos would be an issue counsel would have to confront was obvious

from early in the case.  They excited media attention:  *See Petition Exhibit 17* - News Article:

Fort Worth Star-Telegram, *White separatist is charged in three slayings*, February 10, 2006.

They even sufficiently aroused the interest of a venire person that, contrary to the court's

instructions, he conducted internet research about the tattoos' significance, ultimately being

held in contempt for doing so. *See* 8 RR 5-13, 159-163.  Photographs of the tattoos were also

requested by the jury during the sentencing deliberations.  1 CR 279.

The defense later unsuccessfully sought a mid-trial continuance in order to obtain their

own expert concerning tattoos, but when they did so they wanted the services of a

"symbologist," a field of specialization that does not actually exist.[30]  Counsel do not appear

---

[30]*See, e.g.,* article at
www.slate.com/articles/news_and_politics/explainer/2009/09/can_you_really_be_a_
professor_of_symbology.html (last accessed May 3, 2012) discussing use of the term in a novel
by Dan Brown, and noting that symbology is not a true academic field. *See also* Macy Halford,
*Harvard: No Symbology Here*, New Yorker September 15, 2009 (same). *See also* Dan Brown,

to have considered calling a mental health professional who could discuss the psychological implications of Mr. Wilkins' many tattoos of inflammatory subjects, or the realities of prison life that may compel someone to acquire such tattoos to scare off assailants.[31] For example, they could have utilized records from Mr. Wilkins' past to demonstrate that he had been stabbed while in jail. *See Petition Exhibit* 51 - Letter from Federal Defender to U.S. Marshal Service; *Petition Exhibit 52* - Medical record Harris County 2001.

Defense counsel called a correctional officer to testify that Chris was always "very respectful," *see* Testimony of Kimberly Adams, 35 RR 180-185. That same witness, who happened to be African-American, could have also testified that everyone in the jail has "tattoos," and that they "don't mean much." *See Petition Exhibit 18* - Notes re. CO Adams 03.05.2008. However, counsel did not even present that neutralizing nugget of information to reassure the jurors that Chris' tattoos were not out of line with jailhouse norms.

Dr. Goodness seemed to entertain doubt about the accuracy of Chris's mother Lynda's account of his childhood, since Lynda was inclined to minimize negative aspects of her own, and Chris's father's, behavior, including their drug use. *See, e.g., Petition Exhibit 19* -

---

*The Lost Symbol,* Anchor Books 2009.

[31]*See, e.g.,* Michael Anderson & Randy A. Sansone, *Tattooing as a means of acute affect regulation,* 10 Clinical Psychology and Psychotherapy 5, September/October 2003, at 316-318; Joost a Campo, Henk Nijman & Harald Merckelbach, *Changes in Appearance and Psychosis,* 64(2) Psychiatry, Summer 2001, 165-7; Aglaja Stirn & Andreas Hinz, *Tattoos, body piercings and self-injury: Is there a connection?  Investigations on a core group of participants practicing body modification,* 18 Psychotherapy Research 2008, at 326-333 (discussing existing literature on body modification).

Collateral Interview, Lynda Koepnick at 136.[32]  Her notes also demonstrate a belief that

Lynda's parenting had contributed to Chris' later problems. *Id.*  Lynda was called to testify,

but the jury did not hear many matters that Lynda had disclosed to Dr. Goodness, such as the

fact that Chris had been exposed to LSD as a child, that Child Protective Services had

recommended evaluation of Chris "for mental health reasons" but that that never happened,

that Lynda admitted that her choices with regard to the several men with whom she lived

during Chris' childhood has been "negative," and that she and his stepfathers "tore him up"

with whippings at times.  Lynda claimed to Dr. Goodness that CPS had described the family

as "a progressive family that did no wrong."  Nonetheless, there had been several subsequent

visits by a CPS case worker after that statement was supposedly made, suggesting that there

were real concerns about Chris' home situation.  *Id.*

Moreover, Lynda seems to have tried to shut down defense attempts to obtain

information and conduct interviews.  A list of defense witnesses obtained by Clifford Ginn

from Lynda on February 4, 2008, indicates that many were dead, or stated that those people

should be left alone or that Lynda denied having their contact information.  *See Petition*

*Exhibit 20* - Mitigation list from Lynda Koepnick at 144.[33]  At least one item on the list is

---

[32]Chris had informed Dr. Goodness that his mother had been a drug user, for example,
that she first "knew he was on drugs when he raided her stash." *Petition Exhibit 9* - Dr.
Goodness Self Report Survey at 44.  He also stated that his parents gave him "ETOH, weed,
pills," *Petition Exhibit 9* at 45, and that his mother gave him "meds" to calm him down. *Id.* at
63.

[33]This list is headed: "The following information was obtained from a lady that was
*thought* to be the defendant's mother on February 2, 2008." (emphasis added).  Nonetheless,

patently false. Lynda stated that a person called Sunny Devillier "Never existed" - she was in fact married to Gaines "Sonny" Devillier in Harris County on November 18, 1977, and later testified to that. *See Petition Exhibit 21*; 33 RR 110. Lynda even refused to give the investigators any information about William Koepnick, her current husband, and Mr. Wilkins' step-father, who soon became one of the few defense witnesses. *Id.* Lynda did not testify voluntarily, but had to be compelled to come to court. *See Petition Exhibit 4* - Letter Strickland to Wilkins at 13. Lynda's lack of cooperation should have acted as a red flag to counsel to broaden their investigation, or to try to ascertain why a client's mother, who might be presumed to be eager to assist, would try to sabotage the chances of saving her own child's life. Had the defense gone beyond their illogical reliance on their client's recalcitrant mother, and interviewed other people who had intersected with his life, they might well have obtained alternative viewpoints about the environment in which he grew up. For example, Mr. Wilkins' contemporary, Tesha McClanahan recalls:

> My father and Christopher ("Chris") Wilkins' mother Lynda lived together when Chris and I were small children. I cannot remember exactly what ages we would have been, but I was born in 1968 and I think that Chris and I are around the same age. My father was Donnie Vance McClanahan, and I lived with him when I was a child until his death in 1977, when I was nine. ¶ I'm not sure what age I was when my dad and I moved in with Lynda and Chris. My dad was married to my stepmother, Patti, at the time, and there were a lot of fights because my stepmother wanted my dad to come back, especially after

---

Ginn's billing records indicate that the only interview that he conducted that day was of Lynda Koepnick. It appears Lynda was evasive even as to her own identity.

it turned out that she was pregnant with my half-sister.[34] ¶ There was a time when my stepmother was fighting with my dad at Lynda's house and my stepmother wrapped a cord around my father's neck. Lynda had to call out the police on that occasion. I remember the police coming to the house quite often. Eventually my dad and I moved back in with Patti because of her pregnancy. ¶ My dad smoked a lot of pot, and I realize now that he was a drug addict and was probably using heavier drugs than pot. The way that I know that my dad was a drug addict is because I have had problems with drugs myself. If you grow up around drugs, it's hard not to do them yourself. Since my father used so much pot, and probably other drugs, I believe that Lynda would have had to be aware of that too. ¶ I have no idea how Lynda made a living, although my stepmother said that she was a stripper.

*Petition Exhibit 22* - Declaration of Tesha McClanahan; *Petition Exhibit 23* - Declaration of Lucy C. Taylor.[35]

Lynda did not even mention Donnie McClanahan in her testimony, although Chris had

listed him as a "stepdad" in Dr. Goodness' "Self-Report Survey," along with another

"stepdad" that Lynda did not mention to the jury, David Willingham. *Petition Exhibit 9* -

Self-Report Survey at 48 He also listed Tesha McClanahan in a document given to counsel.

*See Petition Exhibit 10.* Had counsel only pursued some of the many potential witnesses

whose names were provided to them by Chris, rather than relying on Lynda, it seems that a

different picture of his childhood might well have emerged.

---

[34] Tesha's half-sister seems to have been born on April 21, 1973, when Tesha would have been around five years of age. *See Petition Exhibit 25* - Texas Birth Index, indicating Robin Jenann McClanahan was born April 21, 1973 to Patti Jenann Manis and Donnie Vance McClanahan.

[35] A signed copy of Ms. McClanahan's declaration has not yet been obtained. When it is, it will be attached to an Amended Petition.

Dr. Goodness also analyzed Chris's records that had been obtained from the Texas Youth Commission ("TYC"), which indicated that his mother had only visited him on four occasions, "Doesn't seem like much investment from Mom." *See Petition Exhibit 26-* Goodness Records Review at 163. Chris' poor academic grades caused Dr. Goodness to wonder why he had not been referred to Learning Disabled classes while at TYC. *Id.*

An early psychological report in those records, see *Petition Exhibit 27* - TYC Psychological Assessment September 12, 1983, indicated that there was a split between his verbal IQ or 94 and performance IQ of 104, and that, at nearly 15, he was reading at an 8th grade level but his math was at a 4th grade level. The report also indicates that he had been living on his own for one year, and had been abusing drugs, including marijuana, since the age of eight, as well as "acid," cocaine and alcohol. He was reported as "under socialized" and "nonaggressive." Dr. Goodness also noted that his school had requested that Chris be placed in counseling with their psychologist. *Petition Exhibit 26* - Goodness Records Review at 16.

Dr. Goodness questioned whether Chris had received adequate services while in TYC, since less than two hours with a counselor was documented, *Id.* at 169, and no psychiatric evaluation seems to have been requested. She noted, "His paperwork from TYC makes it clear that he was never tried on medication or provided with any form of psychological treatment despite his multiple problems." *Id.* She also noted the presence of several head injuries and fights, *Id.* at 165 - 171, as well as reports of drug use and "huffing" of shoe

polish and liquid paper, *Id.* at 166, indicating to her that a "neuropsych (sic) evaluation should be considered for the purposes of this case." *Id.* at 170-71.

While the TYC records demonstrate a youth who was disruptive, prone to escape, and unable to rationalize why he behaved as he did, Chris is also reported as feeling "neglected and rejected by his family," *Id.* at 169, and that they had backed out on offers to help him, causing him not to want to return home. *Id.* at 170 .

At one point in her TYC records review, Dr Goodness notes: "The lack of any sort [of] treatment or rehabilitation efforts is remarkable." *Id.* at 169 . The failure of TYC to do more for Chris is perhaps not so remarkable, given its history: the Texas Youth Commission, now the Texas Juvenile Justice Department, has had a checkered past.  A prolonged class action, first filed in 1971, was necessary to reform its "debased, execrable institutions in which juveniles were tortured and terrorized." *Morales v. Turman*, 569 F.Supp. 332, 334 (E.D. Tex. 1983).  While a settlement of that action was eventually reached, it required further monitoring, continuing through 1988, to ensure that mandated improvements were made. *See* William S. Bush, *Protecting Texas' Most Precious Resource: A History of Juvenile Justice Policy in Texas, Part II The TYC Era: Between Rehabilitation and Punishment 1949-2008*, Texas Criminal Justice Coalition, 2009 at 42.  Mr. Wilkins' TYC records strongly suggest that this troubled youth, who was indeed "neglected" by his family, was placed in an institution where he did not receive adequate psychiatric intervention or counseling, received no drug treatment, and where there was no concerted attempt to address

53

his many problems.  The jury knew none of this, because counsel apparently failed to obtain, let alone explore, further information concerning this important developmental period of Chris' adolescence and the agency that had him under its supervision from 1983-1986, critical years in his adolescent development: "The record of the sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly stemmed from inattention, not strategic judgment." *Wiggins*, 539 U.S. at 526.

iv.  <u>Mr. Wilkins was cooperative in the mitigation investigation.</u>

In his sentencing testimony, Chris sought to protect his family and to minimize the impact of external forces on his behavior, apparently not understanding that even the choice to use drugs is the product of past influences affecting current decision-making.  However, he did not put up obstacles to counsel pursuing a proper mitigation case:[36]  He described counsel's decision to present testimony from his family as "strictly against my wishes," but did nothing to prevent or disrupt that testimony.  35 RR 14.  Likewise, although he did not want to be portrayed as "crazy," 35 RR 45, he did not prevent counsel from investigation or presenting other evidence:

> I told 'em when we started out in this thing, I said, look, you know, y'all can call in all these doctors and all these investigators and stuff, but I said under

---

[36]Melissa Robinson did claim in an e-mail to trial counsel, *See Petition Exhibit* 6, that Mr. Wilkins had not been cooperative, but she gave no details and does not seem to have communicated any such problem to counsel during the period that she was working on the case.

no circumstances would I permit them to drag my family from all over Texas
up here[.]

35 RR 14.

Admittedly, Chris' testimony ultimately was not helpful to his cause. Nor, indeed, was some of the information he gave to Dr. Goodness, for example, listing in Dr. Goodness' "Self-Report Survey" that his leisure activities were "Sex / Drugs/Rock-n-Roll," as well as noting that he had been fired from jobs for fighting and that he had had thoughts about murder, assaults and sex as a child. *See Petition Exhibit 9* at 69.   In fact, the entire "survey" seems to have been completed with a certain careless bravado, leaving many areas incomplete, describing use of hallucinogens as "no big deal" and his father's occupation as "crook." *Id.*   However, Chris was forthcoming, and revealed facts that counsel was never ultimately to present in court, such as being disciplined with: "Belts - fists etc ... shoes - whatever at hand by Mom or Mike [Jones] on a fairly regular basis." p 14.   Among the records that Dr. Goodness sought, but that were never obtained, were dental records for an incident when stepfather Mike knocked out some of Chris teeth. *Petition Exhibit 16* at 126.

Ultimately, Chris did nothing to try to prevent counsel from performing their function, and his testimony might have been different, or non-existent, had counsel carried out their professional duties.   Moreover, Chris made no bones about the fact that: "I've been, you know, I think subconsciously I've been trying to kill myself or get myself killed since I was probably 12 or 13 years old." 35 RR 59.  To the extent that counsel relied on their client's

self-reported information without taking into account his impulsive and self-destructive

tendencies, their decision-making was unreasonable.   As *Rompilla* recognized, capital

defendants are not always able or willing to assist in their own sentencing preparation, and

may even "send ... counsel off on false leads." *Id.* at 381.   Chris' unusual impulsivity and

poor behavior in the jail were, no doubt, trying to counsel, but were not factors that excused

counsel from their duties.   Such behavior cried out for explanation as to its own causes, and

may well be diagnostic of underlying problems that were never revealed.

v.      Counsel failed to follow through on the recommendations of their retained
        psychologist.

        Dr. Goodness performed a few basic psychological screening tests revealing "a

number of cognitive deficits indicative of some sort of brain pathology" and a "Cognitive

Disorder Not Otherwise Specified."     *Petition Exhibit 28* - Psychological Testing and

Interpretation at 178-79.   Indeed, many factors were present in Chris's past that would be

conducive to brain damage: head injuries, "huffing" of inhalants, ingestion of toxic industrial

chemicals, use of a wide range of drugs including cocaine and methamphetamines, and

possible exposure to LSD while a baby.   *Id.* at 178; *Petition Exhibit 19* at 136.[37]     Dr

---

[37]Both counsel and Dr. Goodness were also apparently unaware that while awaiting trial
Mr. Wilkins had sought treatment with Elavil, an antidepressant, and Klonopin, a drug used to
control seizures and panic attacks, which he had received previously.
Records from the Tarrant County jail while awaiting trial indicate Mr. Wilkins as having as
having a history of "being paranoid and schizophrenic," but it was not possible for the medical
intake worker to take a full history because Mr. Wilkins became too defensive to answer
questions. *Petition Exhibit 45* - MHMR of Tarrant County records.

Goodness recommended a full neuropsychological evaluation, which would have required a continuance: "The question is not whether or not Mr. Wilkins has some neuropsychological deficits - he does. He clearly has deficits in several areas."[38]  That path was not pursued, and no mental health evidence was presented to the jury.

Further exploration of Chris's mental health was also merited because of his actions before and during trial:  His behavior was often impulsive and, as he himself admitted, self-defeating: "I make bad decisions.  I know they're bad decisions when I'm making them, I make them anyway." 35 RR 13.  He confessed to many imaginary offenses.  Without Mr. Wilkins's many interviews with the police, which he undertook against the advice of counsel, the State might never have been able to prove its case.  Nonetheless, even in the middle of trial, Mr. Wilkins sent a note to the female lead detective who had elicited his confessions, and who he described as "wonderful." 35 RR 37.  Mr. Wilkins testified that he had wanted to plead guilty, but went to trial simply to give his attorneys more billable hours. 35 RR 16-17.  He admitted: "I've been, you know, I think subconsciously I've been trying to kill myself or get myself killed since I was probably 12 or 13 years old." 35 RR 59.    B o t h   M r . Wilkins's actions and his trial testimony raise the possibility that he was not even competent to stand trial, being unable to engage in a reasoned choice of legal strategies or to protect his own interests.  *See* Claim for Relief Number 4.  Furthermore, Mr. Wilkins's compulsive

---

[38]*See Petition Exhibit 28* at 178.

need to talk to law enforcement, even when that would undermine his own interests, suggests problems with impulse control relevant to mitigation, as well as raising the question of the validity of his confessions to the crimes of which he was convicted.

vi.    Counsel's investigation and decision-making was unreasonable.

Counsel failed to ensure that case investigation and mitigation preparation was taking place during the eighteen months between May 2006, when Melissa Robinson stopped work, and January 2008, when counsel suddenly hired Clifford Ginn and Kelly Goodness. When they did take action, it was too little, too late, and ill thought-through. For example, Clifford Ginn, does not appear to have any specific training in conducting mitigation investigation and was hired as a private investigator, not a mitigation specialist. 1 CR 212-14. Nonetheless, he was allowed to conduct interviews of critical family members, such as Lynda, who Dr. Goodness came to believed was minimizing adverse facts about Mr. Wilkins' childhood. *See Petition Exhibit 11* - Ginn Billing Records at 83-84.

The decision to hire Dr. Goodness and to have her perform the dual role of psychologist and mitigation specialist was also suspect, indeed, it made it all but inevitable that the jury would not hear Dr. Goodness testify:  A psychologist is normally used to conduct testing, and possibly to be called as a witness, in a capital sentencing proceeding. A mitigation specialist normally gathers factual information from many sources, conducts interviews of mitigation witnesses and assists counsel in formulating the mitigation case.

Because the mitigation specialist may receive adverse information about the client, or simply information that is not believed to be correct or reliable, it is rarely appropriate for the mitigation specialist to testify, but they can provide such information as is valuable to counsel, who can then supply it to a testifying expert. *See, e.g., Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677 (Spring 2008), Guidelines 10.11 (E) &(F) - Requisite Mitigation Functions of the Defense Team: "It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify ... It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses ..." [39]

By having Dr. Goodness perform two conflicting roles, counsel made it a foregone conclusion that she could not testify, or any adverse information of which she was aware might become discoverable under the Texas Rules of Evidence. *See* TEX R. EVID. 705(b).[40]

---

[39] *See also* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Commentary to Guideline *4.1 at 33* (rev. ed. 2003):

> [A mitigation specialist] finds mitigating themes in the client's life history; identifies the need for expert assistance' assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

[40] TEX R. EVID. 705(b): "Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered ... shall ... be permitted to conduct a *voir dire* examination directed to the underlying facts or state upon which the opinion is based."

This was the decision of counsel, and demonstrates their lack of forethought about how to prepare a mitigation case beneficial to their client.

Moreover, it seems that Dr. Goodness, whether through lack of time or because of the nature of her practice, wanted documents to be obtained by subpoena and provided to her, *See Petition Exhibits 15 and 16* - Dr. Goodness Records Needed # 1 and 2.[41] She also seems to have required witnesses to be brought to her office: *See Petition Exhibit 11* at 84 (indicating Clifford Ginn collecting witnesses and taking them to Dr. Goodness' office). This practice would have automatically limited the number of witnesses that it was viable for her to interview.

Whatever the problems created by counsel's tardiness in hiring Dr. Goodness, there is no question that she correctly flagged up many issues that should have led counsel to pursue further investigation and testing, but counsel ignored her input and did not pursue further testing. Nor did they move for sufficient time to allow for a full mitigation investigation. Counsel later stated that: "[Mr. Wilkins'] mental status was aggravating and would not be perceived as a factor in his commission of the murders," and that Mr. Wilkins' family circumstances were "thoroughly investigated." *See Exhibit 24-* Ball Letter to Chief Disciplinary Counsel at 159. However, a handful of interviews of immediate family,

---

[41]Counsel in fact created potential trouble by issuing subpoenas for educational and other records, *see, e.g.*, 5 CR 1416, 1461, 1463-4, since subpoenas under Texas law "inure to the benefit of the opposite party," TEX. CODE CRIM PROC. art. 24.03(a), and therefore documents obtained by subpoena may come into the possession of one's adversary.

unsupported by comprehensive record collection and multiple collateral interviews, is not a sufficient investigation.[42]   Moreover, to conclude that "mental status was aggravating" without a full exploration of Mr. Wilkins' neuropsychological deficits and the extent to which they might in fact be viewed as mitigating was not a reasonable decision.   This mitigation investigation had barely started, let alone being thoroughly done, and a continuance should therefore have been sought at all costs.

It is incontrovertible that Dr. Goodness applied the term "psychopath" to Mr. Wilkins in her notes, and reported a diagnosis of "Psychopathy/Antisocial Personality Disorder with narcissist features, severe" as well as "Cognitive Disorder." That she did so should not have foreclosed a continued investigation into possible brain damage or other factors:  While the "psychopath" label is one that may well have a negative impact on the finder of fact,[43] both mental illness and brain damage can co-occur with psychopathic traits.[44]  Indeed, the World Health Organization's International Statistical Classification of Diseases and Related Health

---

[42]See, e.g., Wiggins, 539 U.S. at 524-25 (counsel ineffective when they "abandoned their investigation of [their client's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources.")

[43]See, e.g., John F. Edens, Ph.D. & Jennifer Cox, M.S., Examining the Prevalence, Role and Impact of Evidence regarding Antisocial Personality, Sociopathy and Psychopathy in Capital Cases: A Survey of Defense Team Members, Behavioral Sciences and the Law (2012).

[44]See also David De Matteo & John F. Edens, The Role and Relevance of the Psychopathy Checklist-Revised in Court, 2006 Psychology, Public Policy and Law 214, "[D]oes the presence of psychopathy rule out the possibility that defendants are suffering from serious mental disorders that might have some bearing on whether they meet the legal standard for insanity in any given jurisdiction?  The accumulated evidence regarding the co-occurrence of psychopathy and major mental disorders indicates that the answer to this question is a clear "no." 229-230.

Problems 10th Revision (ICD-10) actually precludes the diagnosis of a personality disorder until the possibility that symptoms are "directly resulting from disease, damage or other insult to the brain, or from another psychiatric disorder" has been excluded.[45]

Dr. Goodness' impressionistic diagnosis of psychopathy was also one formed on the basis of minimal and incomplete information.  That her information was limited was entirely attributable to trial counsel's apparently last-minute realization that they were without a mitigation expert, causing them to enlist Dr. Goodness at the eleventh hour.  It bears noting that in *Rompilla v. Beard*, no fewer than three defense experts were retained and testified at the time of trial, and that counsel had interviewed their client and his family members but: "None of the sources proved particularly helpful."  *Rompilla*, 545 U.S. at 381.  Readily available documents concerning a prior conviction disclosed information that would have pointed to "schizophrenia and other disorders" and painted a picture of Rompilla's childhood and mental health "very different ... from anything defense counsel had seen or heard." *Id.* at 391.  Testing of *Rompilla* during post-conviction proceedings demonstrated that he suffered from organic brain damage ... significantly impairing several of his cognitive functions ... likely caused by fetal alcohol syndrome and [impairing] his capacity to appreciate the criminality of his conduct or to conform his conduct to the law." *Id.* at 392.[46]

---

[45] *See* www.apps.who.int/classifications/icd10/browse/2010/en#/F60 (last accessed May 14, 2012).

[46] Other notable cases finding ineffective assistance of counsel in capital sentencing proceedings for failure to develop evidence of brain dysfunction include:  *Jefferson v. Upton,* 130 S.Ct. 2217, 2218 (2010) (counsel failed to present evidence of brain damage causing abnormal behavior, over which defendant had limited control, causing restless or aggressive

Thus, Dr. Goodness' opinion on psychopathy was ill-informed - through no fault of hers - and premature, because the possibility of other causes for Mr. Wilkins' behavior had not been excluded. Dr. Goodness' opinion on psychopathy may indeed ultimately be simply incorrect, but until and unless resources and time are available for a full and true factual picture to be compiled, that cannot be proved.

To the extent that counsel concluded that the diagnostic labels Dr. Goodness attached to Mr. Wilkins warranted the conclusion that "his mental health status was aggravating," *See Petition Exhibit 24* at 159, it should be borne in mind that a medical diagnosis is not necessarily conclusive of an answer to either of the Texas death penalty statute special issues. Moreover, counsel did not have a full picture of either Petitioner's mental status or his other potential mitigation evidence. While some of the material contained in Dr. Goodness' notes and elsewhere was unfavorable to Chris, that should not have ended counsel's inquiry into the potential areas of mitigation evidence that the records suggested, such as neuropsychological deficits, a dysfunctional family life, and TYC's failure to provide Chris with the assistance he needed to address his "multiple problems." Foregoing an examination of the factors in his life that caused him to develop as he did, was to abandon the whole task

---

characteristics and impulsiveness ); *Sears v. Upton*, 130 S.Ct 3259, 3262-63 (2010) ("significant frontal lobe abnormalities," and "problems with planning, sequencing and impulse control" as a result of head injuries and drug and alcohol abuse); *Porter v. McCollum*, 130 S.Ct. 447, 451 (2009) (counsel ineffective for failure to investigate and present neuropsychological evidence of "brain damage that could manifest in impulsive, violent behavior" that "substantially impaired ... his ability to conform his conduct to the law"); *Williams v. Taylor*, 529 U.S. 362, 370 (2000) (counsel failed to present mitigating evidence of repeated head injuries and possible mental impairments organic in origin).

of mitigation. It is not dispositive of the issue of ineffective assistance if, "not all of the additional evidence ... was favorable to" the defendant, where there was no tactical justification for failing to discover and introduce that which does speak in the defendant's favor. *Williams*, 529 U.S. at 396. Admittedly, mental health and other evidence may become the proverbial two-edged sword, diminishing blameworthiness while indicating the possibility of future danger, *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), but counsel had insufficient information to conclude that this was simply not a sword worth wielding.

The jury needed to know "What happened to Mr. Wilkins along the way?" and demonstration of neuropsychological deficits affecting his decision-making could have supplied that mitigating explanation, as could the evidence of lay witnesses concerning the influences on his development. Given the prosecution's evidence of future dangerousness, deciding to rely on Mr. Wilkins' "amusing and personable nature" in mitigation, and to abandon other possibilities, as counsel did, clearly demonstrates deficient performance. *See Petition Exhibit 24* at 159. Counsel's decision was not a matter of reasoned and informed professional judgment. It was a house built on sand, because the only thing that supported it was a tiny body of information, some of it flawed and highly questionable. *See, e.g., Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008)( "an *unreasonably truncated mitigation investigation is not cured simply because some steps were* taken prior to the penalty phase hearing and because some evidence was placed before the jury").

64

Mr. Ball also claims reliance on his client's indications that he did not want to blame either his family or his substance abuse for his actions as being a reason to curtail the mitigation case. *Petition Exhibit 24* at 159. That, however, is an abdication of independent professional judgment. There is every indication that Mr. Wilkins, a layperson with a cognitive disorder, with whom it is hard to disagree that he "makes bad decisions," was not an obstructive client. He cooperated in many ways, allowed counsel to enter a plea of not guilty when that was not what he wanted, and took no action when counsel did something that he had explicitly told them not to do: bring his family to court. Had counsel prepared a mitigation case worthy of the name, there seems no reason to think that their client would have stood in their way. *Cf. Schriro v. Landrigan*, 550 U.S. 465, 481 (2007)(client's refusal to have mitigation evidence presented, including repeated disruptions of counsel's presentation, justified denial of evidentiary hearing).

It is clear that Mr. Wilkins was upset at having his family brought to court in person, but had no objection to "these doctors and all these investigators and stuff," 35 RR 14, and therefore would have acquiesced had counsel prepared and presented a coherent mitigation case. His desire to protect his family extended to his agreeing on cross-examination that they were just "good, decent, hard-working people," 35 RR 65, and continuing to blame himself alone. Given his previously stated concern not to blame family and characterization of his counsel's mere decision to bring them to court as "pretty vicious," that is unsurprising. 35

65

RR 13. Nonetheless, it had been counsels' job to explain that Mr. Wilkins's early life was less than idyllic, and counsel failed to do so.

The foreshortened mitigation investigation resulted in Mr. Wilkins' mother Lynda becoming a witness for the defense, when trial counsel should have realized that in reality Lynda's succession of husbands and boyfriends, combined with otherwise inadequate parenting including likely drug abuse and excessive discipline, played a significant negative role in Mr. Wilkins' development, which should have been made clear to the jury. Over-reliance on a close relative of a defendant for information on which witnesses may be worth interviewing, as seems to have happened here, is also inherently risky since family members may have their own motives to steer the investigation in a particular direction. *See, e.g., Sears v. Upton,* 130 S.Ct. 3259 (2011)(delegating selection of witnesses to defendant's mother demonstrated constitutionally inadequate investigation).

Defense counsel failed to present to the jury any narrative of Mr. Wilkins' life that might help the jury understand how he had arrived at the point of facing a capital trial. The jury had no information to undermine the notion that his home life was the essentially normal childhood, marred only by friction with stepfathers, an unsuccessful adaptation to a change of school and the loss of a friend in a wreck, that was presented to them. The jury also had no information to cause them to question whether the Texas Youth Commission had failed to address Mr. Wilkins' "multiple problems."

Counsel failed to explore to what extent Mr. Wilkins' descent into substance abuse has been influenced by others in his life, including his father, Reginald Wilkins for whom drug usage seems to have been a constant factor: In February 1971, when Mr. Wilkins was only two and a half years old, he was at his father's home in Houston when the police, acting on a tip-off from an informant, went to the house where there were reported to be "several bags of marijuana and several bags of barbiturates." After "[t]he small child of [Reginald Wilkins] was released to a friend," Reginald was charged with possession of marijuana, barbiturates, heroin and methamphetamine. *See Petition Exhibit 29* - Harris County Police Report February 12, 1971, 1t 183-84. Reginald was placed on probation for that offense, but his probation was revoked in 1978. *See Petition Exhibit 30* at 191. In 1987, when Chris would have been 18, Reginald was convicted of possessing methamphetamine in an amount of 28-400g. *See Petition Exhibit* 31. In the intervening years, Reginald had also acquired convictions for Unauthorized use of a motor vehicle in 1979, *See Petition Exhibit* 32; Forgery, *See Petition Exhibit* 33; Possession of Methamphetamine and Unauthorized use of a motor vehicle in 1983, *See Petition Exhibit 34* and *Petition Exhibit 35*; as well as yet another Unauthorized use of a motor vehicle in 1986. *See Petition Exhibit 36.* However, the extent of Reginald's influence on his son's development was one of many factors left unevaluated, even though, at the age of 17 Chris had indicated to a parole officer that he was considering working with his father, suggesting that he and his father were indeed in touch at the time. *See Petition Exhibit 37* - TYC Furlough Plan, April 15, 1986.

Thus, at the time of trial counsel had failed to acquire almost all significant information about their client, not least:

- Mental health history and information;
- Neuropsychological testing;
- Social history information from sources other than family;
- History of Child Protective Services involvement;
- Educational history;
- Medical history;
- Employment records;
- Failings of the Texas Youth Commission.

At this point, Petitioner's case can only be viewed through the distorting prism of a trial and sentencing that occurred after inadequate investigation. Unhelpful as Mr. Wilkins' testimony was in many ways, that testimony might well have been different, and might not have taken place at all, had he been in the hands of effective counsel, properly prepared for a capital sentencing. Similarly, the entire mitigation case might well have been altogether different, had counsel performed their proper role. Even the limited facts that have been identified by undersigned counsel demonstrate that Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments were violated by counsel's deficient performance in this case, and that there can be no confidence in the outcome of his sentencing proceeding. It is respectfully suggested that this is a claim that merits the opportunity for further investigation and development as requested above, pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and other recent authority of the United States Supreme Court, and that it should not be

dismissed because it was not raised by state habeas counsel.   Further development is particularly critical in a claim of this type, where it is necessary to prove prejudice by developing the information that the jury should have heard, but did not.

> B.   Trial Counsel conducted an inadequate investigation of Petitioner's future conditions of confinement, presented inaccurate testimony, and failed to ensure that the jury had a true picture of the security measures to which Petitioner would be subject if sentenced to life, thereby violating Petitioner's Sixth Amendment right to effective assistance of counsel, and prejudicing the outcome of the case.

Trial counsel should have realized early on that the question of the degree of security to which Petitioner would be subject if he received a life sentence was a live issue, since they would have been aware that Petitioner had a history of escape attempts and actual escapes, and this evidence was bound to be introduced by the State at the sentencing phase. *See, e.g.,* Testimony of Jerry Belotte, 30 RR 78; Larry Caldwell 30 RR 103-116; Wesley Zurovec, 31 RR 54-166.  That defense counsel eventually became aware of the need to address the issue of prison security is demonstrated by the fact that they called a defense expert - their only testifying expert - during their mitigation case.  This was a former prison warden, Susan Perryman-Evans, who testified about the functioning of the Texas Department of Corrections (TDCJ).   However, counsel hired their expert at only two weeks notice, 26 RR 10-14; 35 RR 130, and their choice of expert - if they considered alternatives at all - was a poor one.

Ms. Perryman-Evans had last worked in TDCJ's classification office in 1991.  34 RR 204.  She had retired in 2003 at which time she was warden of a minimum custody "farm."

35 RR 125.   She apparently based her testimony on the TDCJ classification plan of 2003,

not 2008, and otherwise acquired her information on TDCJ policies from "contacts that I still

have in TDCJ." 34 RR 245.   It seems that she testified on the basis of the plan as it existed

when she retired. 34 RR 246-7.  As will be discussed below, her information was incorrect.

The purpose of Ms. Perryman-Evans' testimony was doubtless to assure the jury that

the Department of Corrections had procedures in place that would suffice to contain

Petitioner safely.   However, Ms. Perryman-Evans testified about specific highly-publicized

escapes from TDCJ, those of Martin Gurule and of the "Texas Seven," while counsel did not

present any testimony about the statistical probability of an escape from TDCJ in general, let

alone of the probability of escape from the type of unit where Petitioner was likely to be

housed.  They did not have Ms. Perryman-Evans analyze how Petitioner would actually be

classified by TDCJ on the basis of his circumstances and history, and therefore did not

provide her with the necessary information to do so.  34 RR 207, 240.

i.   <u>Ms. Perryman-Evans' testimony was factually incorrect.</u>

Ms. Perryman-Evans discussed TDCJ's classification system for inmates, which

ranges from G-1 (the lowest level of security) to G-5 (the highest level of security).  She

testified that Petitioner would start out classified as a G-3 inmate but could rise, after ten

years, to the less restrictive G-2 classification. 35 RR 98, 107, 134.  However, that

information was incorrect and misled the jury: TDCJ modified its policies after the

implementation of life without parole as a sentence for capital murder in Texas in September

70

2005, two and a half years before Ms. Perryman-Evans testified. Under that policy Petitioner, whose alleged offenses occurred in October 2005, could never rise above G-3 status if he received a life sentence. The relevant Unit Classification Procedure document was issued in July 2005, *see Petition Exhibit 38* - TDCJ Unit Classification Procedure at 237, and the same basic information seems to have been available on the TDCJ website from January or February 2006, *see Petition Exhibit* 39 at 245-6.

Thus the jury was left with the impression that Petitioner could eventually rise to G-2 status, rather than being at most a G-3 inmate, who could not live in a dormitory outside the main prison buildings, could not work in certain jobs, such as in the maintenance department or as an outside "Support Service Inmate", would be restricted in his movement within the prison unit and could not even go to vocational courses held in prison outbuildings. 35 RR 104-106. Defense counsel elicited from Ms. Perryman-Evans details of the "Connally Seven" escape, which involved seven inmates working in a maintenance department who broke out and eventually killed a police officer.[47] 35 RR 120-21. Although she testified that inmates with greater than 50-year sentences are not allowed to work in the maintenance department, nor allowed to be in more than one section of the unit, 35 RR 121, Ms. Perryman-Evans also, confusingly, referred to inmates with capital murder sentences "doing well in minimum custody." 35 RR 123.

---

[47]The "Connally Seven" or "Texas Seven" escape took place in 2000, the year after the Gurule escape.

On cross-examination the State rammed home the notion that Petitioner could eventually rise to G-2 level, even if "he proved himself to be a big problem" provided he waited long enough. 35 RR 134.  The State also brought out the fact that there had even been an escape from death row in 1999, but Ms. Perryman-Evans did not go further than to say that "changes" had happened as a result of that, without providing any information as to the specific steps taken. 35 RR138-39.

Ms. Perryman-Evans' error was identical to that committed by a prosecution expert in a recent Texas case who testified that a life-without-parole inmate could obtain a lower classification than G-3.  *See Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010). In that case, the State confessed error on direct appeal and the sentence was reversed because of the erroneous information supplied to the jury.

Trial counsel's deficient performance in hiring an expert whose information was out of date, and who lacked proficiency in the very area on which she was to testify, resulted in the jury in Petitioner's case being left with the false impression that he could at some point be housed in less secure conditions than was in fact the case.  Other experts would have been available to testify concerning the issue of prison classification and security had counsel taken time to focus on selecting the best expert available.[48]  For example, Frank G. AuBuchon, who at the time of his retirement from TDCJ in 2007 had been Administrator for

---

[48]It is possible that Ms. Perryman-Evans name was suggested by Dr. Goodness. 34 RR 207.

Classification Operations for seven years, was an appropriate expert. *See Petition Exhibit 40.* Mr. AuBuchon worked for the Texas Department of Criminal Justice from 1981-2007. Likewise, Larry Fitzgerald, former Public Information Manager for TDCJ has testified concerning TDCJ's classification system and security measures, including in the *Estrada* case. *See Petition Exhibit 41.*[49]

However, instead of carefully investigating this area of their client's case and thoughtfully selecting an appropriate expert, Petitioner's counsel belatedly hired a witness who gave inaccurate testimony. That incorrect testimony on this particular point is critical is demonstrated by the State of Texas conceding as much in the *Estrada* case. Perryman-Evans' inaccurate testimony led to a result whose reliability must also be questioned: any confidence in this sentence is undermined by the fact that the jury's decision rested on a false premise.

ii.     Ms. Perryman-Evans was not prepared to testify to how Petitioner would in fact be classified were he to receive a life sentence.

The information that Ms. Perryman-Evans provided to the jury was necessarily generic, since she was not provided with sufficient information to actually conclude what his classification would be. Had she - or another expert - been provided with that information,

---

[49]Petitioner will seek leave to supplement or amend this claim if granted funds for investigation and experts. The TDCJ Classification Plan is large, complex and difficult for the layperson unfamiliar with prison administration to interpret because of TDCJ's use of specialized terminology. Therefore the assistance of an expert is required.

the jury might have heard how Petitioner would actually be classified, which would have

taken into account "any problems that he's had on previous convictions in the county jails"

and "all his information." 35 RR 99.  Given Petitioner's history at the Tarrant County Jail,

which would have been included in the confinement packet brought with him to TDCJ, 35

RR 117-18, it seems logical that the decisions made concerning his classification would be

to place him in more, rather than less, secure conditions, but the jury heard nothing specific

to his actual situation.  Thus, the State was able to cross-examine Ms. Perryman-Evans about

how Petitioner might be classified, without her being equipped to actually answer the

questions. 35 RR 132-33.

iii.    Ms. Perryman-Evans was not prepared to testify about security improvements made
        since the notorious escapes about which she testified.

        Defense counsel elicited evidence of prison escapes, as did the State, thus bringing

to the jury's attention the fact that there had been escapes even from death row.  Indeed, these

escapes were highly publicized and the jurors may already have been aware of them.[50]

However, Ms. Perryman-Evans was not asked to explain in any detail what changes had

---

[50]*See, e.g.*, New York Times, *Texas Death Row Inmate Pulls Off Escape*, November 28,
1998 (http://www.nytimes.com/1998/11/28/us/texas-death-row-inmate-pulls-off-escape.html, last
accessed December 30, 2011); Los Angeles Times, *Escaped Death Row Inmate Found Dead*,
December 4, 1998 (available at http://articles.latimes.com/dec/o4/news/mn-50595);  Amarillo
Globe-News, *Condemned Inmates sent to New Facility*, March 4, 2000 (available at
http://amarillo.com/stories/030400/tex_LD0612.shtml)(last accessed December 30, 2011);
Amarillo Globe-News, *Body of escaped death row inmate found in Trinity*, December 4, 1998
(available at http://amarillo.com/stories/120498/new_body.shtml, last accessed December 30,
2011); Dallas Morning News, *Members of 'Texas Seven' get execution dates*, November 2, 2011
(describing Texas Seven gang as "notorious").

actually been made to ensure that such escapes were less likely. Nor did defense counsel

provide that information from any other source. On a question that was truly critical to the

jury's assessment of whether Petitioner would pose a "continuing threat to society" TEX.

CODE CRIM. PROC art. 37.071, there was no attempt to present a coherent, detailed picture

of why Petitioner was never likely to be able to escape, and could be safely housed within

the Texas Department of Corrections.

In sum, defense counsel failed to conduct and present to the jury a reasonable

investigation into the single most pressing issue in a Texas capital case, the actual probability

of future danger. They do not appear to have attempted to ascertain the facts for themselves,

or to have given comprehensive, timely thought to the issue.

Moreover, had the inaccurate testimony of Ms. Perryman-Evans been introduced by

the State, reversal would have been required under *Estrada*.[51] Here, however, it is defense

counsel's negligence in belatedly hiring an "expert" whose information was out of date, and

in failing to acquaint themselves with information on the vital details of their client's future

incarceration conditions that require reversal. In *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.

---

[51] Due process prohibits the State from securing a conviction or death sentence through the use of false or misleading evidence. *See Napue v. Illinois*, 360 U.S. 264 (1959)("a conviction obtained through use of false evidence ... must fall under the Fourteenth Amendment'). This is so whether or not the State knew of the falsity of the testimony. *See also Giglio v. United States*, 405 U.S. 150, 154 (1972)(suppression of material evidence violated due process whether it resulted from the prosecution's negligence or deliberate deception); *Miller v. Pate*, 386 U.S. 1 (1967)("[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence.").

2007), a capital case arising out of arson deaths, counsel retained his expert late in the case and deferred to his conclusion agreeing with the State's experts without question.   "[T]he mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable." 498 F.3d at 362.  The defense expert did not perform his own independent testing and deferred to the state experts who he believed to be better qualified:

> A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is. . . .  The point is not that [counsel] had a duty to shop around for another expert who would refute the conclusions of [the defense expert] and the State's experts.  The point is that [counsel] had a duty to know enough to make a reasoned determination about whether he should abandon a possible defense based on his expert's opinion. . . .  Having simply been served up with [the defense expert's] flat agreement with the State, and not having known either what [he] did to arrive at his conclusion or why he came out where he did, [counsel] was in no position to make this determination.

*Id.*  Counsel's conduct was not explained by strategy to simply challenge the identity of the arsonist since other circumstantial evidence against Richey "made such a choice unreasonable." *Id.*  "Although the circumstantial evidence alone might have led to a conviction, the question before us is not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result." *Id.* at 364.

Even the limited facts that have been identified by undersigned counsel demonstrate that Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments were violated

76

by counsel's deficient performance in this case, and that there can be no confidence in the outcome of his sentencing proceeding.  It is respectfully suggested that this is a claim that merits the opportunity for further investigation and development as requested above, pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and other recent authority of the United States Supreme Court, and that it should not be dismissed because it was not raised by state habeas counsel.

C.    <u>Trial Counsel failed to prepare to exclude or contest the introduction of pictures of Petitioner's tattoos, and evidence about them, despite the nature of the tattoos, and counsel's awareness that the State would seek to introduce evidence concerning that topic.</u>

As discussed above, trial counsel failed to prepare to address the issue of Mr. Wilkins' many tattoos, in spite of indications that they attracted interest, being considered noteworthy by the media and by a venire person who had improperly researched the tattoos on the internet.[52]

While counsel claimed at trial that they had had a lack of notice that evidence concerning the tattoos would be introduced, 34 RR 8-13, they themselves had mentioned the tattoos in their opening statement 26 RR 39, describing them as "shocking."   The tattoos came up again in the defense closing as "wild tattoos" and "pretty extreme."   29 RR 145.[53]

---

[52]Photographs of the tattoos were admitted into evidence as State's Exhibits 183-93; 204-09.

[53]Defense counsel even referred twice to a "666" tattooed on Petitioner's penis, 29 RR 145, 35 RR 41, "You've got demons and 666 on your body, including on your Johnson?"  This is a fact which undersigned counsel has been unable to locate in the trial transcript or otherwise referred to in evidence in the case.

The reality was that whether or not the State introduced evidence concerning the meaning of the tattoos, their potential shock value to the layperson was great. Failing to mitigate or minimize their impact was to leave the proverbial elephant in the room, without comment.

Evidence was introduced at the guilt phase that a pentagram design scratched onto the hood of the vehicle of one of the victims was the same as that of one of Mr. Wilkins' tattoos. 26 RR 203-4. At sentencing, the State called Deputy Richard Almendariz of the Tarrant County Sheriff's Office to testify that the tattoos contained Satanic, Confederate Hammerskin, skinhead, white supremacist and Nazi symbols.[54] 34 RR 7-80. Almendariz testified on Monday March 10, 2008. In a hearing outside the presence of the jury conducted under Tex. R. Evid. 705, Almendariz stated that the training and background that qualified him to interpret tattoos was that as an employee of the Sheriff's Office:

> I've been doing the gang intel for the confinement division since 1996. I've been a member of the National Major Gang Task Force and the Texas Violent Gang Task Force since 1996. I joined the Texas Gang Investigators Association last year, 2007. And I also instruct at our training academy.

34 RR 22.

Almendariz also explained during the Rule 705 hearing what interpretation he put on Mr. Wilkins' tattoos, but without being asked how he knew, for example, that the

---

[54]According to Almendariz, the Confederate Hammerskin are a gang founded in Dallas in the late 1980s. 34 RR 58.

Confederate Hammerskin favor the color red, 34 RR 32, or how he knew that specific symbols were those of the Hammerskin. 34 RR 34.

Both on *voir dire* and in his actual testimony, Almendariz admitted that he had no documentary evidence that Petitioner was a member of the Confederate Hammerskin gang, 34 RR 42, 46-47; 34 RR 72, or that Petitioner had any actual affiliation to a gang, rather he described himself as an "independent skinhead." Nonetheless, Almendariz testified, without objection, to the idea that gangs create problems in jail such as "Assaultive behavior toward other inmates, recruitment, extortion, protection, introduction of contraband. They're more likely than a regular non-affiliated inmate to become a disruption." 34 RR 51. Almendariz simply claimed that he could tell from the design of Mr. Wilkins' tattoos, including their use of red ink, that his tattoos were symbols of the Confederate Hammerskin.

Mr. Wilkins later testified that he was not a member of the Confederate Hammerskin, and that Almendariz was "lacking" when he testified to that. 35 RR 43. He described the tattoos as "mostly hype" designed to make people steer clear of him so that he would be let alone, 35 RR 42. He indicated that his tattoos could be read as making him a Dirty South Nazi, which was a street gang he had belonged to in his youth, and which had disbanded. 35 RR 43. In fact, the other members of that group were all deceased. 35 RR 77-79.

i.      <u>Defense Counsel failed to prepare to address the issue of Petitioner's tattoos.</u>

Defense counsel's handling of the tattoo issue was notably inept. They complained on the very day that Almendariz was to testify that they had had inadequate notice of the State's notice of intent to introduce this extraneous bad act evidence at the sentencing phase. This became Point Three of Petitioner's direct appeal. However, the point was not addressed in the opinion of the Texas Court of Criminal Appeals, on the ground that no harm was caused by any lack of notice since Mr. Wilkins' testified concerning why he had the tattoos, and which gang's insignia was illustrated in them. *See Wilkins v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 622 *22-26 (Tex. Crim. App. 2010). *See also Gray v. Netherland*, 518 U.S. 152, 168 (1996)(other than evidence that must be produced pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), a prosecutor is not compelled to disclose his evidence). In addition to the news coverage of Petitioner's tattoos and the venire person who had improperly researched the tattoos on the internet, counsel were in reality apprized of the thrust of Almendariz' testimony on the preceding Friday, 34 RR 18. They therefore had ample notice that the topic was likely to be of concern to the jury, and in fact had notice of the proposed testimony, in addition to Almendariz' name being on the State's witness list and there being references to tattooing and to the Confederate Hammerskin gang in the State's notices of Extraneous Offenses. 1 CR 226, 228

Given that they had advance notice that the tattoos were likely to be an issue about which the jury might have questions, and that the State would introduce evidence on the

topic, counsel might have been expected to file a motion *in limine* to exclude that testimony. However, they objected on the ground that it was "vague."[55]

The defense also moved orally for a continuance in which to retain a "symbologist." 34 RR 47-48. That was denied and the denial became Point Five on Mr. Wilkins' direct appeal.  Under Texas law, a written motion for a continuance is required. TEX CODE CRIM. PROC. Art. 29.03, and the Court of Criminal Appeals overruled the point error for lack of a written motion.   While it has sometimes been held that insistence by a State on a "formal ritual ...[that] would further no perceivable state interest" may not be allowed to interfere with the right to defend, *see Lee v. Kemna*, 534 U.S. 362, 366   (2002)(citation omitted)(unexpected absence of alibi witnesses), the defense here had had at least a couple of days actual notice of the type of testimony Almendariz would give, and had made no preparation for it, nor prepared a written motion.  The equities therefore did not favor the grant of a continuance without compliance with commonplace state rules of procedure.[56]

---

[55]Point Four on direct appeal was whether Deputy Almendariz testimony was more prejudicial than probative.  In addressing Point Four on direct appeal, the Court of Criminal Appeals held that there had not been an objection to the testimony of Deputy Almendariz.  In fact, the objection that the evidence was vague was made at 34 RR 47-48 but appellate counsel did not draw the Court's attention to it, referring instead to an objection to specific photographs made at 34 RR 57. *See Wilkins v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 622 *22-26 (Tex. Crim. App. 2010).   The Court held that the complain on appeal did not comport with that at trial. Even assuming that evidence being "vague" was a sufficient objection, direct appeal counsel did not move for rehearing, or attempt to correct this error.

[56]With regard to this point of error, appellate counsel all but conceded defeat, noting that there was no evidence to demonstrate that the defense could have located a "symbologist" if given more time, and that the appellate record did not demonstrate harm from the trial court's ruling, adding "It is possible that counsel on the Art. 11.072 writ will obtain a record under which harm can be determined; appellate counsel will defer to the writ as the more appropriate

Had the defense prepared thoughtfully for trial, no continuance would have been required, but as with so many other aspects of the defense preparation, it is apparent that counsel had not begun to seriously consider how to deal with the issue of Mr. Wilkins' tattoos. That the State wished to connect Mr Wilkins' with a known gang was not surprising. As Almendariz testified, gangs may cause disruption in correctional institutions, and the question of whether Mr. Wilkins "would commit criminal acts of violence that would constitute a continuing danger to society," *see* TEX. CODE CRIM. PROC. art. 37.071 § 2 (b)(1), was one the jury would be called upon to answer.

ii.    <u>Defense Counsel failed to move to exclude Almendariz' testimony under Tex. R. Evid. 702 or to discover the underlying facts under Tex. R. Evid. 705.</u>

There were tools available to defense counsel under State law that could have been used to either exclude Almendariz' testimony or to acquire information to undermine his opinion: TEX. R. EVID. 705(b) gives the right, in a criminal case, to a *voir dire* examination "directed to the underlying facts or data upon which the opinion is based."   Rule 705©

---

avenue for review by an appellate court." Appellant's Original (sic) Brief, at 42.   As discussed above, however, Art. 11.072 counsel did not plead any facts not contained in the record on appeal, and the only claim made in the State Application for Writ of Habeas Corpus was that the introduction of a picture of Adolf Hitler tattooed on Mr. Wilkins' back deprived him of his right to a fair trial.  Other than pointing out how inflammatory this image can be, Application for 11.071 Post-Conviction Writ of Habeas Corpus at 48, habeas counsel simply made arguments based on TEX. R. EVID. 403, concerning whether the evidence's probative value was substantially outweighed by the danger of unfair prejudice, and claimed that the Due Process clause was also violated. Habeas counsel also claimed that the admission of the photograph violated the Texas Constitution, but did not make any separate argument to support that or to demonstrate that the state constitution provided greater protection than the federal constitution, as required by, *e.g.,* *Shuffield v. State*, 189 S.W.3d 782, 788 (Tex. Crim. App. 2006).

further provides for the exclusion of the expert's opinion if the underlying facts or data do not provide a sufficient basis for the expert's opinion under TEX. R. EVID. 702. Thereafter, Rule 705(d) provides a "balancing test" for excluding facts or data if the danger they will be used for a purpose other than as explanation or support of the expert's opinion outweighs their legitimate value, or if they are unduly prejudicial, and provides for a limiting instruction to ensure that such information is properly.

Although defense counsel sought and received a Rule 705 hearing, counsel did not inquire into the actual sources of Almendariz' professed knowledge of the Confederate Hammerskin or any other area of which he spoke, for example the use of runes by white supremacists, or whether the color red has "strong importance" for a skinhead. 34 RR 27. Counsel acquired no information as to whether Almendariz had received systematic training, done in-depth self-guided study or had simply spoken to other "gang investigators" or surfed the internet in order to acquire his data, or what that data consisted of. Thus counsel lost a valuable opportunity to demonstrate a lack of substance behind Almendariz' prognostications.

TEX. R. EVID. 702 sets out the standard for admitting expert opinion testimony: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Scientific evidence is judged by stringent criteria: "(a) the underlying scientific

theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992)(also setting out nonexclusive list of factors that a trial court can consider in determining scientific reliability); *See also Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010). A somewhat more flexible inquiry may be applied in cases involving other fields, asking: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim. App. 1998).

Although defense counsel made a fleeting reference to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), of which *Kelly* is the state law equivalent, 34 RR 25, no actual challenge was made to whether Almendariz was qualified to testify as an expert. He testified to having done "gang intel" since 1996, without explaining what that task entailed. He claimed membership of the National Major Gang Task Force, an entity that does not appear to have a functioning website;[57] and the Texas Violent Gang Task Force, since 1996. The Texas Violent Gang Task Force is an entity established under TEX. CODE CRIM. PROC. Art. 61.10, whose purpose is to "form a strategic partnership" among various agencies "to better enable those agencies to take a proactive stance towards tracking gang

---

[57]*See* www.facebook.com/pages/national-major-Gang-Taskforce/155665357805012 (last accessed May 15, 2012); www.nagia.org/links.asp (Last accessed May 15, 2012).

activity and the growth and spread of gangs statewide." Almendariz did not explain what his membership of either organization had contributed to his ability to speak concerning Mr. Wilkins' tattoos. Almendariz also belongs to the Texas Gang Investigators Association, a voluntary membership organization, open not only to all full-time licensed peace officers, but to any other person approved by its Board of Directors.[58]

Thus, counsel failed to make any effective inquiry into the legitimacy of Almendariz' actual field of practice, and whether his testimony fell within the norms for that field, and whether it was derived from the normal principles or sources utilized in that field.  He was permitted to testify about matters bearing on the critical issue of the jury's assessment of Mr. Wilkins' future dangerousness, not only as a law enforcement officer but as an expert whose expertise had not in fact been established.  If his qualifications and the facts on which he relied were indeed overstated then the jury received a false impression of their validity and Mr. Wilkins' sentence should not be allowed to stand.  *See Napue v. Illinois*, 360 U.S. 264 (1959)("a conviction obtained through use of false evidence ... must fall under the Fourteenth Amendment'); *Miller v. Pate*, 386 U.S. 1 (1967)("[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence.").

iii.   <u>Defense Counsel failed to move to exclude irrelevant evidence of a purported gang affiliation.</u>

---

[58]<u>www.tgia.net/join-us.html</u> (last accessed May 15, 2012).

Defense counsel at Mr. Wilkins' sentencing also failed to move to exclude the testimony of Deputy Almendariz on the basis that it violated the First Amendment. The First Amendment protects abstract beliefs, and forbids the admission of evidence concerning those beliefs when they have no bearing on the issue being tried. *Dawson v. Delaware*, 503 U.S. 159, 166-67 (1992). In Dawson, there was stipulated testimony concerning the Aryan Brotherhood, a white racist prison gang, including a statement that such gangs existed in many state prisons. That stipulation was entered into by the defense in order to avoid the admission of expert testimony concerning the Aryan Brotherhood. The prosecution was allowed to introduce evidence that Dawson had an Aryan brotherhood tattoo on his hand. The United States Supreme Court held that this was error, and reversed, noting that the evidence in question bore no relationship to the offense in question and did not demonstrate that the Aryan Brotherhood is associated with drugs, escapes or assaults on other inmates, which might have resulted in "a different case." The Court acknowledged that "associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society," but found no such purpose in the evidence introduced against Dawson. *Id.* at 167. "[O]n the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible." *Id.* Furthermore, the evidence did not legitimately rebut any evidence offered by the defense.

Here, the evidence that Mr. Wilkins was ever a member of the Confederate Hammerskin rested entirely on Almendariz' supposition. There was no actual evidence of an admission by Mr. Wilkins that he was a member of that organization, and no evidence at all of whether it was a prison gang or a street gang, what activities it might engage in, or what how large its membership is or was. Mr. Wilkins' position was that he was an "independent skinhead," and he testified that his purpose in acquiring so many tattoos was that he wanted to be left alone. 35 RR 42-43. He acknowledged having been involved in the "Dirty South Nazis" as a teenager - something that might not even have come up, but for the testimony of Almendariz - and that he still wrote their slogans on things, 35 RR 7. He said that he was the only member of that group left alive. Again, no evidence concerning the actual beliefs or activities of that group was introduced. Indeed, no evidence was ever introduced to demonstrate that the ideology demonstrated by Mr. Wilkins' tattoos was something on which he had ever acted: he was quite clear that he preferred a separation of the races, but was adamant that he did not "hate anybody for the color of their skin" or any other factor. 51-52. While the victims of the homicides in this case were minorities, there was no evidence that the offenses were racially motivated. The only incident that even suggested a racial motivation was an assault on an hispanic inmate at the Taft Correctional Institution in California which seemed to be motivated by the fact that contaminated drugs had been brought into that prison by that inmate, rather than being racial *per se*. Testimony of Matthew Holm, 30 RR 138-39. There was no evidence that Mr. Wilkins' had ever

87

engaged in satanic or Nazi-inspired activities. Thus, the prosecution's motivation in introducing that evidence seems to have been simply to demonstrate that Mr. Wilkins had "morally reprehensible" beliefs. The defense did nothing of value to counter that evidence, either by presentation of evidence in explanation or systematic efforts to exclude the introduction of that testimony in the first place. Had they done so, "there is a reasonable probability that at least one juror would have struck a different balance," and that Mr. Wilkins was thereby prejudiced by his counsel's deficient performance. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

The foregoing facts, identified by undersigned counsel, demonstrate that Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments were violated by counsel's deficient performance in this case, and that there can be no confidence in the outcome of his sentencing proceeding. It is respectfully suggested that these are claims that merit the opportunity for further investigation and development of the facts concerning Deputy Almendariz and his testimony, pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and other recent authority of the United States Supreme Court, and that it should not be dismissed because it was not raised by state habeas counsel.

D.     <u>Trial Counsel failed to conduct an investigation into the evidence the State would introduce at sentencing in seeking to have Petitioner sentenced to death.</u>

The State filed an initial "Notice of Intent to Introduce Evidence Pursuant to Article 37.07, 37.071 and 38.36 Code of Criminal Procedure and Articles 404(b) and 609(f) Texas

Rules of Evidence" on January 3, 2008, 1 CR199-206.  A supplemental notice was filed on

February 2, 2008.  1 CR 222-229.  The supplemental notice ran to 8 pages and listed many

incidents occurring in Texas, New Mexico and California, and other allegations.

At sentencing, the State introduced evidence of many of the incidents and offenses of

which notice had been given, through a total of twenty-four witnesses. 30 RR 10 - 33 RR 96.

On review of such files and billing as are available, defense counsel seem to have made

virtually no attempt to prepare to contest any of the State's evidence by investigation of the

incidents in question, interviewing of witnesses or background research.  While Petitioner

would ultimately admit to many of the alleged incidents, it was counsel's job to prepare to

defend him:[59]

A.     [C]ounsel at every stage of the case have a continuing duty to
       investigate issues bearing upon penalty and to seek information that
       supports mitigation or rebuts the prosecution's case in aggravation ...

H.     Trial counsel should determine at the earliest possible time what
       aggravating factors the prosecution will rely upon in seeking the death
       penalty and what evidence will be offered in support thereof [.]

I.     Counsel at all stages of the case should carefully consider whether all
       or part of the aggravating evidence may appropriately be challenged as
       improper, inaccurate, misleading or not legally admissible.

---

[59]It is questionable whether Petitioner would have testified at all had counsel
provided effective assistance in their preparation of the case and advice to Petitioner
about his plea.

89

American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11.

That failure to investigate prior convictions or extraneous incidents can be disastrous is well illustrated by *Rompilla v. Beard*, 545 U.S. 374 (2005). Counsel were ineffective in that capital sentencing for failing "to make reasonable efforts to obtain and review material that counsel [knew] the prosecution [would] probably rely on as evidence of aggravation at the sentencing phase of the trial," *id.* at 377, which would have led to significant mitigation. Counsel interviewed Rompilla, but he provided minimal assistance in mitigation and "was actively obstructive by sending counsel off on false leads," *id.* at 381.  Counsel did not obtain the file of a prior conviction for rape and assault, even though counsel knew the state intended to rely on the aggravating circumstance of a significant history of felony convictions indicating the use or threat of violence.  They also knew that the state specifically intended to read the testimony of the prior rape victim into evidence in sentencing.

In a capital sentencing, "defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation." *Id.* at 380-81.  While "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," *id.* at 383, counsel's conduct in Rompilla was "deficient in failing to examine the court file," *id.*, on the prior conviction because counsel knew the state intended to rely on it and "the prior conviction file was a public document, readily available for the asking at the very courthouse where [the defendant] was to be tried," *id.* at 384.  While

counsel opposed admission of the evidence, this was insufficient because "[c]ounsel's obligation to rebut aggravating evidence extended beyond arguing it ought to be kept out." *Id.* at 386 n.5. In *Rompilla*, despite knowing of the state's intent to rely on the evidence, counsel did not look at any part of the file, until the day before the sentencing phase began and then looked only at the transcript of the victim's testimony. *Id.* at 385-86.

The Court also noted that "[t]he notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense." *Id.* at 387. It is described "in terms no one could misunderstand" in the ABA Standards for Criminal Justice "in circulation," *id.,* at the time of trial and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases promulgated in 1989, "shortly after" this trial, and made "even more explicit" in the 2003 revisions. *Id.* at 387 n.7. "[I]n any case, [we] cannot think of any situation in which defense counsel should not make some effort to learn the information in the possession of the prosecution and law enforcement authorities." *Id.* at 387 n.6. The state court's application of *Strickland* was objectively unreasonable because the court reasoned that "defense counsel's efforts to find mitigating evidence by other means excused them from looking at the prior conviction file." *Id.* at 388. The Court rejected this reasoning because "[n]o reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony." *Id.* at 389. Counsel is not required to look for a needle in a haystack, when a lawyer truly has reason to

doubt there is any needle there. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell the defense counsel something about what the prosecution can produce. *Id.* The Court concluded that the previously undiscovered evidence "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury," and might well have influenced the jury's appraisal of the case. The Court found prejudice and reversed Rompilla's death sentence. *Id.* at 393.

In this case, Petitioner's previous convictions and the other alleged incidents should have been investigated, and any appropriate claims raised, by state habeas counsel. Through no fault of Petitioner's, these issues went uninvestigated by former counsel, and current counsel has not had sufficient time, nor any funding, for an adequate investigation.

Petitioner therefore respectfully requests sufficient time and funding, and in due course, leave to amend this Petition once investigation has taken place and relevant claims concerning the possible ineffective assistance of trial counsel and any other issues related to the State's evidence in aggravation have been identified and developed.

### Claim for Relief Number 2

**Petitioner was denied the right to unconflicted counsel at trial, because trial counsel had previously represented the victim of an extraneous homicide, thereby violating Petitioner's Sixth Amendment right to effective assistance of counsel.**