

There is no question that Wes Ball, Mr. Wilkins's lead trial counsel had previously represented Gilbert Vallejo, the victim of an extraneous homicide, and that the issue of that extraneous offense came up at both phases of the trial.

At the trial on the merits, the defense sought to introduce evidence of the Vallejo homicide in order to demonstrate that Mr. Wilkins's confession to that, and the other offenses, was false. 29 RR 6-11. The defense theory was essentially that Mr. Wilkins had a propensity to confess to crimes that he either did not commit, or that never happened. This evidence was excluded at the trial on the merits, but at sentencing the State introduced evidence of the Vallejo homicide. 32 RR 7 - 33 RR 96. At that time the State also introduced evidence that the projectiles fired in the Freeman/Silva murders matched a projectile found at the Vallejo crime scene, 32 RR 70-72, 87, although fingerprints taken from a car parked at the scene of that murder could not be linked to Mr. Wilkins. 33 RR 20-21.[60]

Mr Ball would later claim that:

During the presentation of the evidence of Mr. Wilkins' shooting Mr. Vallejo, evidence was presented that Mr. Vallejo was likely a drunk and belligerent individual when he and Mr. Wilkins met outside a bar. This evidence was the

---

[60]Neither trial nor habeas counsel seem to have sought to independently verify the reliability of the toolmark evidence, or other forensic evidence, introduced by the State. This is one of many issues for which additional time and resources are now required. Moreover, as stated above, undersigned counsel has not had access to the full prosecution discovery material, let alone bench notes or any other underlying material concerning this evidence. Undersigned counsel has only been provided with portions of the files of trial and habeas counsel, and the habeas investigator.

result of our investigation of the offense and not from anything that had occurred in 1988.

*Petition Exhibit 24* - Ball Letter to Chief Disciplinary Counsel at 15.   However, the trial

transcript does not reveal defense counsel as eliciting more than that Mr. Vallejo had had

four or five beers, 32 RR 32, and establishing that his blood alcohol level, at 0.175

percentage of ethanol, was sufficient to impair "both fine and gross motor coordination." 32

RR 135.

The existence of the conflict was drawn to Mr. Ball's attention by the prosecution,

since he had not identified it himself.  HDCI at 11.  Mr. Wilkins was made aware of Mr.

Ball's previous representation of Vallejo prior to trial, but Mr. Ball did not bring the matter

to the trial court's attention.   While Mr. Ball informed Mr. Wilkins of his representation of

Vallejo, he did not inform the court, did not explain to Mr. Wilkins the possible legal

consequences of the situation, and did not obtain a written waiver from him:[61]

| | |
|---|---|
| [Mr. Ball]: | What I recall was I broached the subject with you and told you about my prior representation of Mr. Vallejo -- |
| [Mr. Wilkins]: | True.  But I'm nobody. |
| [Mr. Ball]: | – and told you what I knew about it.  And it was my opinion you were making full and complete decisions about the course of |

---

[61]Nor does Mr. Ball appear to have discussed the matter with Mr. Vallejo's heirs.

94

your trial.   And I believe I told you if you wanted me out because of that, I would accommodate you and do so.


[Mr. Wilkins]:        Mr. Ball, the point is I didn't know the law.


Hearing to Determine Conflict of Interest (HDCI) of March 9, 2009 at 14-16.

Later, Mr. Ball was appointed to represent Mr. Wilkins on direct appeal,[62] but during the pendency of the appeal Mr. Wilkins became aware that Mr. Ball's former representation of an alleged victim of a current client presented a legal conflict of interests.[63]   HDCI at 15-16.  He then sought to have Mr. Ball removed as his direct appeal counsel, and the Court of Criminal Appeals entered an order noting: "Appellant asserts that because of [Ball's relationship with Vallejo] and his desire to see appellant convicted, counsel was blatantly ineffective in his representation of appellant at trial, and will continue to be ineffective on appeal.  Under these circumstances we will abate the appeal and remand the case to the trial court to investigate and develop a record on appellant's allegation." *See* Court of Criminal Appeals Order of February 11, 2009 in Cause No. AP-75,878.

---

[62]Normally, trial counsel in a Texas capital case is precluded from also representing the defendant on direct appeal.  *See* TEX. CODE CRIM. PROC. art. 26.052(k).  Such an appointment may, however, be made if there is "good cause."  The "good cause" for appointing Mr. Ball was only that it was the request of both Mr. Wilkins and Mr. Ball, that Mr. Ball was familiar with the case, the legal issues and Mr. Wilkins, and that Mr. Ball was qualified to handle death penalty appeals.  *See Motion Exhibit J* - Trial Court Finding of Good Cause.
[63]*See* Hearing to Determine Conflict of Interest (HDCI) of March 9, 2009 at 16-17.

The hearing was held in the trial court on March 9, 2009, and the trial court concluded that no conflict of interest had been demonstrated, HDCI at 27. However, Mr. Ball offered to withdraw as appellate counsel, to which Mr. Wilkins agreed. HDCI at 22-24.

Nonetheless, that hearing was insufficient to resolve the issue of whether Mr. Ball had indeed labored under a conflict of interest. Mr. Wilkins was brought back to Tarrant County for the hearing, but was effectively without representation. Mr. Ball did not in any way represent Mr. Wilkins, but simply addressed the court to explain his own actions. Mr. Wilkins' habeas corpus counsel Jack Strickland was present in court, together with an associate and an investigator, *See Motion Exhibit F* - Jack Strickland Billing at 130, 139; *Motion Exhibit G* - Fred Pendergraf Billing at 154, but took no action to have Mr. Wilkins represented, or to represent him himself. Nor did the trial court offer to appoint conflict-free counsel for the purpose of the hearing, as would have been authorized "in the interests of justice" under TEX. CODE CRIM. PROC. Art 1.051(a)( c) or (d)(4). While the purpose of the hearing was to develop a record on Petitioner's allegation that the conflict affected both his trial and appeal, the trial court did little to ensure that that goal was met, and Petitioner was effectively unrepresented at the hearing.

Mr. Wilkins wanted the opportunity to call witnesses, including the trial judge, the trial prosecutors Kevin Rousseau and Tiffany Burks, and members of the Vallejo family. HDCI at 8-9. He seemed unaware that in order to have witnesses called, those individuals needed to be notified or placed under subpoena. HDCI at 8. He failed to understand that it

96

is not possible to have the judge presiding over a proceeding also act as a witness, TEXAS R. EVID. 605, and that it would have been necessary to move for a different judge to preside over the conflict hearing if he was to have the trial judge testify. *See, e.g., Hensarling v. State*, 829 S.W.2d 168 (Tex. Crim. App. 1992). HDCI at 9. He did not ask for anyone to be placed under oath, and even when the state also asked for that to happen, HDCI at 10, the hearing proceeded informally, without anyone being sworn as a witness.

Mr. Ball was able to state at the hearing that he had obtained information about "Mr. Vallejo and his background" prior to trial and that he was "a heavy consumer of alcoholic beverages among other things." 32 RR 12. He denied having any further knowledge of Mr. Vallejo beyond than his prior representation of him in probation revocation proceedings.[64]

Deprived of legal representation to assist in resolving the matter, for example, by investigating the existence of the conflict prior to the hearing, or asking the court for an *in camera* review of Mr. Ball's file on the Vallejo case, Mr. Wilkins was unable to establish whether or not Mr. Ball had actually labored under a conflict. Mr. Ball was allowed to state his position, largely in narrative form, HDCI 10-14, 17-19, 21-23, and without being cross-examined by anyone with legal knowledge or who had been independently able to look into the facts.

---

[64]Inspection of that portion of Mr. Ball's file that has been released does not demonstrate any independent investigation into Mr. Vallejo such as investigators' reports. It is possible that Mr. Ball obtained information from prosecution discovery materials contained in Mr. Wilkins's files, but since these have been withheld from current counsel, that cannot be ascertained.



A.    Mr. Ball labored under a conflict of interest

An actual conflict of interest negates the unimpaired loyalty that a defendant is entitled to expect and receive from his attorney. *Cuyler v. Sullivan*, 446 U.S. 335, 356 (1980). When counsel labors under a conflict of interest that adversely affects counsel's performance, there is an "actual conflict" for Sixth Amendment purposes, not merely a potential conflict, and reversal must ensue without any need for an inquiry into prejudice. *Cuyler*, 446 U.S. at 349-50: "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."

Mr. Ball's representation of Mr. Wilkins, having previously represented Mr. Vallejo presented, at minimum, a potential conflict of interest. *See, e.g., Mickens v. Taylor*, 535 U.S. 162, 171-73 (2002) (conflict of interest must also affect strategic decisions by counsel in order to require reversal). Whether the situation presented an actual conflict of interests that actually affected the adequacy of Mr. Ball and his cocounsel's representation cannot be ascertained, because the hearing in question was manifestly inadequate to do so.  The mere fact that Mr. Wilkins was aware that Mr. Ball had previously represented Vallejo does not decide this question: The "imponderables" created by a conflict of interest "are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics." *Wheat v. United States*, 486 U.S. 153, 163 (1988).

98

The defense confrontation of the evidence concerning the Vallejo homicide presented at the sentencing phase was in fact weak and the defense did not establish that Mr. Vallejo was belligerent, as claimed by Mr. Ball. Counsel's files reveal virtually no evidence of any independent investigation by the defense into Mr. Vallejo or the circumstances of his death. Mr. Ball failed to obtain an informed waiver of Mr. Wilkins' right to unconflicted counsel. Mr. Ball failed to bring the potential conflict of interest to the notice of the trial court, notwithstanding his duty to do so: "Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980).[65]

The adverse effect of the conflict on counsel's representation.

While it is true that Mr. Ball withdrew from representing Mr. Wilkins on direct appeal, that withdrawal does not cure the potential conflict of interest that occurred at trial. Whether this was an actual conflict of interest, requiring reversal, is something that only investigation and a properly conducted hearing on this matter can ascertain. Investigation is particularly important because when there is joint representation of conflicting interests, "the evil – it bears repeating – is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the

---

[65]The prosecution also failed to notify the court of the potential problem, despite being aware of it. HDCI at 11. This was inconsistent with the primary duty of the prosecutor in Texas "not to convict, but to see that justice is done." TEX CODE CRIM. PROC. Art 2.01; *see also United States v. Agurs*, 427 U.S. 97, 110-11 (1976)(government attorney must "be faithful to his client's overriding interest that 'justice shall be done'"(citation omitted).

sentencing process." *Holloway*, 435 U.S. at 490. The hearing that was conducted was so inadequate that it left the question as to the existence of an actual conflict, and how it may have affected counsel's performance, unanswered and unaddressed.

Therefore, it is respectfully suggested that this is a claim that merits the opportunity for further investigation and development as requested above, pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and other recent authority of the United States Supreme Court, and that it should not be dismissed because it was not raised by state habeas counsel.

Moreover, Mr. Wilkins repeatedly raised a concern, both in his *pro se* pleadings and at the hearing to determine conflict of interest, that the trial court may have known, at the time of trial, about Mr. Ball's prior representation of Gilbert Vallejo. Mr. Wilkins asked for what he termed a "*Garcia* hearing," a term the trial court did not know. HDCI at 9. The name comes from *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975), *see Perez v. State*, 352 S.W.3d 751, 754 (Tex. App. - San Antonio 2011, no pet. ) and refers to a hearing required when a court either knows, or reasonably should know, of an actual conflict of interest between client and counsel. Such a hearing is in fact required as a matter of federal constitutional law: *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978) (court apprised of potential conflict of interest must take action protective of the accused's right to the assistance of counsel); *see also Glasser v. United States*, 315 U.S. 60, 71 (1942)(same). The trial court asserted that "the first I heard of these allegations was after you made them" HDCI at 9. Nonetheless, should any information to the contrary come to light on further inquiry, Mr. Wilkins wishes to reserve the right to assert as a separate claim the denial of an earlier

hearing on this conflict of interest, if the trial court in fact had knowledge of the conflict prior to Mr. Wilkins' filing of his motion to have Mr. Ball removed as appellate counsel.

### Claim for Relief Number 3

**Petitioner was denied the right to counsel at a critical stage of the proceedings, because he was functionally without counsel during a hearing on whether his trial counsel had labored under a conflict of interests, having previously represented the victim of an extraneous homicide of which evidence was introduced by the State, thereby violating Petitioner's Sixth Amendment right to the assistance of counsel.**

As discussed above with regard to Claim for Relief Number 2, Mr. Wilkins's trial counsel Wessley T. Ball, later also appointed as his appellate counsel, had previously represented the victim of an extraneous homicide of which the State introduced evidence at the sentencing phase of trial. Mr. Wilkins was *de facto* without counsel during the hearing convened to ascertain whether Mr. Ball had in fact had a conflict of interests affecting the adequacy of his representation, although both Mr. Ball and state habeas counsel Jack Strickland were present at that hearing. Without counsel, Mr. Wilkins was unable to call witnesses, to effectively examine Mr. Ball or to ensure that the full facts of Mr. Ball's prior representation and its effect on his own trial were ascertained.[66]   The Court of Criminal Appeals order had stated: "Appellant asserts that because of [Ball's relationship with

---

[66]There is no evidence that Mr. Wilkins was ever offered counsel to assist him at the hearing, or that he was aware that he had that right. In determining whether a defendant has waived his right to conflict-free representation, a court must, of course, "indulge every reasonable presumption against the waiver." *Glasser v. United States*, 315 U.S. 60, 70 (1942).

Vallejo] and his desire to see appellant convicted, counsel was blatantly ineffective in his representation of appellant at trial, and will continue to be ineffective on appeal. Under these circumstances we will abate the appeal and remand the case to the trial court to investigate and develop a record on appellant's allegation." *See* Court of Criminal Appeals Order of February 11, 2009 in Cause No. AP-75,878. No such investigation and development took place, because Petitioner was *de facto* without counsel.

The Sixth Amendment provides that a criminal defendant shall have the right to "the assistance of counsel for his defence." This right has been accorded, "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Generally, a defendant alleging a Sixth Amendment violation must demonstrate " a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). There is an exception to this general rule. A defendant is spared the need of showing a probable effect on the outcome, where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the result of the proceeding is unreliable is so high that a case-by-case inquiry is unnecessary. *See Cronic*, 466 U.S. at 658-59. *See also Geders v. United States*, 425 U.S. 80, 91 (1976). If a court allows a defendant to proceed at a critical stage without the assistance of counsel and without a competent waiver of the right to counsel, the court fails to discharge its "protecting duty" and allows a violation of the

102

defendant's sixth amendment right to assistance of counsel. *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963).  In such circumstances, the reviewing court must reverse the conviction without "stopping to determine whether prejudice resulted." *White v. Maryland*, 373 U.S. 59, 60 (1963).

The "mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." *Holloway*, 435 U.S. at 490.  In *Cronic*, the Court explained that "if no actual assistance for the accused's defense is provided, then the constitutional guarantee has been violated." 466 U.S. at 654 (citations omitted).  When that is so, and if there is no valid waiver of counsel, then prejudice must be presumed and the conviction set aside.

This hearing was a critical stage of proceedings, at which Mr. Wilkins was entitled to representation by counsel.  *United States v. Ash,* 413 U.S. 300, 313 (1973) stated that "the test utilized by the Court [in determining whether an event is a critical stage] has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." Cases concerning whether an event is a critical stage often discuss the question whether a prosecution has commenced, at which stage the right to counsel "attaches," or whether the defendant is at that point confronted by his adversary.  *See, e.g., Rothgery v. Gillespie County*, 554 U.S. 191, 199 (2008); *Massiah v. United States,* 377 U.S. 201 (1964).  More than that, however, "[a] concern of ... lasting importance was the recognition and awareness that an unaided layman



had little skill in arguing the law or in coping with an intricate procedural system.  The

function of counsel as a guide through complex legal technicalities long has been recognized

by this Court." *Ash*, 413 U.S. at 307.  Numerous courts have applied the automatic reversal

criteria in cases where a criminal defendant was deprived of the assistance of counsel at a

critical stage.  *See, e.g., Penson v. Ohio,* 488 U.S. 75, 86-89 (1988) (denial of counsel during

"decisional process" on appeal); *Green v. Arn*, 809 F.2d 1257, 1263 (6th Cir. 1987)(reversal

required when counsel absent during the taking of evidence); *United States v. Minsky*, 963

F.2d 870, 874 (6th Cir. 1992) (reversal automatic when counsel excluded from a sidebar

conference);  *Carter v. Sowders*, 5 F.3d 975, 979 (6th Cir. 1993)(reversal automatic when

counsel absent from a pre-trial deposition).

The answer to the question of whether Mr. Wilkins required "aid in coping with legal

problems" was made manifestly clear by his inability to call witnesses or otherwise properly

conduct the hearing held to determine whether Mr. Ball had a conflict of interests.  The

deprivation of counsel at this critical stage resulted in a situation that was precisely what a

criminal proceeding should not be, "a sacrifice of [an] unarmed prisoner ... to gladiators."

*Cronic*, 466 U.S. at 657, *quoting United States ex rel. Williams v. Twomey*, 510 F.2d 634,

640 (7th Cir. 1975).  In a room full of lawyers, at least two of them - Mr. Ball and Mr.

Strickland - nominally appointed to represent him, Mr. Wilkins was without legal assistance

at a proceeding to determine whether Mr. Ball, his trial counsel, had a conflict of interests

potentially affecting both phases of his capital trial, as well as his direct appeal.

This issue should have been raised in state habeas corpus proceedings, along with any other related issues concerning the performance of trial and appellate counsel. The unfairness of having a layperson represent himself in a hearing concerning vital trial and appellate rights that may have been violated was manifest. However, state habeas counsel, who was appointed to Petitioner's case and ultimately was paid to attend the hearing, did nothing to protect Petitioner's interests. *See Motion Exhibit F* - Jack Strickland billing at 130.

If it is not agreed that reversal is required on the record as it stands, it is respectfully suggested that this is still a claim that merits the opportunity for further investigation and development as requested above, pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and other recent authority of the United States Supreme Court, and that should not be dismissed because it was not raised by state habeas counsel.

### Claim for Relief Number 4

(A)    Petitioner's plea of not guilty was not voluntary: he had expressed his wish to plead guilty to counsel, but at counsel's insistence the trial on the merits went forward, thereby violating Petitioner's Sixth Amendment right to the effective assistance of counsel and to due process of law under the Fourteenth Amendment.

(B)    Petitioner's plea of not guilty was not voluntary: counsel knew that Petitioner wished to plead guilty but insisted on the trial going ahead because it would benefit counsel to do so, thereby violating Petitioner's Sixth Amendment right to the assistance of unconflicted counsel and to due process of law under the Fourteenth Amendment.

Petitioner's doubt as to the correct plea to enter in this case was apparent early on. At an initial arraignment outside the presence of the jury, he was asked:

| The Court: | What is your plea? |
| [Petitioner]: | No, Sir. |
| Mr. St. John: | He enters a plea of not guilty, your honor. |

2 RR 54.

Again, at the outset of Petitioner's trial the indictment was read to him but it was counsel, not Petitioner, who entered a plea of not guilty:

| The Court: | Mr. Wilkins, to the indictment you may plead either guilty or not guilty.  What is your plea? |
| Mr. St. John:[67] | Judge, Mr. Wilkins pleads not guilty. |

26 RR 25.

Thus, Petitioner never unequivocally entered his own plea of not guilty.  Petitioner had in fact expressed to counsel that he did not want to go to trial but to plead guilty, and he testified to that at the sentencing phase of his trial.

| [Petitioner]: | I've been trying to tell those people from out of the gate that, look, I'm guilty, okay so now what? Let's – let's – I've been in jail for 27 months. Tell them, look, let's get on and get on over there and get this over with sooner rather than later. |

25 RR 14-15.

---

[67]Mr. Warren St. John was second-chair counsel at trial, with Mr. Wessley Ball serving as lead counsel.

106

[Mr. Ball]:    Before I forget, while we're sitting here talking, you entered –
               we entered a plea of not guilty for you at the beginning of the
               trial.  Was that your idea?

[Petitioner]:  No, absolutely not.  Like I said, I told you I just wanted to
               absolutely – actually, you know, I said look, why can't we just
               plead guilty, pick the jury, okay, fine, pick 'em, plead guilty, cut
               this whole first half of the trial out and just get into sentencing.
               ¶ Well, these guys over here, they convinced me, of course, they
               – of course, they're sitting there – they're billing up a whole
               bunch of hours and stuff too.  So I said, you know, buy your kids
               something nice, buy them Big Wheels or something, and then
               we'll get down to it.  That's what I told them right now, we're
               at right now I'm pleading guilty, even though they didn't want
               me to, to all what they got and some more stuff, too.

[Mr. Ball]:    Okay.  So you understand billable hours?

[Petitioner]:  Oh, yeah.  Rack 'em up.

[Mr. Ball]:    Something near and dear to my heart.

35 RR 16-17.

Mr. Ball does not seem to have subsequently taken the view that this was a case where

he could realistically have succeeded for his client at the trial on the merits.[68]  In a response

to a written grievance that Mr. Wilkins filed with the State Bar of Texas, Mr. Ball wrote:

"Mr. Wilkins' own recorded confessions to three murders was what got him convicted."

*Petition Exhibit 24* - Ball Letter to Office of Chief Disciplinary Counsel at 158.[69]  Since Mr.

---

[68]As discussed above, whether the course of trial would have gone differently had counsel
prepared and investigated more fully remains an open question that cannot be resolved without
the time and resources to properly investigate the case.

[69]This letter would have more accurately stated "two confessions" got Mr. Wilkins
convicted: the evidence of the third homicide did not come in until the sentencing phase.  32 RR
8-138.

Ball knew by the time of Mr. Wilkins' arraignment before the jury that the two confessions relevant to the indicted offenses would ultimately be admitted, 26 RR 14-15, 1 CR 246-50, the decision to press ahead with a trial, against his own client's wishes, seems quixotic. While trial counsel had a potential line of defense in mind, it required the jury to believe, or at least to have a reasonable doubt concerning, the falsity of Mr. Wilkins' many confessions. *See* Opening Statement of Defense Counsel 26 RR 36-41. To that end, defense counsel even intended to introduce Mr. Wilkins' confession to another homicide, that of Gilbert Vallejo, but counsel had no assurance, at the outset of trial, that evidence of that offense would be admitted at the trial on the merits. Indeed, it was not, and thereby a significant component of the defense theory of the case was removed. 29 RR 6-11.

Thus, the prospect of success at trial at the time defense counsel entered Petitioner's plea for him was speculative at best. Nonetheless, against their client's wishes, counsel forged ahead with a trial lasting five days, calling for the jury to attend court in difficult winter weather, *see, e.g.*. 32 RR 139, as well as requiring the testimony of the wife of one of the victims. *See* Testimony of Rachel Caballero, 26 RR 97-128. That this was counsel's decision, not Mr. Wilkins,' is a fact that Mr. Ball has already affirmed: "Mr. Wilkins' entertained the notion of entering a guilty plea to the Capital Murder indictment. *At our insistence*, he entered a plea of not guilty and permitted us to defend the substantive charges against him. " *Petition Exhibit 24* at 156 (emphasis added). It is also a fact that state habeas counsel corroborates: "You stated numerous times to your lawyers that you simply wished

to plead guilty to these charges and that you didn't care whether you lived or died." *Petition Exhibit 4* - Strickland letter to Wilkins, May 25, 2010 at 14.

Counsel later tried to explain in argument that proceeding as they had in going to trial, had somehow been a "valiant effort." 35 RR 169. However, they presented no witnesses and were not able to undermine the State's case, not least because the evidence of the Vallejo homicide, which they hoped to rely on to demonstrate the falsity of Mr. Wilkins' confessions, was excluded. The efforts that they did make were less than valiant, and still do not explain why they overrode their client's wishes.

That counsel had much to gain by proceeding to trial, even if that was contrary to their client's wishes, is shown by their billing: Mr. Ball billed a total of $124,304.45 for his work on Petitioner's trial, at rates as high as $225 an hour for out of court time, and $2,000 per day for the trial itself. He billed another $6,437.50 for work on Petitioner's appeal, at rates as high as $225. *Petition Exhibit 42* - Wessley T. Ball billing. Mr. St. John billed a total of $129,155.72, also at rates rising to $225 an hour for out of court time, and $2,000 per day for the trial itself. *Petition Exhibit 8* - Warren St. John billing at 26-27. [70]

---

[70]Trial counsel's concern not to alienate the trial court that was paying them so amply is also demonstrated by their decision to sign affidavits attacking Mr. Wilkins' credibility when he made allegations that the trial court viewed child pornography. Those affidavits were attached to a Motion to Seal filed by Mr. Strickland in an attempt to seal a document in which Mr. Wilkins complained about the performance of both Strickland and trial counsel. *Motion Exhibit LL* - Motion to Seal pro se Filing in CCA. Mr. Strickland intentionally did not provide Mr. Wilkins with a copy of the Motion to Seal.

It may be noted that normally, trial counsel in a Texas capital case is precluded from also representing the defendant on direct appeal. *See* TEX. CODE CRIM. PROC. art. 26.052(k). Such an appointment may, however, be made if there is "good cause." The "good cause" for appointing Mr. Ball was only that it was the request of both Petitioner and Mr. Ball, that Mr. Ball was familiar with the case, the legal issues and Petitioner, and that Mr. Ball was qualified to handle death penalty appeals. *See Motion Exhibit J* - Trial Court Finding of Good Cause, 35 RR 202-03.   By seeking appointment as direct appeal counsel when he had acted as trial counsel, Mr. Ball was running contrary to the *State Bar of Texas: Guidelines and Standards for Texas Capital Counsel*, Guideline 12.1(D):

> Trial counsel should consider carefully whether they should accept appointment for the appeal of the case.  While Texas law does permit trial counsel to be appointed for appeal upon a showing of "good cause," ... the availability of some habeas issues may be negatively impacted by counsel representation at both phases, resulting in claims conceivably being procedurally defaulted or waived.  In the event that counsel and the appellant strongly desire that one of the trial counsel act as counsel on appeal, it is recommended that another independent counsel also be appointed as lead appellate counsel to prevent any conflicts.

While the trial court accepted entirely generic, rather than case-specific, reasons as being the "good cause" required by statute, Mr. Ball's decision to represent Chris on appeal was not in keeping with the prevailing state guidelines on the issue, and the appointment obviously promised further financial gain.

The extent to which Mr. Wilkins was influenced by his attorney's financial interests permeated the case to the end of trial.[71]  His last words to the court, in the presence of the jury came just after the appointment of appellate and habeas counsel were made:

| | |
|---|---|
| The Court: | Mr. Wilkins, at this time, then, I'll remand you to the custody of the sheriff for transportation to the Institutional Division of Texas Department of Criminal Justice for execution of the sentence.  And you may be seated at this time. |
| [Petitioner]: | Okay.  Excuse me, your Honor.  Can you drum up some work for Warren? |

35 RR 204.[72]

(i)    Counsel entered a plea of not guilty that did not reflect Petitioner's voluntary and intelligent choice.

The decision whether to plead guilty or not is one that is for the defendant in a criminal case to make personally.  *See Brookhart v. Janis*, 384 U.S. 1, 7 (1966):  "Our question ... narrows down to whether counsel has power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead

---

[71] Mr. Wilkins does not appear to have had much expectation of sharing in the largesse he was bestowing on counsel.  Post-trial correspondence demonstrates that eighteen months after his trial, trial counsel had failed to send him $300 dollars that they had told him they would put in his inmate account, and had also failed to send him some promised photographs of his children.  He was sufficiently upset that he offered to withdraw any claims of ineffective assistance against trial counsel if he could have the photos, the money and his trial transcripts. *See Petition Exhibit 43.*

[72] The Court then simply noted that Mr. St. John had indicated that he did not desire to be appointed on the appeal, and Mr. St. John stated that Mr. Ball did not need his assistance for the appeal. *Id.*

111

not guilty ... We hold that the constitutional rights of a defendant cannot be waived by his counsel under such circumstances." Here, Mr. Wilkins had repeatedly expressed his desire to enter a guilty plea, but counsel overrode their client's wishes and convinced him to proceed to trial. While a plea of guilty to a capital murder indictment is a relatively rare occurrence, it is an available option under the law of the State of Texas. *See, e.g., Luna v. State,* 268 S.W.3d 594 (Tex. Crim. App. 2008)(plea of guilty to capital offense before a jury becomes a trial on punishment) and it might well have been in Mr. Wilkins' best interests to take responsibility for these offenses, had counsel investigated and been prepared to offer a better mitigation case than the brief, misleading and incomplete case that they actually presented.

The decision to proceed with trial was not counsel's to make: Counsel is supposed to provide expert "assistance," and not to become the master of his client by interposing himself on the defendant's right to make personal decisions concerning his defense. *See Faretta v. California,* 422 U.S. 806, 820 (1975). Counsel may legitimately make decisions concerning trial strategy, even decisions that have constitutional implications, *Id.*; *Brookhart,* 384 U.S. at 7, but the decision to go to trial in the first place, rather than to waive that right and enter a plea of guilty, is personal to a defendant. Just as with a plea of guilty, the decision to plead not guilty "is a grave and solemn act to be accepted only with care and discernment," *Brady v. United States,* 397 U.S. 742, 748 (1970). It should be a "knowing,

112

intelligent act ... done with sufficient awareness of the relevant circumstances and likely consequences." *Id.*

There is nothing in this record to suggest that Mr. Wilkins was properly apprized that the decision as to how to plead was his alone and should be without regard to other's interests, nor that he received truly independent legal advice on that point.   For example, a rational discussion of the "likely consequences" of making a jury sit through an unpleasant and unnecessary trial and then telling them that they had done so to pad counsel's pockets seems scarcely likely to have taken place.

While the jury's verdict was consistent with the plea that Mr. Wilkins' had wanted to enter,[73]  the jurors had been subjected to a trial lasting several days that they were then informed had been an avoidable charade, and that in itself may well have been a factor, the "likely consequence" of which was Mr. Wilkins' sentence of death.  Since counsel's decision - for counsel's decision it was - to forge ahead with a trial presenting a false confession theory, only to follow immediately with a completely inconsistent "true confession" sentencing, is not one explicable under any professional norm. This is something specifically addressed in the ABA Guidelines:[74]   Guideline 10.10.1 - Trial Preparation Overall states :

---

[73]Mr. Wilkins' lack of competence to make binding legal decisions is dealt with separately at Claim for Relief Number 5.

[74]American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003).

"Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." The commentary to the Guideline notes:

> [I]f counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages.

Likewise, the commentary to Guideline 10.11 - The Defense Case Concerning Penalty, refers to the importance of an integrated defense: "During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, the theory of the trial must complement, support and lay the groundwork for the theory of mitigation." (quotation omitted).[75]

In light of the evidence in aggravation, the good will that Mr. Wilkins' might garner by his "amusing and personable nature," *Petition Exhibit 24* - Ball Letter to Office of Chief Disciplinary Counsel at 159, was an insufficient basis on which to found a sentencing presentation. Nonetheless, counsel described that as their "only hope" for a life sentence. *Id.* It would not, of course, have been Petitioner's "only hope," had counsel conducted the thorough and systematic investigation that professional standards dictate, *See* Claim for Relief Number 1. However, even if Mr. Wilkins' personal charm had some power to sway

---

[75] *See also* Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 Mercer L. Rev. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation. This just does not work. The jury will give the death penalty to the client and, in essence, the attorney.")

the jury, its impact would have been squandered by counsel's profligate disregard of the jurors' time and personal convenience, let alone the unusual emotional ordeal that being a decision-maker at a murder trial must represent for a lay person.

The prejudice inquiry for an ineffective assistance of counsel claim is not outcome determinative. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* A reasonable probability is simply a probability sufficient to undermine confidence in the outcome of the case, and counsel's decision-making here is sufficient to do that, since it must have tainted the jury's ability to arrive at a reliable determination.

(ii)    Counsel entered a plea of not guilty that did not reflect Petitioner's voluntary and intelligent choice, because it was in counsel's financial interest to do so.

Counsel labored under an undisguised conflict of interest: proceeding to trial would benefit them financially, which was something "near and dear" to their hearts, 35 RR 17, but was contrary to their client's expressed wishes and disregarded his best interests.[76]

---

[76]Admittedly, counsel did not further "rack up" billable hours by asking for a continuance to prepare properly for sentencing, as they should have done. *See* Claim for Relief Number 1. However, at the time Petitioner's trial commenced, well over two years had passed since the original offenses, which occurred in October 2005. Since no activity by counsel for much of that time is reflected in the trial record, or in the available billing, counsel may have felt reluctant to draw attention to their own inaction. The itemized billing of Mr. Ball is not available and is not contained in his files provided to undersigned counsel. The billing of Mr. St. John reflects a total of 88 hours work between February 2006 and December 2007, and 5 "non-trial" appearances. *See Petition Exhibit 42* - Wes Ball Billing ; *Petition Exhibit 8* - Warren St. John billing.

When counsel labors under a conflict of interest that adversely affects counsel's performance, there is an "actual conflict" for Sixth Amendment purposes, not merely a potential conflict, and reversal must ensue without any need for an inquiry into prejudice. *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980).   In this Circuit, it has been held in *Beets v. Collins*, 65 F.3d 1258 (5th Cir. 1995), that conflict claims other than those of simultaneous multiple representation, should be governed by the *Strickland v. Washington* requirement of proving a "reasonable probability" of prejudice. *Id.* at 1270-71.

As acknowledged in *Beets*, conflicts of interests may exist not just when counsel is involved in the simultaneous representation of different defendants, as in *Cuyler*, or where counsel has previously represented a codefendant or witness, but also when counsel's personal financial interests are in conflict with the best interests of a client. *Id.* at 1273-74. *See, e.g., Stitt v. United States*, 369 F.Supp.2d 679, 694-95 (E.D. Va. 2005)(relief granted in case where counsel let personal financial interests adversely affect decision-making in his client's case).

For the jury to hear that the criminal trial in which they had just participated was motivated by a desire to increase counsel's billable hours, an idea that Petitioner testified to and which lead counsel endorsed, must have affronted the sensibilities of the individual jurors, if for no other reason than because they themselves were only receiving $40 a day for

their attendance at court.[77]   The insertion of this extraneous and inflammatory information may well have caused the jury to want to punish the lawyers, but by doing so at the expense of their client, which may have become a contributing factor to the sentence of death.   For an attorney to seek an undue profit from a case is: "offensive because it may encourage counsel to misuse the judicial process for the sake of his enrichment ... and it necessarily trades on the misery of the victim and his family." *Beets*, 65 F.3d at 1273.   There is, of course, nothing improper about an attorney seeking to be paid for conducting his professional duties in accordance with his client's wishes and best interests.   Here, however, the decision-making concerning going to trial in the first place lacked legitimacy.   The adverse effect on Petitioner's representation could hardly have been starker, especially given counsel's failure to prepare adequately for either trial or sentencing, leaving much undone that ought to have been both done and presented to the jury.   This highlights all the more the impact of the unabashed disclosure to the jury of counsel's financial motivation.

There is a "reasonable probability" that the inconsistency between the decision to go to trial, followed by the revelation of a completely illegitimate rationale for doing so, resulted in prejudice to the Petitioner by swaying the jury toward a sentence of death.   Any lingering doubt that the jury may have had about guilt would not only have been removed by Petitioner's confessions from the stand, but completely negated by the discovery that money was at the root of the decision to go to trial at all.   Counsel's decision-making in choosing

---

[77]*See* 3 RR 28, Proceedings in Central Jury Room.

to conduct the proceedings in this way was sufficiently prejudicial to Petitioner's interests that any confidence in the verdict is undermined, and reversal must follow.

### Claim for Relief Number 5

(A)     **Petitioner was not competent to enter a plea or to stand trial since he lacked the ability to protect his own interests, was self-destructive and was incapable of making a reasoned choice between legal strategies and options; being subjected to trial while incompetent violated Petitioner's right to due process of law under the Fourteenth Amendment.**

(B)     **Petitioner was not competent to enter a plea or to stand trial since he lacked the ability to protect his own interests, was self-destructive and incapable of making a reasoned choice between legal strategies and options; counsel's decision to continue to trial while Petitioner was incompetent violated Petitioner's Sixth Amendment right to the effective assistance of counsel and to due process of law under the Fourteenth Amendment.**

A defendant is incompetent to stand trial if he lacks both a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 403 (1960). The competency standard for entering a guilty plea is the same as that for competency to stand trial. *Godinez v. Moran*, 509 U.S. 389 (1993).

While defense counsel never seem to have expressed doubt about Chris' competency, his actions and decision-making were so self-destructive that it should have been clear that he lacked both the ability to make meaningful use of his lawyer's advice, and a rational understanding of the gravity of proceedings against him.

118

Chris' behavior prior to trial was remarkably impulsive, and his decisions were made without thought of long term consequences. As Chris himself admitted: "I make bad decisions. I know they're bad decisions when I'm making them, I make them anyway." 35 RR 13. His decision to walk away from a federal half-way house when he had a job waiting for him and the end of his sentence was already in sight was one.[78] 35 RR 69-70. The shooting of Gilbert Vallejo in broad daylight outside a busy bar was another. His decision to try to escape from the jail by climbing through the roof of a basketball court several stories high, resulting in a 30 foot fall that broke both his ankles, is still another. 35 RR85-87.

Chris confessed to many offenses, some of which seem never to have happened and which the State admitted it could not substantiate.[79] 28 RR 102-04. Although his lawyers urged him not to talk to law enforcement, he did so in the speculative hope that doing so would somehow give him a chance to escape if he was taken out of the jail to look for the scene of his non-existent crimes. 35 RR 32-33. He did so even though he realized he might get shot if he attempted to flee. *Id.*

---

[78]Petitioner had received a five year sentence in 2001 for being a felon in possession of a firearm. See State's Exhibit # 213. Approximately four months of that sentence remained to be served at the time of his arrest in Fort Worth.

[79]This propensity to false confession, as well as Chris' tendency to speak without any regard to long-term consequences, should in itself have acted as a trigger to counsel to explore his competency.

119



Chris' many discussions with law enforcement were also motivated by the relatively

trivial possibility of getting food other than the meals served at the jail. *See, e.g.,* 35 RR 35

(Chinese food); State's Exhibit 12 (coke and candy bar, or donuts and coffee), State's Ex. 14:

> I figured chineeze (sic) take out one day.  Steak and shrimp the next.  Maybe
> Taco Bell after that.  Hell, by then you're done with me and narcotics may
> have a few questions about the labs stuff.  You tell me what a hell of a guy I am
> and maybe I get a Jack-in-the-Box out of it?  Then Vice wants details on who
> really needs to be busted.  And I could get a Happy Meal that day.  See?  No
> games, Detective.  Strait (sic) up + full disclosure .  You bring some munchies
> and we'll talk.

Without Chris's many interviews with the police, which he undertook against the

advice of counsel, *see, e.g.,* CR 247, 250, the State might never have been able to prove its

case.  Nonetheless, even in the middle of trial, Chris sent a note to the female lead detective

who had elicited his confessions, and who he described as "wonderful," and of whom he

spoke admiringly.  28 RR 125; 35 RR 37-38.

Chris testified that he had wanted to plead guilty, but went to trial simply to give his

attorneys more billable hours.  35 RR 16-17.  He admitted: "I've been, you know, I think

subconsciously I've been trying to kill myself or get myself killed since I was probably 12

or 13 years old."  35 RR 59.

Rather than fight for his life, as a rational person might be expected to do, Chris

seemed careless of his own existence:



[A]t this point, really, it doesn't matter what I want. And, frankly, I'm as undecided as you are. Don't ask me. ¶ I'm undecided, really. I would like for you to win because I can tell – you said you was going to – you had some plans. But it's no big deal, no big deal. Just do whatever you do.

33 RR 61.

In the course of his testimony Chris was apparently inappropriately jocular, mimicking

hanging himself:

[Petitioner]:   I've been, you know, I think subconsciously I've been trying to kill myself or get myself killed. Hang on, you can't say kill yourself, they take all your sheets.

[Counsel]:   Don't do that.

35 RR 59.

When conducting the hearing to determine whether trial counsel had had a conflict

of interest, the trial court commented:

It's very clear to the Court from your testimony that you were completely lighthearted about receiving the death penalty or not.

HDCI at 27.

Had counsel instituted a full investigation of Chris' background, as they should have

done automatically for the purpose of preparing the mitigation case, they might well have

come across indicators that Chris' past behavior suggested the possibility of mental health

issues.[80] For example, records from a 1998 incarceration in New Mexico report a bizarre

---

[80]As early as his days in TYC, Mr. Wilkins' "difficulty in effecting good judgment" had been remarked upon. *See Petition Exhibit 27* at 174.

episode in which Chris either solicited another inmate to stab him in the back with a sharpened metal rod, or stabbed himself. *See Petition Exhibit 44* - New Mexico State Police Records. While Chris claimed he had done this so that he could sue the state, the other inmate believed that "Inmate Wilkins' reasoning was more that he was worried he could not 'make it' on the streets after his release[.]"

Records from his more recent incarceration in the Tarrant County jail while awaiting trial indicate Mr. Wilkins as having a history of "being paranoid and schizophrenic," but it was not possible for the medical intake worker to take a history because Mr. Wilkins became too defensive to answer questions. *Petition Exhibit 45* - MHMR of Tarrant County records. Mr. Wilkins sought treatment with Elavil, an antidepressant,[81] and Klonopin, a drug used to control seizures and panic attacks,[82] which he had received previously. The response to this had been: "House per jail standards; no MHMR follow-up." *Id.*

Even without full background information, those records that were available to trial counsel included reports of extensive drug use including cocaine and methamphetamines, "huffing" of shoe polish and liquid paper, head injuries, a serious motorcycle wreck as a

---

[81]*See* www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666/ (last accessed May 18, 2012).
[82]*See* www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635/ (last accessed May 18, 2012) (indicating that generic name of Klonopin is Clonazepam).

teenager, ingestion of toxic industrial chemicals, and possible exposure to LSD while a baby.

All of these are factors that indicate the possibility of brain damage. Counsel's own expert,

Dr. Goodness, advised that basic psychological screening tests revealed "a number of

cognitive deficits indicative of some sort of brain pathology" and a "Cognitive Disorder Not

Otherwise Specified." She also reported that "Testing revealed significant deficits in ... his

ability to focus and sustain his attention." She added:

> Significant impulsivity and attention problems were noted with his having great difficulty focusing on whatever the task was, he had difficulty screening out ancillary noises in the jail, and his mind often wandered. He was in constant movement, be it his legs jiggling or his hands fiddling with something on the desk. Some obsessive-compulsive behaviors were noted. Papers had to be folded "just so" before Mr. Wilkins would write on them. He constantly neatened his half of the desk and he picked at his skin and table repeatedly in an obsessive manner.

*See Petition Exhibit* 28 at 179.

Dr Goodness recommended a full neuropsychological evaluation, which would have

required a continuance. "The question is not whether or not Mr. Wilkins has some

neuropsychological deficits - he does. He clearly has deficits in several areas." *Id.*

However, Dr. Goodness does not seem to have been asked for a formal opinion on Chris'

competency, nor did she conduct any testing specifically designed to assess competency.[83]

---

[83]A number of psychological test instruments exists for assessing competence to stand trial. *See, e.g.*, Robert A. Nicholson, Helen C. Robertson, William G. Johnson & Georgia Jensen, *A Comparison of Instruments for Assessing Competency to Stand Trial,* 12 Law and Human Behavior 3 (1988); Eric Y. Drogin, Frank M. Dattilo, Robert L. Sadoff & Thomas G. Gutheil, *Handbook of Forensic Assessment: Psychological and Psychiatric Perspectives,* John Wiley and Sons (2011).

i.     Petitioner was not competent to enter a plea or to stand trial.

Chris's actions, his trial testimony, and his history, raised the possibility that he was not competent to stand trial, being unable to engage in a reasoned choice of legal strategies or to protect his own interests. His own lawyers had clearly advised him to stop allowing himself to be interviewed by law enforcement, and to cease his futile escape attempts, but he seemed incapable of internalizing that sound advice. 35 RR 36-37. His apparent lack of realization of the gravity of his situation, bizarrely elevating a desire for junk food over his own long-term well-being, also indicated an inability to arrive at appropriately reasoned decisions.

The conviction of an incompetent defendant violates the federal constitutional right to due process. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Competence to stand trial is "rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Drope*, 420 U.S. at 171-72. It is sufficiently important to merit protection even if the defense fails to make a timely request for a competency determination. *Pate v. Robinson*, 383 U.S. 375, 384 (1966). "For the defendant, the consequences of an erroneous determination [of competence] are dire. Because he lacks the ability to communicate effectively with counsel he may be unable to exercise other rights deemed essential to a fair trial." *Cooper*, 517 U.S. 348, 363 (1996).

However, none of the trial participants - judge, prosecution, defense counsel, or anyone else - took any action to halt, even for a moment, a proceeding in which it must have been increasingly clear that the defendant was throwing away his own life. The most "fundamental component of our criminal justice system - the basic fairness of the trial itself," *Cooper*, 517 U.S. at 363, was thereby disregarded.

ii.   <u>Trial counsel were ineffective for allowing Petitioner to go to trial when he was not competent to do so.</u>

In spite of Chris's actions and history, trial counsel did nothing to raise the issue of his potential incompetency to the trial court, even though their client lacked apparent understanding of the potential consequences of the pending criminal proceedings, had failed to disclose to them that he was engaged in discussions with law enforcement, and seemed to have a loose grasp of the adversarial nature of the proceedings, given his admiration of the detective on his case. Far from engaging in a reasoned choice of legal strategies and options motivated by his own interests, Chris went to trial for his attorneys' financial benefit.[84] When in trial, he exhibited inappropriate courtroom behavior; and testified that he did not care what the jury chose to do.

Counsel's failure to take any action, or even "suggest" to the Court that their client might be incompetent, triggering an inquiry into his mental status, as provided by TEX. CODE

---

[84]Post-trial, Chris even offered to forego raising ineffective assistance of counsel claims against trial counsel if they would give him $300, some photographs of his children and his trial transcripts. *See Petition Exhibit 43.*

CRIM. PROC. Art 46B.004, was a severe deficiency in their representation.   Texas law at the time indicated that "recent severe mental illness, or bizarre acts by the defendant or ... moderate retardation" were indicators of incompetence sufficient to trigger a judicial inquiry into the issue.   *McDaniel v. State*, 98 S.W.3d 704, 710 (Tex. Crim. App. 2003); *Montoya v. State*, 291 S.W.3d 420, 425 (Tex. Crim. App. 2009) *superseded by statute, see current* TEX. CODE CRIM. PROC. Art 46B.004(c-1).   Chris' behavior could certainly be characterized as "bizarre," his history suggested the possibility of organic brain damage or mental illness, and effective counsel would have sought to have him evaluated on the specific issue of competency.   However, trial counsel did not do so.   There can be few graver situations for an attorney than one where a client is impaired not only in his ability to protect his own interests, but is endangering his very life.   In such a scenario, the "guiding hand of counsel" is of critical importance.   *Powell v. Alabama*, 287 U.S. 45, 68 (1932).   In this case, however, that guiding hand was absent.

Counsels' inaction in allowing their client to proceed to trial while incompetent clearly undermines any potential confidence in the outcome of Chris' trial.[85]

---

[85]While the court could eventually order that a retrospective hearing on competency should be conducted, given the passage of time and the inherent difficulty of such retrospective reconstructions of past mental status, that is unlikely to be a fruitful endeavor. *See Dusky v. United States*, 362 U.S. 402 (1960)(retrospective hearing after one year deemed undesirable - case reversed and remanded for new trial); *Drope,* 420 U.S. at 162 (given inherent difficulty of a *nunc pro tunc* determination even "under the most favorable circumstances" due process required reversal and remand for new trial); *Pate,* 383 U.S. at 386-87 (reemphasizing need for "concurrent determination" of the issue).

The question of Chris' incompetency is one of the most critical of the many issues that should have been, but were not, explored at trial, on appeal or in state habeas proceedings and for which additional time and adequate resources are required.[86]   Undersigned counsel has already filed a Motion seeking leave to make an *Ex parte* Sealed Request for Necessary Funds for Expert and Investigative Assistance, but that has not yet been granted.  When it is, proper exploration of this issue can commence for the first time.

## Claim for Relief Number 6

**Petitioner's counsel failed to conform to prevailing professional norms with regard to the trial on the merits because they failed to conduct reasonable pretrial preparation and investigation, thereby violating Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.**

As explained above, and in Petitioner's earlier Motion for Scheduling Order, Petitioner repeatedly urged state habeas counsel to investigate numerous matters concerning both phases of his trial.  Soon after Mr. Strickland's appointment, Petitioner began inquiring whether he had hired an investigator, urged him to investigate, and listed specific areas that Petitioner believed should be covered.   *See Petition Exhibit 46* - Letter: Wilkins to Strickland 08.05.2008; *See Petition Exhibit 47*- Letter: Wilkins to Strickland 12.12.2008; *Petition Exhibit 48* - Letter: Wilkins to Strickland 01.02.2009; *Petition Exhibit 49* - Letter: Wilkins to Strickland  01.25.2009;  *Petition Exhibit 50* - Letter: Wilkins to Strickland 02.10.2009.  As time went by, Petitioner surmised that Mr. Strickland was not going to

---

[86]State habeas counsel moved for, and was granted, funds for a psychologist to examine Chris, but did not then retain anyone to carry out the necessary work.

pursue any ineffective assistance claims against trial counsel.  In a letter requesting Mr. Strickland to investigate various matters, he noted:

> I understand you have a personal relationship with both Mr. Ball and Mr. St. John.  They both advised me that you were "a good attorney and a good friend," so I agreed when they asked me to let them ask the judge to appoint you.  ¶ And Mr. Ball and Mr. St. John are both "capable and conscientious attorneys" and also both likeable and very personable fellows.  I understand your instinct to want to protect one of your own ...

*Id.*

Mr. Strickland eventually retained an investigator but that investigator did no more than a handful of witness interviews, conducted a few days before the state habeas application was filed, and all related to mitigation.  The detailed billing of both attorney and investigator reveals no interviews, no record collection or requests, no examination of physical evidence, whether introduced into evidence or not, nor any other activity related to the trial on the merits.  *See Motion Exhibit F* - Jack Strickland billing;  *Motion Exhibit G* - Fred Pendergraf billing.   Thus, no real investigation into the efforts of trial counsel to investigate and prepare for trial was ever undertaken.

As explained above, undersigned counsel has only received part of Petitioner's files from former counsel, from which prosecution discovery material has been removed.  However, those parts of trial counsel's files that have been obtained reveal in turn little effort to investigate the merits of the case through interviews, independent record collection or requests, or any other activity related to the trial on the merits.  From the records available,

it appears that counsel's personal involvement in the investigation consisted of visiting one of the crime scenes, speaking to the medical examiners and inspecting the physical evidence, and that they did so a few days before the trial on the merits began.[87]

Efforts to obtain the trial investigator's files have so far been unsuccessful: The original investigator, Bruce Cummings, has not been located, and the investigator retained close to the time of trial, Clifford Ginn, has not complied with requests for his files, having apparently been told by trial counsel that he is "under their privladge (sic) so I was out of order in talking to you." *See Petition Exhibit 3* - Clifford Ginn e-mails at 8.   Mr. Ginn's available billing reveals that, with regard to the trial on the merits, he or those working for him, only visited the crime scenes, making some inquiries there, served subpoenas, and tried to locate, or actually interviewed four witnesses from the State's witness list.[88] *See Petition Exhibit 11* - Clifford Ginn billing.[89]  So far as Petitioner can currently ascertain, that was the extent to which his case was ever investigated.

It cannot be denied that Petitioner made many damaging admissions, indeed, confessions, during interview and in his testimony. Nonetheless, "[c]onfessions, even those that have been found to be voluntary, are not conclusive of guilt. And as with any other part of the prosecutor's case, a confession may be shown to be insufficiently corroborated or

---

[87]*See Petition Exhibit 8*- Warren St. John billing at 30.
[88]See State's Third Supplemental List of Witnesses and Expert Witnesses 1 CR 238-245.
[89]The billing for Mr. Ginn that has been obtained through a Public Information Act request appears to be incomplete.  Further information is being sought.

otherwise ... unworthy of belief." *Crane v. Kentucky*, 476 U.S. 683, 688-89 (1986)(citations omitted. Some of the details of the indicted offenses were corroborated by forensic evidence, but this went largely unchallenged, and was not independently tested. Investigation and testing might have revealed potential for impeachment of the State's witnesses, therefore, given the fact that counsel were intent on taking the case to trial in spite of their client's stated desire to plead guilty, their duty to try to undermine the State's case was manifest.

Furthermore, regardless of Petitioner's admissions both trial and habeas counsel had a duty to conduct an investigation of the charges against Petitioner. Under the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7:

A.   Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

   1.   The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented ...

B.   1.   Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case.

*See also State Bar of Texas: Guidelines and Standards for Texas Capital Counsel: Standing Committee on Legal Services to the Poor in Criminal Matters Adopted by the State Bar Board of Directors*, Guideline 11.1(A) & (B) (containing identical provisions).

Petitioner therefore respectfully requests the Court to afford him sufficient time and resources such that, once he has been able to obtain and review the entirety of former counsel's files and to conduct independent investigation and , if merited, independent testing, he may raise any potentially legitimate claims that arise concerning the following areas:

a. <u>Toolmark Evidence</u>

Firearms examiner Terry Gleason testified that she had compared projectiles from the Silva-Freeman homicides and from the Vallejo murder, and had concluded that they were fired from the same firearm. She also concluded that the fired projectiles shared characteristics with a bag of Remington cartridges found in the Chevy Blazer. 27 RR 106-128; 32 RR 87-92. This evidence does not appear to have been independently examined or tested by the defense, nor any investigation made into Ms. Gleason's qualifications or reliability as an expert in her field.

b. <u>DNA</u>

A DNA analyst, Christina Capt, tested cigarette butts found in the area where the bodies were found and in the Blazer, and also items found in the Blazer. 29 RR 72, 78. Petitioner's DNA allegedly could not be excluded from some items, 29 RR 73, 78, but other DNA profiles were found that did not match Petitioner, Freeman or Silva. 29 RR 89. This evidence does not appear to have been independently analyzed, examined or tested by the defense, nor any investigation made into Ms. Capt's qualifications or reliability as an expert

in her field, nor into the integrity of the work done at the University of North Texas Health Science Center laboratory where she works.

c.    Tape protocols and analysis

There were several recorded interrogations of Petitioner by the Fort Worth Police Department (FWPD), but an interview on November 30, 2005, and most of an interview on December 14 were not recorded, supposedly because of human error. 27 RR 178, 181, 185. Much of the latter interview is apparently barely audible because of operator error.   The defense do not appear to have sought to have the original tapes analyzed or enhanced, nor do they appear to have obtained or considered any FWPD protocols for recording interrogations that may have been breached. [90]

d.    Fingerprint Evidence

Fingerprints from the Chevy Blazer were allegedly matched to known prints of Petitioner.   27 RR 20-21.  However, remaining prints from that vehicle were not been identified, 27 RR 31; 28 RR 60, nor were prints taken at the scene of the Vallejo homicide 33 RR 20-22.  This evidence does not appear to have been independently examined or tested by the defense, nor any investigation made into the fingerprint examiners' qualifications or reliability as experts in their field.

_____

[90]Petitioner's former counsel have not provided copies of any of the recorded interviews to undersigned counsel, nor any other recordings or photographs.  These are presumably among the discovery materials that are currently being withheld by former counsel.

e.     Physical Evidence and Crime Scenes

Physical items found in the same area as the bodies were not analyzed by the Fort

Worth Crime Lab, 27 RR 37, and the defense do not appear to have sought to have that, or

any other, physical evidence independently examined or tested, nor did the defense seek

expert assistance with analysis of the crime scenes or other aspects of the physical evidence

of the offenses.

f.     Security cameras/Surveillance videos at Fiesta Store & Fina Gas Station

Petitioner asked counsel to obtain any footage from cameras located at the Fiesta

Grocery store where the Chevy Blazer was seen, 26 RR 135-40, and at a Fina Gas Station

where Darcel Kauers testified that he took her. 31 RR 94-127. These need to be located, if

they still exist, and reviewed. [91]

g.     Eyewitness Identification Procedures

The only positive eyewitness identification of Petitioner as the perpetrator of any of

the three homicides was that of a witness called Keith Sweat. Mr. Sweat, who had been in

the vicinity of the Lady Luck Lounge on the day of the Vallejo homicide, had at first failed

to pick Petitioner out of a photo spread. He later made an identification at a lineup held on

---

[91]Mr. Strickland stated in a letter to Petitioner of March/May 25, 2010 that he had obtained a video of the interior of the store, "and you are not depicted." *See Petition Exhibit 4* Letter: Strickland to Wilkins March/May 25, 2010 at 16. However, that video was not included in the part of Mr. Strickland's file thus far provided to undersigned counsel.

133

November 16, 2005.  While Mr. Sweat did not testify, the existence of his supposed identification of Petitioner was argued by the State as a reason to exclude Petitioner's confession to the Vallejo homicide, which the defense wished to have admitted into evidence.  29 RR 8-10.

Defense counsel barely questioned the circumstances in which this line-up was conducted, even though one of the participants was substantially taller than Petitioner, with the overall heights ranging from 5' 5" to 6' 5", and the weights of the participants varying from 150 pounds in Petitioner's case, to a man of 208 pounds, 25 RR 74, 14 RR 92.  Nor did they consult with an expert about the likelihood that having previously viewed a photograph of Petitioner would have made it more probable that Mr. Sweat would later pick Petitioner out of this skewed line-up.  Nor do the defense appear to have contacted or interviewed Mr. Sweat themselves.  Consequently, these matters merit further inquiry.

h.    Witness reliability

The prosecution called witnesses who require investigation, including a convicted prostitute, Darcel Kauers, who admitted to drug and alcohol use, and may have been under the influence of alcohol at the time of her testimony, "Alcohol is kind of a part of my day every day[.]" 31 RR 99.  Preston Byerly had been released from a conviction for a state jail felony just over a month before he testified, 31 RR 83.[92]  Any favor that he received

---

[92]Mr. Byerly was served with a subpoena on January 16, 2008 at the Galveston County Jail.  5 CR 1491

concerning that case in return for his potential testimony must be examined.  Chris Green, who was an employee of the Harris County Constable when he testified concerning an extraneous offense 31 RR 6-34, had previously been terminated from employment at the Houston Police Department, supposedly for failing to comply with proper procedures.  31 RR6-11. The defense chose "to taken them at their word" on this, rather than investigate the matter.  It does not appear that the defense conducted independent checks into these or any other prosecution witnesses, or sought in any way to prepare to contest their credibility or reliability.  Investigation of the State's witnesses, including any factors that may have influenced their testimony, or impeached it, must therefore be conducted.

Petitioner is not currently in a position to allege any specific claim concerning the areas noted above, nor any specific violation of *Brady v. Maryland,* 373 U.S. 83 (1963)(suppression of evidence favorable to the accused violates due process where the evidence is material to either guilt or punishment); *Napue v. Illinois*, 360 U.S. 264 (1959)(conviction obtained through use of false testimony, known to be such by representatives of the State, is a denial of due process); or *Massiah v. United States*, 3771 U.S. 201 (1964); *United States v. Henry*, 447 U.S. 264 (1980)(once proceedings have been initiated, prosecution attempts to circumvent the protections afforded by counsel cannot be tolerated).  However, as explained previously, through no fault of his own, Petitioner's case was largely uninvestigated by former counsel and current counsel has not had sufficient time, nor any funding, for an adequate investigation of either phase of Petitioner's trial.  In order

to accomplish the investigation of the case on the merits that should have been available to counsel at trial, it will be necessary to perform an investigation that comports with the ABA guidelines, which would include the duty to: inspect the physical evidence, obtain protocol documents from the law enforcement agencies and laboratories in question, as well as bench notes and other work product, to review records and police reports, interview eye witnesses and others who have purported knowledge of the events in question or of the likelihood that Petitioner committed the offenses and his degree of culpability; to listen to and analyze Petitioner's tape recorded statements in comparison with the physical evidence. Furthermore, there were alternative suspects for the extraneous homicide offense, the murder of Gilbert Vallejo, and those potential leads should also be reviewed.

Petitioner therefore respectfully requests sufficient time and funding, and in due course, leave to amend this Petition once investigation has taken place and relevant claims have been identified and developed.

### Claim for Relief Number 7

**Petitioner's counsel failed to conform to prevailing professional norms because they failed to strike two venire persons who would be unable to render an impartial verdict or sentence, thereby violating Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.**

A.  Defense counsel were ineffective for accepting a juror who had a family member who was a prosecutor, who had met the assistant prosecutor socially, and who would be predisposed to sentence Petitioner to death because of the subject matter of his tattoos.

136

The very first juror selected was Robert Lee Evans III, 4 RR 4-69. Petitioner did not wish Mr. Evans to be seated because Mr. Evans had a third cousin, a woman known as "Rocky" Jones, through whom he had met assistant prosecutor Tiffany Burks socially.[93]   4 RR 35-36.   While Mr. Evans stated that he was not sure when he had met Ms. Burks, it was clear that he had a family connection to a prosecutor who knew Ms. Burks.   Petitioner also disagreed with the decision to seat this juror because Mr. Evans had stated on his jury questionnaire that the person for whom he had least respect in the world was Adolf Hitler.[94] Petitioner has many tattoos on his body, including a portrait of Adolf Hitler on his back. *See* State's Exhibit # 193.   This was one of many issues  Petitioner wished to include in his application for state habeas corpus relief, but which was not raised. [95]

B.   <u>Defense counsel were ineffective for accepting a juror who had been exposed to unauthorized information about Petitioner's case, was impaired in her ability to follow the law and who was related to a member of the court personnel.</u>

---

[93]The State Bar of Texas website indicates that there is an assistant District Attorney in Dallas County called Raquel Jones; Raquel Jones appears to be known as "Rocky": *See* www.wfaa.com/news/local/Underground-dentists-provide-unauthorized-care-9309424.html (last accessed May 18, 2012), referring to "Dallas County Assistant District Attorney, Raquel "Rocky" Jones."

[94]The jury questionnaires do not appear in the public record of the case. *See* Tex. Code Crim. Proc. Art. 35.29.  Copies are presumed to be among the materials being withheld from undersigned counsel by former counsel, since the Tarrant County Criminal District Attorney's Office, in its Motion for Protective Order (Docket # 18 pp. 6-7) seeks to have juror names and other personal information redacted.  Undersigned counsel will also move the state trial court for the disclosure of the questionnaires, pursuant to Tex. Code Crim. Proc. Art. 35.29, if necessary.

[95]*Motion Exhibit # CCC* - Motion to Amend State habeas 11.071, p. 41-42.

Petitioner expressed concern during his state habeas corpus proceedings about the seating of Brandy Medford as a juror.[96]  8 RR 32-41; 8 RR 92-156.  Ms. Medford, who was venire person # 17, was the daughter of a court coordinator, 8 RR 121-22.  She also knew Judge Mitchell, for whom her mother worked.  She had in fact known Judge Mitchell since before her mother began employment with him, but the defense made no inquiry into how Ms. Medford came to know Judge Mitchell.   In addition to concern about whether those connections might affect her decision-making, Petitioner wished his attorneys to strike Ms. Medford because another venire person Kerry White, had talked to her, telling her that he was a DEA agent and a state trooper.  Mr. White informed Ms. Medford  that he had conducted internet research concerning Petitioner's tattoos: "I saw those tattoos, and I knew exactly what they were from."  8 RR 33-36.   Ms. Medford claimed not to have heard anything about the actual significance of the tattoos from Mr. White, but there is no question that Mr. White had conducted such research, in contravention of the court's earlier instructions 8 RR 9-13, and was held in contempt for doing so, and for attempting to communicate what he had found to two other venire persons.[97]  8 RR 159-163.  Ms. Medford had previously served as a juror on a murder trial, 8 RR 148–49, and was willing to do so again, in spite of being in the middle of an "at risk" pregnancy and having a toddler to care for.  8 RR 151-52.

---

[96]*See Petition Exhibit 48* -  Letter: Wilkins to Strickland January 2, 2009; *Motion Exhibit # CCC* - Motion to Amend State Habeas 11.071, p. 41-42.
[97]The second of the two venire persons, Jill Deck, was the subject of a peremptory strike by the defense. 8 RR 91.

While the defense initially tried to challenge Ms. Medford for cause, on the ground that she would have difficulty in disregarding a confession that the defense would argue was constitutionally infirm, the court denied the challenge.[98] 8 RR 140-48; 8 RR 155-156. At that point, the defense accepted the juror, apparently to the Court's surprise: "You say you will?" 8 RR 156.

The Court itself had expressed concern about Ms. Medford's ability to disregard an improperly obtained confession. 8 RR 154-56. Her view was that "... if a person is intelligent enough to know the rules that they have a right to ask for an attorney, then they should know the rules that the have the right to shut their mouth ... The dumbest defendant on the planet would say, I want a lawyer." 8 RR 147-48.

The accused has a constitutional right to trial by an impartial jury. U.S. Const. Amend. VI. "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Part of the guarantee of a defendant's right to an impartial jury is therefore an adequate voir dire to identify unqualified jurors, *Id.,* and the intelligent exercise of peremptory strikes when necessary.

---

[98]*See, e.g.,* TEX. CODE CRIM. PROC. Art. 38.22 § 6, Art. 38.23(a).

Here, defense counsel neither pursued the question of Mr. Evans' previous encounters with Ms. Burks, nor his relationship with "Rocky." They asked no questions concerning any bias he might have against Petitioner because of his tattoo.[99]

Defense counsel did not press Ms. Medford for information about whether she would experience adverse reactions from her mother or the judge for whom her mother worked if she were to acquit or give a life sentence, nor contest her willingness to serve as a juror in spite of employment, domestic responsibilities and a difficult pregnancy. Nor did they question whether Ms. Medford's stated position that Mr. White's improper references to Petitioner's tattoos would not affect her was accurate: it would, however, be a notably incurious person who did not have their interest piqued by that encounter and the implication that the tattoos had some special significance. The very fact that the defense had sought to strike Ms. Medford for cause for her inability to disregard an improperly obtained confession, only to accept her moments later, demonstrates a lack of rational strategy in counsel's approach.

Counsel's performance was therefore deficient in that they allowed two jurors to be seated who were impaired in their ability to serve, and with regard to whom there was no

---

[99]Assuming that they had read Mr. Evans' questionnaire, counsel also failed to ask before the commencement of voir dire for a "jury shuffle," available under TEX. CODE CRIM. PROC. Art. 35.11, as a means to rearrange the sequence in which venire persons will be questioned, which could have served to push Mr. Evans toward the back of the line as a potential juror. *See, e.g., Chappell v. State*, 850 S.W.2d 508, 511 (Tex. Crim. App. 1993); *Davis v. State*, 782 S.W.2d 211, 214 (Tex. Crim. App. 1989).



strategic reason not to use a peremptory strike.  *See, e.g, Virgil v. Dretke*, 446 F.3d 598, 609-10 (5th Cir. 2006)(reversal required when defense counsel ineffective for failure to challenge for cause biased jurors).

C.    Petitioner should now be afforded the time and resources necessary to conduct jury interviews.

In addition to the above stated claims, trial counsel did not conduct any post-trial juror interviews in an attempt to discover any irregularities or misconduct during the jury's involvement with the case, nor do trial counsel seem to have engaged in any independent investigation into the venire persons prior to jury selection.  These are precisely the type of issues that should have been investigated and raised by state habeas counsel.  Through no fault of Petitioner's, these issues went uninvestigated by former counsel, and current counsel has not had sufficient time, nor any funding, for an adequate investigation.

Petitioner therefore respectfully requests sufficient time and funding, and in due course, leave to amend this Petition once investigation has taken place and relevant claims concerning any issues of jury misconduct have been identified and developed.

<div align="center">

**Claim for Relief Number 8**

</div>

**Petitioner was denied the right to a public trial, to be present during the course of his own trial, and denied the right to counsel at a critical stage of the proceedings, when the trial court issued supplementary jury instructions in response to notes from the jury without notifying Petitioner or counsel or reconvening the court, thereby violating Petitioner's rights under the Sixth and Fourteenth Amendment rights.**

<div align="center">

141

</div>



The jury sent notes to the Court at both phases of Petitioner's trial.  During the trial on the merits, the jury sent four separate notes:

<u>Jury Note # 1</u> was filestamped at 5:15 p.m. on March 3, 2008:

> Can we see the photos and the drawings from the medical examiner?

> Can we please hear the tape again of the confession?

1 CR 267.

> No response to this request appears in the record.

<u>Jury Note # 2</u> was filestamped at 6:00 p.m. on March 3, 2008:

> Does the decision have to be unanimous or 10 of 12?

1 CR 268.

The Court responded to this note with a written instruction: "Members of the Jury: In response to your question, your verdict must be unanimous.   Please continue your deliberations."  The Court's response was also filestamped at 6:00 p.m. on March 3, 2008. 1 CR 269.

<u>Jury Note # 3</u> was filestamped at 11:15 a.m. the following day, March 4, 2008:

> Could we please see (1) the letters (kites) from C. Wilkins; (2) line-up photos
> (6 guys); (3) fingerprint cards, (4) the date of the taped confession.

1 CR 270.

The Court responded to this note with a written instruction: "Members of the Jury: In response to the fourth (sic) request concerning "the date of the taped confession" the Court is not able to respond unless you have a dispute as to testimony, in which event you must certify a dispute and set out the particular point in dispute. Please continue your deliberations." This response was filestamped at 11:30 a.m. on March 4, 2008.  1 CR 271

Jury Note # 4 was filestamped at 12:00 p.m. on March 4, 2008:

We have reached a verdict.

1 CR 272.

The written jury verdict form was thereafter filed at 12:09 p.m. on March 4, 2008.  1 CR 266.

At the punishment phase, the jury sent two jury notes:

Jury Note # 5 was filestamped at 4:50 p.m. on March 11, 2008:

Tattoo Pictures

Picture of 5 genriations (sic - presumably "generations")

1 CR 279.

Jury Note # 6 was filestamped at 5:18 p.m. on March 11, 2008:

We have reached a decision.

1 CR 280.

The written form giving the jury's verdict on punishment was thereafter filed at 5:28

p.m. on March 11, 2008.  1 CR 277.

For all the questions that were sent out by the jury, the record reflects in-court

discussion of only one, and that was the very first note sent during guilt-phase deliberations.

See 29 RR 152-4.  Petitioner was present for that discussion.  Nothing else in the record at

either phase demonstrates that the court was convened in the courtroom with both Petitioner

and counsel present.

A criminal defendant has the right to be personally present and to have the assistance

of counsel at all critical stages of his trial.  *Rushen v. Spain*, 464 U.S. 114, 118  (1983); *Hopt*

*v. Utah*, 110 U.S. 574, 579-80 (1884).  A defendant also has the right to a public trial under

the Sixth Amendment to the United States Constitution. *Presley v. Georgia*, 130 S.Ct. 721,

723 (2010).  A trial cannot be closed to the public unless there is an overriding interest that

is likely to be prejudiced, the closure is no broader than necessary to protect that interest, the

court considers reasonable alternatives to the closure and makes adequate findings in support

of its decision.  *Waller v. Georgia*, 467 U.S. 39 (1984).  Courts must indulge every reasonable

presumption against the waiver of fundamental constitutional rights. *Johnson v. Zerbst*, 304

U.S. 458, 464 (1938).

A request to the court for further instruction, or other contact between the court and the jurors, should be disclosed to all parties. *Rushen,* 464 U.S. at 119-20 (assuming that communication between judge and juror was stage at which rights to presence and to counsel are implicated); *Rogers v. United States*, 422 U.S. 35, 38-40 (1975)(jury messages should be answered in open court, with counsel for the defense having the opportunity to be heard).

Here, the trial court disregarded the guidance given by state law on the handling of communications from the jury.  Under Texas law, "when a trial court responds substantively to a jury question during deliberations, that communication essentially amounts to an additional or supplemental jury instruction." *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1992).  Texas law also provides that "The court shall answer any such communication in writing, and before giving such answer to the jury shall use reasonable diligence to secure the presence of the defendant and his counsel, and shall first submit the question and also submit this answer to the same to the defendant or his counsel ... The written communication or answer to the communication shall be read in open court unless expressly waived by the defendant ... All such proceedings in felony cases shall be a part of the record and recorded by the court reporter." TEX. CODE CRIM. PROC. Art. 36.27.  With the one exception mentioned above, where discussion about the jury's request was in open court and in Petitioner and counsel's presence, the trial court does not seem to followed these procedures when dealing with the jury notes.  The record is silent as to whether counsel and Petitioner were informed of all the notes, or given the opportunity for input into the court's

145

response to the notes, whether the notes were read in open court and, if so, whether Petitioner was personally present.

While the question of whether to provide members of the jury with requested items of evidence is unlikely to occasion much dispute, the decision as to how to respond to the note asking about jury unanimity was one where it was important for the defense to have an opportunity to respond. Counsel may well have objected to the supplementary jury charge given: It is clear that one or more jurors were holding out, and inclined to render a verdict of not guilty, or were simply unable to come to a decision. The original instruction given to the jury was: "It is [the foreman's] duty to preside at your deliberations, vote with you, and when you have unanimously agreed upon a verdict, to certify to your verdict by signing the same as foreman." 1 CR 264. Thus, the original instruction did not command the jury to be unanimous; the supplementary instruction was more strongly worded: "[Y]our verdict <u>must</u> be unanimous."

This was, therefore, an instruction that would tend to compel any hold-outs to acquiesce in majority decision, since a reasonable juror would read it as implying more strongly than the original instruction that there must be a verdict, and that it must be unanimous. At most, the jury should have been instructed to consider the instructions they had already been given. Had the trial court done so, this error might have been less, *see United States v. Hillsman*, 480 F.3d 333, 336 (5th Cir. 2007)(reading previously agreed-to instruction to jury is not a critical stage), *cf. Curtis v. Duval*, 124 F.3d 1, 4 (1st Cir. 1997),

146

where giving a jury instruction without consultation with, and in the absence of, defense counsel denied the defendant the assistance of counsel at a critical stage.  Although the deprivation was of short duration, it occurred during "a vital point in the trial and was, within its limits, total." *Curtis*, 124 F.3d at 4-5.

Petitioner was therefore denied his right to be personally present and to the assistance of counsel at critical stages of the trial, and his right to a public trial also.  Where there has been a total deprivation of counsel, reversal without any specific showing of prejudice is required. *Cronic v. United States*, 466 U.S. 648, 659 (1984).  Similarly, when a public trial has been denied, the Sixth Amendment is violated and there is no need to prove specific prejudice in order to obtain relief. *Waller*, 467 U.S. at 49; *Presley*, 130 S.Ct at 725 (reversal required when courtroom closed during voir dire).

A.  <u>Petitioner was denied the effective assistance of appellate counsel, since these issues could have been, but were not, raised on direct appeal.</u>

Trial counsel made no objection to the trial court's handling of the jury notes. However, all of the above issues, denial of personal presence, denial of the assistance of counsel and denial of a public trial, are apparent on the face of the record and could have been raised on direct appeal.  These are the types of right that, in Texas law, are "waivable only," in that they cannot be given up unless the defendant "says so, plainly, freely, and intelligently, sometimes in writing and always on the record." *See State v. Dunbar*, 297 S.W.3d 777, 780 (Tex. Crim. App. 2009); *Marin v. State*, 851 S.W.2d 275, 278-280 (Tex. Crim. App. 1993).

Thus, the normal rules of appellate preservation do not apply. *Id.* Appellate counsel therefore rendered ineffective assistance to Mr. Wilkins on direct appeal, since there would be no rational strategic reason for failing to raise these issues which require reversal without any need to show prejudice. State habeas counsel should also have raised these issues, along with any other related issues concerning the performance of trial and appellate counsel.[100]

### Claim for Relief 9

**The presentation of factually inaccurate testimony violated Petitioner's right to Due Process under the Eighth and Fourteenth Amendments to the United States Constitution.**

As stated in Claim for Relief Number 1.B above, the testimony of Susan Perryman-Evans was factually inaccurate and therefore unreliable. A conviction or sentence procured by use of fundamentally unreliable testimony violates due process, *see Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012) (inaccurate and unreliable evidence concerning arson violated due process, even absent an independent constitutional violation). Regardless of whether the error is caused by carelessness of counsel or design, a sentence based on assumptions that are materially untrue violates due process and cannot stand. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *United States v. Tucker*, 404 U.S. 443, 447 (1972)(sentence based on misinformation, rather than within informed discretion of sentencer, could not stand).

---

[100]In the event of a factual dispute as to e.g., whether Petitioner in some fashion waived his rights to counsel, to personal presence and a public trial, Petitioner will seek to amend this claim.

Moreover, this was a capital case, and the inaccurate information was provided by Ms. Perryman-Evans, a former employee of the prison system to which Petitioner would be sent, and the final witness at the sentencing phase, whose testimony would have been fresh in the jury's mind when deliberation began. Thus there exists the strong probability that the jury gave weight to what she said, and relied on it in arriving at its decision. This violated Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment. While permitted by the Constitution, the U.S. Supreme Court has consistently recognized that death is a sentence which differs from all other penalties in kind rather than degree. *See Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) ("When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."); *Satterwhite v. Texas*, 486 U.S. 249, 262, (1988) (capital punishment is "qualitatively different from all other sanctions."); *Accord Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (opinion of Stewart, J.). While the Eighth Amendment allows the death penalty as an appropriate response to egregious crimes, it also strictly regulates the procedures by which death sentences are imposed and reviewed. The penalty phase in capital trials has been treated with particular care by the Supreme Court. *Monge v. California*, 524 U.S. 721, 731-32 (1998). The decisions in the penalty phase must "be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Reliability is of paramount importance to avoiding the arbitrariness that would violate the Eighth Amendment. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (opinion of Burger, C.J.) (stating that the

"qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"); *accord Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).  Sentencing procedures for capital crimes must be created and enforced in a way that ensures "that the punishment will [not] be inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 189 (opinion of Stewart, J.).  Likewise, a sentence based on "materially inaccurate" information violates the Eighth Amendment's heightened reliability requirement, which is underpinned by a fundamental respect for humanity. *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988); *see also Hernandez v. Johnson*, 213 F.3d 243, 252-54 (5th Cir. 2000)(treating materially inaccurate expert testimony as falling in same category as the materially inaccurate previous conviction at issue in *Johnson v. Mississippi*).

Had habeas counsel actually considered the underlying reliability of Ms. Perryman-Evans testimony, this claim could have been raised and presented in Petitioner's State Habeas application, along with the related claim of ineffective assistance of trial counsel.  Even the limited facts that have been identified by undersigned counsel demonstrate that Petitioner's rights under the Eighth and Fourteenth Amendments were violated by counsel's deficient performance on this issue, and that there can be no confidence in the outcome of his sentencing proceeding.  It is respectfully suggested that the issue of the unreliability of Ms. Perryman-Evans testimony, and the mishandling of this issue by counsel, is a claim that merits the opportunity for further investigation and development as requested above, pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and

other recent authority of the United States Supreme Court, and that it should not be dismissed because it was not raised by state habeas counsel.

### Claim for Relief Number 10

**Petitioner's counsel failed to conform to prevailing professional norms with regard to the sentencing phase of trial because they failed to object to excessive and prejudicial security measures adopted by the trial court, which were not justified by any essential state interest specific to Petitioner, in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.**

One of many issues that Petitioner wished to have raised by state habeas counsel concerning the conduct of his trial was that of an excessive number of guards being present in close proximity to him, particularly at the sentencing phase when he testified, with officers being located in the immediate vicinity of the witness box.  Petitioner also wanted the use of a taser-belt as a restraint during the proceedings to be raised, given that a guard holding the remote-control was visible to the jury.[101]  While the record reflects that the trial court arranged for Petitioner to be seated prior to the jury entering the room when he testified, 35 RR 6-7, so that the shackles he was wearing were not visible, these other security measures were employed, and impaired Petitioner's defense.

It is a principle "deeply embedded" in the law that the use of physical restraints visible to the jury "absent a trial court determination, in the exercise of its discretion, that they are

---

[101]*See, e.g., Motion Exhibit* NN.

justified by a state interest specific to a particular trial" violates due process.  *Deck v. Missouri*, 542 U.S. 622, 629 (2005).  When there has been such a violation, the burden is on the State to prove beyond a reasonable doubt that the error did not contribute to the verdict obtained.  *Deck*, 542 U.S. at 635.

Physical restraints are "inherently prejudicial," because they undermine the presumption of innocence, and may also imperil the "heightened reliability" which should characterize a capital sentencing.  *Deck*, 542 U.S. at 632-33: "The appearance of the offender during the penalty phase in shackles ... almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community - often a statutory aggravator and nearly always a relevant factor in jury decision making, even where the State does not specifically argue the point."  The same concerns apply when a defendant is medicated so as to have a negative effect on his outward appearance,  *Riggins v. Nevada*, 504 U.S. 127, 137 (1992) or is compelled to stand trial in prison clothing, *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976).  Similarly, when an excessive number of guards are present, the message conveyed to the jury is that the individual in question presents a threat. "A defendant ought not to be brought to the Bar in a contumelious Manner; as with his Hands tied together, or any other Mark of Ignominy or Reproach ... unless there be some Danger of a [rescue] or Escape."  *Deck*, 544 U.S. at 630-31 (quoting 2 W. Hawkins, *Pleas of the Crown*, ch. 28, § 1, p. 308 (1716-1721)).  Whatever security measures may in fact have been appropriate, the trial

court failed to make specific findings concerning the need for them, nor does there seem to have been discussion of what less restrictive measures might be employed.

In addition to the impression on the minds of jurors if they become aware that the defendant is wearing a taser or stun-belt, such devices also implicate the Sixth Amendment right of the defendant "to participate in his own defense," *see Faretta v. California*, 422 U.S. 806, 818-32 (1975), because of the "psychological toll" they exact if worn, let alone activated. *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1250 (9th Cir. 2001)(noting that accidental activation can occur).

Since trial counsel did not raise this issue, and the record is silent as to what security measures were actually employed and what the jury would have perceived, these are precisely the type of issues that should have been investigated and raised by state habeas counsel. Through no fault of Petitioner's, these issues went uninvestigated by former counsel, and current counsel has not had sufficient time, nor any funding, for an adequate investigation.

Petitioner therefore respectfully requests sufficient time and funding, and in due course, leave to amend this Petition once investigation has taken place and relevant claims concerning both the actions of the trial court and the possible ineffective assistance of trial counsel regarding this issue have been identified and developed.

## Claim for Relief Number 11

**The jury instruction that mitigating evidence must reduce "moral blameworthiness" violates the Eighth Amendment by precluding consideration of evidence regarding a defendant's character and background that a juror could find to be mitigating.**

Petitioner acknowledges that *e.g, Blue v. Thaler,* 665 F.3d 647, 665-66 (5th Cir. 2011) has already found against this argument. Counsel nevertheless has a duty to raise issues where there is a potential or foreseeable change in existing law, and believes that these claims are valid. Former counsel argued on direct appeal as Petitioner's Sixteenth point of error, and again in Petitioner's State Application for Habeas Corpus as his Fifteenth Point of Error, that the jury was not given *any* definition of the term "mitigating circumstances." Both direct appeal and state habeas counsel overlooked the fact that the jury charge in this case *did* define "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's "moral blameworthiness." 1 CR 274. That definition is contained in the current sentencing statute, art. 37.071 § 2(f)(4). It appears that direct appeal counsel erred in including this claim, and that state habeas counsel, who was essentially duplicating the direct appeal arguments in the state habeas application, did not acquaint himself with the actual jury charge. This in itself supports Petitioner's position that his state habeas counsel rendered a level of performance well below reasonable professional norms.

An instruction defining mitigating evidence solely as that which reduces moral blameworthiness limits the scope of mitigating evidence available to the jury in contravention

to the Eighth Amendment and this Court's precedents.   Such an instruction is obviously contrary to the longstanding constitutional requirement that a sentencer not be precluded in a capital case from considering as mitigating evidence "any aspect of the defendant's character or record … that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 5-6 (1986); *Hitchcock v. Dugger*, 481 U.S. 393, 395-396 (1987).   Because a capital juror might appropriately find that aspects of a defendant's character or background militate against imposition of the ultimate penalty, despite lacking a nexus to moral culpability, but the definition precludes giving effect to that evidence, the "moral blameworthiness" definition offends this constitutional principle.   Trial counsel should have identified this issue and raised an appropriate objection in the trial court.

The Supreme Court has consistently invalidated capital punishment schemes that limit the scope or type of mitigating evidence available to the sentencer in making the decision between life and death, establishing that "a process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration… the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).   The Court held that the consideration of mitigating evidence was required in any and all capital punishment statutes, and approved the Texas statute on the premise that "the enumerated questions allow consideration of particularized

155

mitigating factors," even though consideration of such evidence was not explicitly authorized by the statute. *Jurek v. Texas,* 428 U.S. 262, 272 (1976).

The Supreme Court has continued to define the contours of the requirement of the ability of the sentencer to consider mitigating evidence. In *Lockett,* the Court held that a death penalty statute must not preclude consideration of relevant mitigating factors if it is to meet the constitutional requirements of the Eighth and Fourteenth Amendments, whereas the Ohio capital statute did not encompass "the character and record of the individual offender and the circumstances of the particular offense." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304). The Court concluded that under the Eighth and Fourteenth Amendments, a sentencer in a capital case could "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604.

*Lockett*'s protection of evidence relevant to the defendant's character includes evidence presented in rebuttal to assertions of the future dangerousness of the defendant. In *Skipper v. South Carolina*, the petitioner sought to introduce testimony from two jailers and a regular visitor to him in jail that he had "made a good adjustment during his time spent in jail," but had been prevented by the trial court because it deemed the evidence irrelevant. *Skipper v. South Carolina,* 476 U.S. 1, 5-6 (1986). The Court rejected the State's argument that the exclusion was a proper application of evidentiary rules, and held that "a defendant's

156

disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character," and is relevant in this facet to the sentencing determination. *Id.* at 7. The Court, following *Lockett,* held that the exclusion from the sentencing hearing of the testimony petitioner proffered impeded the sentencer's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.

Further, when a jury was told, in considering whether to impose a sentence of death on the defendant, to render a verdict as to "whether sufficient mitigating circumstances exist as enumerated in [the statute] which outweigh the aggravating circumstances found to exist," this Court unanimously held that the instruction improperly limited consideration of mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 395-396 (1987). The Court found that "the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances," and therefore the proceedings were conducted in violation of the principles set forth in *Lockett* and *Skipper*. Id at 398-399.

Finally, the Court has held that a threshold of "constitutional relevance" for permissible mitigating evidence contravenes the Eighth Amendment's requirement that any "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value" may be used as mitigating evidence. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)). In *Tennard*, the mitigating evidence had been limited to "a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own," and

which was responsible for the criminal act. *Id.* at 283. This Court held that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met the "low threshold for relevance" described in *McKoy*. The state court's contention that "a mentally retarded individual must establish a nexus between her mental capacity and her crime" denies the defendant the right to present evidence that is inherently mitigating. *Id.* at 287. Imposing higher limits on the relevance of mitigating evidence a capital defendant may introduce concerning his own circumstances improperly screens out evidence that "might serve as 'a basis for a sentence less than death.'" *Id.* at 285 (quoting *Lockett v. Ohio*, 438 U.S. at 604).

The "moral blameworthiness" instruction limits the evidence the jury can consider as mitigating, in violation of the constitutional principles defined in *Lockett, Skipper, Hitchcock,* and *Tennard.* By directing the jury, in deciding whether to impose a sentence of death on a convicted capital defendant, to consider solely mitigating evidence that may be regarded as reducing the defendant's moral blameworthiness, the instruction prevents the jury from considering mitigating evidence of a defendant's good behavior subsequent to the incident at issue, as well as the defendant's acclimation to prison life, in contravention to the holding of *Skipper*. The statutory instruction likewise violates *Hitchcock,* in that it in effect constitutes a limitation of the mitigating evidence that may be considered by the jury to statutorily designated factors. The section also creates an impermissible nexus between the mitigating evidence presented and the crime committed, in violation of the principles elucidated in

158

*Tennard*. The total effect of §37.071(f)(4) is to preclude the jury from considering any aspect of the defendant's character or record as evidence mitigating against the imposition of death.

Because of the deficiencies of his trial counsel, see above, the jury heard very little evidence in mitigation of Petitioner's sentence. Nonetheless, he may have impressed the jurors with his extreme candor when he testified, or by the testimony of correctional officers that he was consistently courteous and respectful to them. The jurors may have wished to impose a life sentence because Petitioner's son, the mother of his children, and his grandmother asked them to spare him. Very little, if any, of this evidence presented in mitigation of a sentence of death would be understood by a reasonable juror to reduce "the defendant's moral blameworthiness." *Collins English Dictionary* defines "morality" as, "1. The quality of being moral; 2. Conformity or degree of conformity, to conventional standards of moral conduct; 3. A system of moral principles; 4. An instruction or lesson in morals." *Collins English Dictionary Complete & Unabridged 10th Edition* (2009). These definitions approximate a common, normative understanding of morality that can be assumed to be held by the general populace.

A reasonable juror operating under a definition of "morality" similar to those described above would be likely to understand the instruction as limiting the scope of evidence to be considered as mitigating. The average juror would understand "moral blameworthiness" to refer to acts that lent themselves to moral scrutiny. Instead of using the "low threshold for relevance" described in *McKoy*, the juror would limit the consideration of evidence to that

159

which is relevant to one of the definitions listed above. This is the same as the statutorily enumerated mitigating evidence that was found to be unconstitutional in *Hitchcock*. The statutory instruction also limits the consideration of mitigating evidence to that which relates to the crime for which the defendant was convicted. This creates a *de facto* nexus between the mitigating evidence introduced and the circumstances of the crime and does not allow for the expansive scope of mitigating evidence required by *Lockett* and *Tennard*.

By limiting mitigating evidence to that which reduces "blameworthiness," the natural and probable effect of this instruction is that a reasonable juror will see the instruction as pertaining to the culpability for the crime at issue. It is unlikely that a reasonable juror would take a more expansive definition of the defendant's blameworthiness, and consider all the morally blameworthy acts the defendant has committed over the course of his life. This has two effects: it does not permit consideration of evidence that post-dates the crime, which *Skipper* held to be unconstitutional, and it draws an impermissible nexus between the mitigating evidence allowed and the crime committed under *Tennard*.

Additionally, the limiting effect of the instruction on moral blameworthiness is thrown into sharp relief when considered in light of another provision of the Texas capital sentencing statute. *Article* 37.071 § (e)(1) states that "the court shall instruct the jury that if the jury returns an affirmative finding to [the enumerated aggravating factors] it shall answer the following issue: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal

160

moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." In contrast, section (4) of the above article (which provides the jury with guidelines for applying the consideration of mitigating evidence to the decision of whether to impose a life sentence) requires only consideration of evidence "that a juror might regard as reducing the defendant's moral blameworthiness" in voting "Yes" or "No." Thus, the jury is instructed to consider the sum of mitigating evidence required by *Lockett* but is asked only to apply the evidence concerning moral blameworthiness when determining the sentence.

The definition given to the jury concerning what it could consider to be mitigating circumstances was therefore one which was at odds with the long line of cases, from *Lockett*, *Eddings* and *Hitchcock* through to *Tennard*, requiring that the jury be permitted to consider "*any* aspect of the defendant's character or record … that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis added).   The instruction therefore resulted in an unreasonable application of clearly established federal law.

## Claims Exhausted on Direct Appeal

### Claim for Relief Number 12

**Petitioner was denied the right to present evidence in his own defense when the trial court excluded evidence of a confession to an extraneous murder, thereby violating Petitioner's right under the Sixth and Fourteenth Amendments to a meaningful opportunity to present a defense.**

As was argued on direct appeal as his Sixth point of error, Petitioner's trial counsel sought to have admitted testimony of an extraneous offense, the murder of Gilbert Vallejo, which the State successfully argued should be excluded.  This evidence was necessary to prove Petitioner's counsel's chosen line of defense, as announced in the opening statement, which was to establish that Petitioner had a propensity to confess to crimes that he had not committed.  26 RR 36-41.

Counsel intended to cross-examine Detective Cheryl Johnson concerning the Vallejo homicide, 29 RR 6-11, and made a proffer of the questions he intended to ask.  The State's response was that this was "an attempt to blunt the State's punishment case," and to argue that there was an identification of Petitioner by one witness and that the "ballistics evidence" matched that from the indicted homicide offenses.  29 RR 8-10.  The trial court sustain the State's objection to the proposed evidence on the ground of a lack of relevance.  29 RR 10.

The Texas Court of Criminal Appeals held that Petitioner had failed to proffer meaningful evidence that the confession to the Vallejo murder was false, and that the trial court "therefore did not abuse its discretion in excluding the evidence for lack of relevance."

*See Wilkins v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 622 * 6-10 (Tex. Crim. App. 2010).  This decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.§ 2254(d)(1), as well as being a decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.§ 2254(d)(2).

In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court confirmed the constitutional guarantee to criminal defendants of a meaningful opportunity to present a complete defense, whether that is grounded in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment. *See also Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973); *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986).  That right is abridged by rules that infringe a weighty interest of the accused or are arbitrary or disproportionate to the purpose they are designed to serve. *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

As Petitioner argued on direct appeal, the trial court was excluding evidence upon which the Petitioner's defense depended, citing *Ray v. State*, 178 S.W.3d 833 (Tex. Crim. App. 2005)(noting that improper exclusion of evidence vital to a defense may establish a constitutional violation).  The Court of Criminal Appeals held that because Petitioner could not conclusively prove that the Vallejo confession was false, that confession did not have a tendency to make the falsity of Petitioner's other confessions more probable. *Id.* at 9-10.  This

163

decision held Petitioner to a standard of proof that was impossible to meet, and set the bar unnecessarily high.   The jury was already aware that Petitioner had given unreliable confessions to many other offenses. 28 RR 136-48.   Combined with that testimony, the confession to the Vallejo homicide indeed had a tendency to make more it more probable that all his confessions were false.   Requiring absolute proof of a defense before it can be presented simply sets too high a barrier to the presentation of a meaningful opportunity to present a defense. *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 690 (1986)(evidence relevant to the weight jury would give to evidence already admitted should have been allowed, being relevant to defendant's fair opportunity to present his defense).   Moreover, even though the State maintained that it had eyewitness testimony and a ballistics match that would corroborate the Vallejo confession, defense counsel already knew that, and still sought the admission of the confession, believing that the jury would give it appropriate weight.[102]

The trial court's ruling prevented Petitioner from presenting a complete defense, in violation of the Sixth and Fourteenth Amendments, and the Court of Criminal Appeals decision upholding that decision was unreasonable.

---

[102]As is argued above, see Claim for Relief Number 5,  trial counsel do not seem to have obtained expert assistance for an independent analysis of the ballistics/toolmark evidence, or to have looked into the circumstances in which a line-up identification was conducted . The one supposed eyewitness, Keith Sweat, had at first failed to identify Petitioner, but purported to do so in a later line-up, 22 25 RR 69-79. He was not called to testify at either phase of the trial.

### Claim for Relief Number 13

**Petitioner's challenge to the admission of one of his statements to law enforcement was erroneously denied; the State had failed to meet its burden of showing a voluntary waiver of counsel, thereby violating Petitioner's rights under the Fifth Amendment.**

As was argued on direct appeal as his tenth point of error, the State failed to meet its burden of showing a voluntary waiver of the presence of counsel at the time Petitioner provided police authorities with his second statement,  given on December 14, 2005. Petitioner was read his *Miranda* rights after he indicated that he wanted to speak to a Detective.[103] However, that is in itself insufficient to demonstrate that he was waiving the presence of counsel, when he had formerly requested counsel.

When an interrogation continues outside the presence of the suspect's attorney and a statement is taken, a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.   The question of waiver turns on whether the State has met its "heavy burden" of establishing a "knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)(citations omitted).  The State failed to meet its burden of showing a sufficient waiver

---

[103]*Miranda v. Arizona*, 384 U.S. 436 (1966).

of counsel, given the evidence of Petitioner's diminished mental capacity and the fact that the written warnings preceding the statement included rights petitioner had already invoked.[104]

The Texas Court of Criminal Appeals' decision that Petitioner's waiver was voluntary was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), as well as being a decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). *See Wilkins v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 622 * 13-18 (Tex. Crim. App. 2010).

### Claim for Relief Number 14

**Petitioner's challenges to two potential jurors were erroneously denied even though one would have automatically found Petitioner to be a future danger and the other would have placed a burden on Petitioner to present evidence in his defense, thereby violating Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.**

As was argued on direct appeal in Petitioner's first and second points of error, his challenges for cause to two members of the jury venire, Zona Peterson and Denise Kitchen, were erroneously denied. Ms. Peterson could not return an answer of "no" to the future dangerousness special issue, thereby making her an automatic vote for death. Ms. Kitchen

---

[104]Appellate counsel identified the issue that Petitioner might be suffering from "diminished mental capacity." There is no affirmative defense of "diminished capacity" in Texas law, *see Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008), however appellate counsel was clearly referring to the issue of Petitioner's lack of competence to give a knowing, intelligent and voluntary waiver of his rights. Inexplicably, counsel at trial, appeal and in state habeas corpus proceedings failed to raise this issue as a separate claim. See Petitioner's Claim for Relief Number 4 above.

would have required both parties to produce evidence, thus improperly placing a burden of proof on Petitioner.  Petitioner sought to challenge both jurors for cause, but those challenges were denied and he was compelled to use a peremptory challenge to each.  Petitioner later received and used one additional peremptory challenge. 22 RR 202.  He thereafter sought a further peremptory challenge but that was denied, forcing him to accept an otherwise objectionable juror.  23 RR 86.

## Venire person Peterson

Venire person Number 26, Zona Mae Peterson was challenged on a number of grounds, including her inability to return a "no" answer to the future danger special issue.

In an exchange with defense counsel following counsel's initial challenge, she revealed herself as firmly entrenched in that position:

| [Defense Counsel]: | [The jury charge at punishment] says this person who committed this capital murder beyond a reasonable doubt, is there this probability they will commit criminal acts of violence that would constitute a continuing threat to society, yes or no. |
|---|---|
| [Ms. Peterson]: | I would say yes. |
| [Defense Counsel]: | Okay.  All right.  I thought that was your answer.  I mean, the fact of the capital murder alone directs you to a yes answer; is that true. |
| [Ms. Peterson]: | Yes. |
| [Defense Counsel]: | Now, in a no answer, if the fact is they committed a capital murder, you would not believe a no answer would be appropriate, true? |

167

[Ms. Peterson]:      No.

[Defense Counsel]:   Okay.

[Ms. Peterson]:      Yes, that would be true. Sorry.

[Defense Counsel]:   Okay.  A no wouldn't be appropriate if we determined they committed capital murder, true?

[Ms. Peterson]:      Well, if the question is  – okay.  But we're at the sentencing stage.

[Defense Counsel]:   Right.  We have already determined they have committed capital murder.  That's been resolved beyond a reasonable --

[Ms. Peterson]:      So, now we're just talking about the probability.

[Defense Counsel]:   Correct.  Well, that's part of that question, yes.

[Ms. Peterson]:      Okay.  Yes, I think the answer would be that there is a probability that they would commit future crimes.

[Defense Counsel]:   Okay.   Because of the fact that it's been established they committed capital murder, correct?

[Ms. Peterson]:      Right.

[Defense Counsel]:   And the answer wouldn't be no if you have already determined they committed capital murder; is that how you feel?

[Ms. Peterson]:      I feel like that would be true, but once again, since I don't really know all the situations --

[Defense Counsel]:   Right.  And we can't say here – all I can say is the only fact we know is the person has been determined to commit capital murder.

[Ms. Peterson]:      Right.

[Defense Counsel]:   And you are confronted with this question.  And what I heard you saying is if we already know that part, the answer is yes, true.

[Ms. Peterson]:      Well, and I guess I am just still to this place where I am not totally understanding exactly what could allow me to feel differently.  I mean, as far as the probability.  I mean, if I didn't have any circumstances that made me feel that way, but still if a

168



person has murdered two people and we've established that they are guilty, then yes, I believe that I could not – that I would believe the probability they would commit another crime.

[Defense Counsel]:   Okay.  Because of that fact.

[Ms. Peterson]:      Yeah.

11 RR 105-109.

Although Ms. Peterson later stated in response to a question from the court that she would answer the questions based on "the evidence and the law," 11 RR 109, it was evident that she believed that a person convicted of a double murder would commit further crimes. Defense counsel made a further challenge for cause, but it was denied, and a peremptory challenge was therefore use by the defense. 11 RR 110.

Venire person Kitchen

Venire person Denise Kitchen was the subject of Petitioner's second improperly denied challenge.  She would have placed a burden on both parties in this case, including the defense:

[Ms. Kitchen]:       You know, I would like to know all the evidence from both cases.

[Defense Counsel]:   So you would want the Defense to present evidence to show that the person accused of that crime was not liable for anything?

[Ms. Kitchen]:       Yes.

[Defense Counsel]:   Now, as Mr. Rousseau pointed out, the government has the burden of proof in this case.  And you understand they have to prove beyond a reasonable doubt –

[Ms. Kitchen]:       Right.

| | |
|---|---|
| [Defense Counsel]: | – that Mr. Wilkins is guilty of this offense as charged.  Is that your understanding. |
| [Ms. Kitchen]: | Yes. |
| [Defense Counsel]: | And you understand that legally the Defense doesn't have to prove anything to you? |
| [Ms. Kitchen]: | Right. |
| [Defense Counsel]: | But you are of the mind that we would have an obligation to prove to you Mr. Wilkins was not a participant in this allegation; is that correct? |
| [Ms. Kitchen]: | Right. |
| [Defense Counsel]: | Now, you understand that someone accused of a crime does not have to testify.  How do you feel about that? |
| [Ms. Kitchen]: | Okay.  I mean, if that's the way the law has to be, that person does not have to testify, then that's the law. |
| [Defense Counsel]: | Can you see why someone might choose not to testify? |
| [Ms. Kitchen]: | No. |
| | . . . |
| [Defense Counsel]: | And as Mr. Rousseau first pointed out, the codefendant accused of a crime is presumed innocent.  And as Mr. Wilkins sits there now, he is legally innocent. |
| [Ms. Kitchen]: | Okay. |
| [Defense Counsel]: | So I'm not confused about anything, I don't want to put words in your mouth or change your mind, it's your position knowing all the stuff that you know about that you still want us to put on evidence or to show that he didn't participate in any type of killing or anything like that; is that your understanding? |
| [Ms. Kitchen]: | Yes, I want to hear both sides, the parties -- |
| [Defense Counsel]: | And that's your firm position.  And I am not going to try to change your position, have you waiver in any way.  That's your firm position; is that correct? |

<center>170</center>



| [Ms. Kitchen]: | Yes, open-minded about both sides, both sides. |
| [Defense Counsel]: | And knowing that the government has to prove its case to you beyond a reasonable doubt and knowing we don't legally have to show you anything, but that's still your position; is that correct? |
| [Ms. Kitchen]: | Right. Right. |

17 RR 51-52, 65-66.

In spite of Ms. Kitchen's affirmation that she wanted to hear from both parties, the State submitted that Ms. Kitchen had done no more than vacillate on the issue of the burden of proof. Defense counsel made a challenge for cause, which was denied, and the defense therefore exercised a peremptory challenge. 17 RR 66-67.

Both venire persons were impaired in their ability to sit on Petitioner's case. Ms. Peterson made it plain that she could not answer "no" to the Texas special issue on future dangerousness. She was therefore a juror whose views on capital punishment would "prevent or substantially impair the performance of his duties in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *see also Morgan v. Illinois*, 504 U.S. 719, 727 (1992)(juror who would automatically vote for the death penalty is subject to challenge for cause).

Ms. Kitchen would have required both parties to produce evidence, including the defense. She therefore placed a burden of proof on Petitioner, inconsistent with his right to be presumed innocent. *In re Winship*, 397 U.S. 358, 364 (1970); *Coffin v. United States*, 156 U.S. 432, 454 (1894). The trial court should have granted both challenges, but failed to do

so. Consequently the defense was compelled to accept Venire person Donna Kay Davis as a seated juror, since the trial court declined to give the defense any additional peremptory challenges. 23 RR 86. Ms Davis had stated in her jury questionnaire that she believed that a person who commits a violent murder should receive the death penalty, and that a person convicted of capital murder does not deserve to live. She was also concerned about the cost to taxpayers of keeping a murderer alive in prison. 23 RR 43-44. Petitioner was therefore forced to accept an objectionable juror and was denied his Sixth Amendment right to an impartial jury. *Ross v. Oklahoma,* 487 U.S. 81, 89 (1988).

The Texas Court of Criminal Appeals found no error with regard to the denial of Petitioner's challenge to Ms. Kitchens. It did not therefore address the question of Ms. Peterson's impairment as a juror, and made no decision concerning the denial of Petitioner's challenge for cause with regard to her. *See Wilkins v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 622 * 6 (Tex. Crim. App. 2010).

The Texas Court of Criminal Appeals' decision concerning Ms. Kitchens was one made "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.§ 2254(d)(1), as well as being a decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.§ 2254(d)(2). Since the state court did not reach the issues concerning Ms. Peterson, the denial of Petitioner's challenge for cause with

regard to her may be reviewed *de novo*. *Miller v. Johnson*, 200 F.3d 274, 281 & n. 4 (5th Cir. 2000).

### Challenges to the Texas Death Penalty Scheme and Jury Instructions

These claims are grouped together because all raise challenges to the Texas death penalty sentencing scheme or to jury instructions given as a result of the statutory language. Petitioner is aware that the Courts have not previously favored these challenges to the Texas statute, TEX. CODE CRIM. PROC. Art. 37.071, *see, e.g., Rowell v. Dretke*, 398 F.2d 370, 375-79 (5th Cir. 2005) and *Ortiz v. Quarterman*, 504 F.3d 492, 504-05 (5th Cir. 2007). Counsel nevertheless has a duty to raise issues where there is a potential or foreseeable change in existing law. These claims are logically valid and counsel reasonably forecasts that, in the future, perhaps in this case, the courts will reconsider and fully recognize the unconstitutionality of the death penalty under Texas law.

The following claims concerning the Texas Death Penalty Scheme and Jury Instructions were raised on direct appeal and reiterated in habeas corpus. In fact, as discussed above, the Application for Writ of Habeas Corpus filed on Petitioner's behalf in state court largely mirrored the direct appeal, notwithstanding that claims raised and rejected on direct appeal, cannot then succeed in habeas corpus. *See, e.g., Ex parte Torres*, 943 S.W.2d 469, 475 (1997).

### Claim for Relief Number 15

**Petitioner's rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated by the failure of Texas law to require grand juries to pass on the death penalty eligibility factors in this case.**

This claim was raised prior to trial, 1 CR 121-32, argued on direct appeal as Petitioner's Ninth Point of Error, and raised again in Petitioner's State Application for Habeas Corpus as his Fifth Point of Error.[105]

The grand jury in Petitioner's case was called upon to determine whether probable cause existed to believe that he murdered the victims. However, pursuant to current Texas law, the grand jury was not required to, and did not, weigh the special punishment issues. The Fifth Amendment to the United States Constitution demands that no person be held to answer "for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." The Fifth Amendment thus requires that a defendant charged with a felony offense be given notice by indictment of the charges against him.

The purpose of the Fifth Amendment indictment requirement is to give the accused notice of the charges against him in order that he may prepare an adequate defense, and to interpose the public into the charging decision so that a defendant is not subject to jeopardy for a crime alleged only by the prosecution. *United States v. Robinson,* 367 F.3d 278, 288 (5th

---

[105]Petitioner acknowledges that *e.g., Kerr v. Thaler,* 384 Fed. Appx. 400, 402-03 (5th Cir. 2010) has already found against this argument. Counsel nevertheless has a duty to raise issues where there is a potential or foreseeable change in existing law, and believes that these claims are valid.



Cir. 2004).    In *Robinson*, the Fifth Circuit considered the issue of whether aggravating

factors that render a defendant eligible for the death penalty must be alleged in the indictment.

367 F.3d at 294. Relying on the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584

(2002) the court in *Robinson* held the Fifth Amendment requires that aggravating factors

which render a particular defendant eligible for the death penalty are, in fact, elements of the

offense. *Id.* Therefore the government is required to charge by indictment those statutory

factors that it intends to prove at trial in order to render a defendant eligible for the death

penalty. *Id.* Thus, the government's failure to do so was constitutional error.

The Fifth Circuit went on to hold that, although it was error to fail to have the

aggravating factors passed on by the grand jury in the indictment, the error was harmless in

light of the evidence of the crimes for which he was tried. *Id.* at 285. Weight was also given

to the fact that Robinson had received "adequate independent notice" of the government's

intent to seek the death penalty. *Id.* at 287. The Court then addressed the question of whether

Robinson was harmed by the violation of his Fifth Amendment right to have the public rather

than simply the prosecution determine whether probable cause existed to charge the

aggravating factors used to sentence him to death. The Court acknowledged the importance

of public involvement in the grand jury process, and the difficulty of bestowing an appropriate

appellate remedy, *Id.* at 287-88, but opined that "meaningful enforcement" of the Fifth

Amendment indictment requirement would depend primarily on the "vigilance of the trial

court" to require that defective indictments be amended before trial. *Id.* This disregarded the

practical reality that trial courts cannot always be relied on to exercise vigilance, absent a demonstration that failure to do so will result in reversible error, and also disregarded precedent to the contrary:

> If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggest changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says "no person shall be held to answer," may be frittered away until its value is almost destroyed.

*Stirone v. United States*, 361 U.S. 212, 216 (1967).

Since *Stirone*, the Supreme Court has consistently held that the elements of the offense must be contained in a criminal indictment. For example, in *Jones v. United States*, 526 U.S. 227, 230-31 (1999) the Court held that because an allegation of serious bodily injury increased the available punishment, that allegation was properly an element of the offense and thus was required to be in the indictment . The Court held that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 243 n. 6.

Accordingly, this Court should determine that the indictment in this case did not comply with the notice requirements of the Fifth and Fourteenth Amendments to the United States Constitution, that the state court's decision to the contrary represented an unreasonable application of clearly established federal law, and grant the writ of habeas corpus.

## Claim for Relief Number 16

**Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because the jury was misled by instructions concerning the so-called "10-12 rule" in the Texas death penalty statute.**

This claim was raised at trial, 1 CR 136, argued on direct appeal as Petitioner's Eleventh Point of Error, and raised again in Petitioner's State Application for Habeas Corpus as his Ninth Point of Error.

Article 37.071 § 2 (f)(2) of the Texas Code of Criminal Procedure is often referred to as the "10-12" or "12-10" rule: the statute requires that all twelve jurors answer the mitigation issue in the negative before the trial court may impose the death penalty, while at the same time requiring that at least ten jurors vote in the affirmative in order to impose a life sentence. However, the defendant does not actually need ten votes in order to prevail on the mitigation issue. If a capital jury fails to arrive at the requisite number of votes either way, Art. 37.071 § 2 (g), requires the court to impose a life sentence. In other words, a defendant is not "death eligible" until all twelve jurors consider and reject mitigating evidence. In other words, one holdout juror can prevent the death penalty from being imposed after a finding of guilt.

The problem with the Texas death penalty scheme is that jurors are not permitted to know the extent of their individual authority or their ability to affect the outcome of the proceeding. Defense counsel are not permitted to directly allude to this law during jury selection, the trial or their final arguments and are prohibited from informing jurors that their

failure to agree on an answer to any special issue will result in a life sentence being imposed upon the accused. *Id.* § 2 (g). Indeed, the jury charge in this case simply read:

> You shall answer Special Issue Number 2 "Yes" or "No."
>
> You are instructed that you may not answer Special Issue Number 2 "No" unless you agree unanimously.
>
> You may not answer Special Issue Number 2 "Yes" unless ten (10) or more jurors agree.

1 CR 274.

As a consequence, the jurors were specifically instructed that they must deliberate until they reach a 12-0 or 10-2 split and also told that they *shall* answer the issue. Such language unconstitutionally invades the province of the jury and exerts undue pressure on jurors to change their minds in order to simply reach a result. The clear import of the instructions is that the jurors are compelled to answer the special issue, but may do so only by a vote of either twelve or ten. The instruction does not even hint at the fact that no juror must vote in such a manner that the issue is even answered. Although the trial court is required to assess punishment at life imprisonment if the jurors are unable to agree on the answer to a special issue, Article 37.071 § (a)(1) specifically precludes the court from instructing the jury on that aspect of the law. As a result, the jurors in Petitioner's case were never informed that they each had the individual authority to impose a life sentence instead of a death sentence.

This offends Petitioner's right to trial by jury under the Sixth Amendment and his right not to be subjected to cruel and unusual punishment under the Eighth and Fourteenth

178

Amendments. The 12-10 rule is impossible to justify as an effort to avoid arbitrariness or increase equity. It invites the majority group of sentencing jurors to prevail upon the members of the minority to change their votes, not by reason of the merits of the case, but to avoid the artificially created uncertainty of the 12-10 rule and its counterpart, the rule of secrecy surrounding the legal effect of a single holdout vote.

Further, the requirement of ten jurors to produce a life verdict creates an internal inconsistency with the requirement of unanimity to produce a death sentence. This offends the principles that underlay *Penry v. Johnson*, 532 U.S. 782 (2001)(illogical jury instruction did not provide an adequate vehicle for jury to make a reasoned moral response to petitioner's mitigating evidence ).

This argument has admittedly been rejected by several panels of the Fifth Circuit. *See e. g., Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000), *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th. Cir. 2005). However, it is clear that the court may not affirmatively mislead sentencing jurors about their role in the process. *Romano v. Oklahoma*, 512 U.S. 1 (1994). *Romano* should control in Texas because the ostensible but false requirement of ten votes for life affirmatively misleads the jury.

The Texas policy decision to distort the deliberative process at capital sentencing in this way simply does not show the required effort to avoid arbitrariness required by *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)("[W]here discretion is afforded a sentencing body on a

179

matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action") and its progeny. To leave small groups of life-leaning jurors without the certain knowledge of the legal effect of their, say, one or two votes, diminishes their confidence, lowers their resolve to follow the dictates of their conscience, and thereby distorts the deliberative process. The Texas process is better described as one that is designed to promote irrational and arbitrary death verdicts than to avoid them. It thus offends the principles of *Gregg, supra.*

Any suggestion that the effect of uncertainty about the effect of a "deadlock" upon a jury containing a small group of life-leaning jurors is equally likely to produce a life verdict, as a death verdict is doubtful and debatable in light of jury studies that have taken place since that decision.[106] These studies generally show that small groups of three or fewer life-leaning jurors are often tipped into joining a death verdict on irrational bases. *Id.* The Texas statute, and thus, Petitioner's punishment charge, seems designed to promote fearful, irrational, arbitrary death verdicts, not to avoid them. A fearful response is not the *reasoned* moral

---

[106] *See* John H. Blume, Sheri Lynn Johnson, Scott E. Sundby, *Competent Capital Representation: the Necessity of Knowing and Heeding What Jurors Tell Us about Mitigation,* 36 Hofstra L. Rev. 1035, 1054, 1063-4, at n 79, citing Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty,* 30 J. Legal Stud. 277, 304 (2001) (analyzing South Carolina data of Capital Jury Project) and Scott E. Sundby, *The Death Penalty's Future: Charting the Crosscurrents of Declining Death Sentences and the McVeigh Factor,* 84 Tex. L. Rev. 1929, 1936 (2006) (discussing the effect of first ballot juror votes on sentence outcomes).

response required by *Penry, supra*. The Texas Court of Criminal Appeals' approval of the

submission of the 12-10 rule to Petitioner's jury was an unreasonable application of clearly

established constitutional law as determined in *Gregg* and *Penry*. Accordingly, this Court

should grant the writ of habeas corpus.

### Claim for Relief Number 17

**Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because the Texas death penalty scheme fails to instruct the jury that if a single juror "holds out" for life the defendant will receive a sentence of life imprisonment by operation of law.**

This claim was raised by pretrial motion, 1 CR 84-87, argued on direct appeal as

Petitioner's Fifteenth Point of Error, and raised again in Petitioner's State Application for

Habeas Corpus as his Seventh Point of Error.

Closely related to the arguments concerning the "10-12 rule" in the Texas death penalty

statute, above, is the issue of the legal effect of a lone juror who cannot vote in the affirmative

on the future dangerousness special issue or in the negative on the mitigation special issue.

The effect of that situation, known to all the legal professionals in the courtroom, is that the

inability to answer a submitted special issue results in the court sentencing the defendant to

confinement for life without parole.

The unquestionable effect of this failure to inform the jurors about the consequences

of a failure to agree is that they are misled about their role in the sentencing process and the

true operation of the law. While the rules are broad as to what evidence can be introduced at

the sentencing phase of a capital trial in Texas, see Art. 37.071 § 2 (a)(1)(allowing admission

of "any matter the court deems relevant to sentence"), jurors are deprived of critical

information about one of the most significant decisions they will ever be called on to make,

namely whether another person lives or dies. Moreover, this failure to accurately instruct the

jury violates the right to due process and to protection from cruel and unusual punishment.

> As the court stated in *Kubat v. Thieret*, 867 F.2d 351, 369-73 (7th Cir. 1989):
>
> [Petitioner's] jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, [Petitioner] would not be sentenced to death ... [T]here is a substantial possibility that one or more of [Petitioner's] jurors might have been precluded from granting mercy ... because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

867 F.2d at 373; *See also Andres v. United States*, 333 U.S. 740, 752 (1948)(instructions

given by trial judge must clearly convey to jury a correct understanding of the statute); *See*

*also State v. Williams*, 392 So.2d 619, 63 (La. 1980)(members of sentencing body must not

be left to speculate as to what outcome would be if there were no unanimity); *State v.*

*Ramseur*, 524 A.2d 188, 284 (N.J. 1987).

This provision of Texas' capital punishment statute also violates the constitution in two

ways: First, it violates the principle in *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) that

jurors must be properly informed of the role assigned to them by law. *See also Dugger v.*

*Adams*, 489 U.S. 401, 407 (1989). Jurors in Texas are not told that even one holdout juror

results in an automatic life sentence for the defendant on trial. Second, the failure to clarify

for the jury the importance of each vote undermines the Eighth Amendment principle

announced in *Mills v. Maryland*, 486 U.S. 367 (1988). In that case, the Court held that a

death sentence is unconstitutional if individual jurors are led to believe that their votes in

favor of a life sentence are meaningless unless a certain number of other jurors are persuaded

to concur (in the case of Texas, at least nine other jurors for a total of ten). Furthermore the

failure to instruct the jury candidly about the impact of a lone hold-out vote runs counter to

*Penry v. Johnson*, 532 U.S. 782 (2001)(illogical jury instruction did not provide an adequate

vehicle for jury to make a reasoned moral response to petitioner's mitigating evidence ).

The failure to instruct the jury on the impact of a lone holdout vote was an

unreasonable application of clearly established constitutional law as determined in *Caldwell,*

*Mills and Penry.* Accordingly, this Court should grant the writ of habeas corpus.

### Claim for Relief Number 18

**Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because the Texas death penalty scheme does not place the burden of proof on the state on the mitigation special issue.**

This claim was raised by pretrial motion, 1 CR 151-55, argued on direct appeal as

Petitioner's Twelfth Point of Error, and raised again in Petitioner's State Application for

Habeas Corpus as his Thirteenth Point of Error. [107]

---

[107]Petitioner acknowledges that *Rowell v. Dretke*, 398 F.2d 370, 375-79 (5th Cir. 2005) and *Ortiz v. Quarterman*, 504 F.3d 492, 504-05 (5th Cir. 2007) have already found against this

The relevant constitutional requirements are stated in *Apprendi v. New Jersey*, 530 U.S. 466 (2002); *Ring v. Arizona,* 536 U.S. 584 (2002); and *Blakeley v. Washington*, 542 U.S. 296 (2004); *See also United States v. Booker*, 543 U.S. 220 (2005)(federal sentencing guidelines rendered constitutional only by severing certain provisions so that additional facts which increase sentence above a statutory maximum are proved beyond a reasonable doubt); *Cunningham v. California,* 549 U.S. 270 (2007)(rejecting statute that required judge rather than jury to find "circumstances in aggravation" relative to punishment issue in order to justify imposition of upper prison term).

*Apprendi v. New Jersey*, 530 U.S. 466 (2002), held unconstitutional a statute allowing a judge to raise the sentence for an offense by a judicial finding that additional facts were proved by a preponderance of the evidence. The Supreme Court determined that any fact which increases the maximum penalty for a crime must be submitted to a jury and proved beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584 (2002) held an Arizona statute unconstitutional because capital defendants are entitled to a jury determination of any fact on which the legislature conditions the assessment of the death penalty, based on proof beyond a reasonable doubt.

---

argument. Counsel nevertheless has a duty to raise issues where there is a potential or foreseeable change in existing law, and believes that these claims are valid.

In *Blakeley v. Washington*, 542 U.S. 296 (2004), the trial judge made a fact-finding which enhanced a kidnaping sentence after a guilty plea, finding that the defendant acted with deliberate cruelty. The aggravating facts were not admitted in the guilty plea. The Supreme Court found, based on *Apprendi*, that the sentence was unconstitutional because the aggravating facts had not been found by a jury beyond a reasonable doubt.

Pursuant to Texas law, Petitioner could not have been assessed the death penalty without a unanimous negative answer to the mitigation Special Issue, TEX. CODE CRIM. PROC. Art. 37.071. However, the statute and instruction do not state the amount or degree of evidence or persuasion required for a negative answer. There is no reference to proof beyond a reasonable doubt, proof that is clear and convincing, a preponderance of the evidence or any standard at all by which the jury is instructed to weigh or examine the evidence or be persuaded. This absence of a standard of proof violates *Apprendi*, *Ring* and *Blakeley*.

The jury was instructed to answer question No. 2 based on a "circumstance or circumstances" in the evidence, Art. 37.071(e)(1). The jury was required to return an answer if unanimously persuaded to answer the question "No," or when at least ten jurors agreed to answer "Yes." Art. 37.071(e)(2)(b)(2). By law, if there were no answer, the sentence was automatically life imprisonment, but pursuant to Texas law, the Court was not permitted to tell the jury the effect of not returning an answer on question number two.

185

The prescribed statutory maximum for capital murder in Texas is life, unless there is a unanimous "No" answer to the mitigation special issue. Only a unanimous "No" answer raises the punishment to death. Asking the mitigation question without a burden of proof imposed on the State violates the rule that a fact that increases the penalty for a crime beyond the prescribed statutory maximum must be proved to a jury beyond a reasonable doubt.

These legal principles are violated when the sentence is automatically a life sentence, but for the jury answering a specific fact-based question in a certain way, without their discretion being limited by the requirement that the death-resulting answer be proved beyond a reasonable doubt by the State.

The statutory instruction violates reason, common sense and the ordinary meaning of words in the English language. Neither the Texas legislature, nor the courts should be permitted to circumvent *Apprendi* and its progeny by casting a factual issue, the jury's life-or-death decision about what the evidence proves, in the negative, without the assignment of a burden of proof. It is "constitutionally permissible to allow a jury ... to recommend mercy based on mitigation evidence ...," *Penry v. Lynaugh*, 492 U.S. 302, 327 (1989). However, this jury was not given the option of a normative decision based on "mercy." The word "mercy," or any similar word was absent from the charge. The jury was instructed to rely on circumstances placed in evidence - facts - to decide if the mitigation evidence "warranted" a life sentence, implicitly placing the burden on the defense. Therefore, the absence of a burden

of proof imposed on the State on the mitigation issue violated the clearly established federal

precedents of *Apprendi*, *Ring* and *Blakely* and the writ must be granted.

### Claim for Relief Number 19

**Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because the Texas death penalty scheme fails to instruct the jurors that a "Yes" answer to the mitigation evidence special issue is required unless the jurors determined that the aggravating evidence outweighs the mitigating evidence.**

This claim was raised by pretrial motion, 1 CR 151-55, argued on direct appeal as

Petitioner's Thirteenth Point of Error, and raised again in Petitioner's State Application for

Habeas Corpus as his Seventeenth Point of Error, and is closely related to the Point above.

The trial court effectively deprived Petitioner of his right to a jury trial and his right

to have all the elements of the offense proven beyond a reasonable doubt, as guaranteed under

the Fifth and Sixth Amendments to the United States Constitution.  The conclusion to be

drawn from the United States Supreme Court's decisions in *Apprendi v. New Jersey* and *Ring*

*v. Arizona*, when considered in conjunction with the Texas death penalty statutory scheme is

inescapable: because a negative answer to the second statutory special issue, that concerning

mitigation, potentially increases the maximum penalty for the crime of capital murder, the

Texas statutory scheme is unconstitutional for not requiring this issue to be submitted and

proved to the jury beyond a reasonable doubt by ensuring that the evidence on the first special

issue outweighs that on the second.

187

*Apprendi v. New Jersey*, 530 U.S. 466 (2002), held unconstitutional a statute allowing a judge to raise the sentence for an offense by a judicial finding that additional facts were proved by a preponderance of the evidence.  The Supreme Court determined that, "[U]nder the due process clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.  The Fourteeenth Amendment commands the same answer in this case involving a state statute." *Id.* at 475-76.  These guarantees extend not only to a defendant's trial on guilt or innocence, but also to determinations that affect the length of the defendant's sentence. *Id.* at 484.  *Ring v. Arizona*, 536 U.S. 584 (2002) similarly held that an Arizona statute was unconstitutional because capital defendants are entitled to a jury determination of any fact on which the legislature conditions assessing the death penalty, based on proof beyond a reasonable doubt. *Id.* at 589.  Under the Texas death penalty scheme the aggravating factor of future dangerousness must be proved beyond a reasonable doubt, whereas the only "standard" of proof for the second issue, that of mitigation, is whether "there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." Art. 37.071 § 2 (e)(1).  The logical thrust of *Ring, Apprendi* and their progeny is therefore that the jury must be instructed that the evidence on the issue to which the higher standard - reasonable doubt - attaches must be found to outweigh that on the issue to which the lower standard applies, before the jury can give a

negative answer to the mitigation special issue. The Texas Court of Criminal Appeals

approval of the trial court's decision to instruct this jury otherwise was an unreasonable

application of clearly established federal law.

### Claim for Relief Number 20

**Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated because the Texas death penalty scheme fails to require the jury to consider mitigation in answering special issue two.**

This claim was raised by pretrial motion, 1 CR 156-58, argued on direct appeal as

Petitioner's Fourteenth point of error, and raised again in Petitioner's State Application for

Habeas Corpus as his Eighteenth Point of Error.

Jurors in a capital case in Texas should be required to consider mitigating evidence,

not simply to consider whether there is sufficient mitigating evidence to warrant a life

sentence. Failure to mandate consideration of mitigating evidence makes the Texas statutory

scheme unconstitutional, in violation of the Eighth Amendment.

Capital murder statutes that have survived constitutional scrutiny have in common that

all require that the jurors be told that they must consider all mitigating evidence. *See, e.g.,*

*Boyde v. California*, 494 U.S. 370 (1990); *Blystone v. Pennsylvania,* 494 U.S. 299, 305

(1990). The failure of the trial court to properly instruct the jurors in this case deprived

Petitioner of his rights under the Eighth and Fourteenth Amendments to the United States

Constitution, pursuant to *Boyde* and *Blystone,* and the Texas Court of Criminal Appeals' approval of that decision was an unreasonable application of clearly established federal law.

### Claim for Relief Number 21

**Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated because the Texas death penalty scheme fails to adequately define "mitigating circumstances".**

This claim was argued on direct appeal as Petitioner's Sixteenth Point of Error, and raised again in Petitioner's State Application for Habeas Corpus as his Fifteenth Point of Error, and concerned the vagueness of the mitigation special issue, allegedly because it failed to define "mitigating circumstances." As explained above, see Claim for Relief Number 10, both direct appeal and state habeas counsel overlooked the fact that the jury charge in this case *did* define "mitigating evidence," with the definition being "evidence that a juror might regard as reducing the defendant's "moral blameworthiness." 1 CR 274. That definition is contained in the current sentencing statute, art. 37.071 § 2(f)(4). It appears that direct appeal counsel erred in including this claim, and that state habeas counsel, who was essentially duplicating the direct appeal arguments in the state habeas application, did not acquaint himself with the actual jury charge. This in itself supports Petitioner's position that his state habeas counsel rendered a level of performance well below reasonable professional norms.

Petitioner does, however, argue above, as Claim for Relief Number 10, that the definition was unconstitutional in that it requires a nexus between the mitigation evidence and the offense in question, and that trial counsel should have so argued.

190

## VIII.   CONCLUSION AND PRAYER FOR RELIEF

As Petitioner has set out above and in his Motion for Scheduling Order, Petitioner was ill-served by his state habeas corpus counsel who barely investigated Petitioner's case and, raised no claims likely to prevail in habeas corpus.  Beyond merely rendering ineffective assistance, habeas counsel was encumbered by conflicting loyalties.  Petitioner's situation therefore goes beyond ineffective assistance, as in *Martinez v. Ryan*, and even beyond abandonment, as in *Maples v. Thomas,* where the attorneys supposedly representing the Petitioner simply failed to ensure that his interests were protected when they moved to other employment.  Petitioner made diligent efforts to secure proper investigation and legal assistance in state court, and sought at every turn to preserve his rights.  The claims pleaded above that were not litigated in state court demonstrate that Petitioner had potentially meritorious legal claims that state habeas counsel could have raised, had he only been willing.

*Martinez* and *Maples* now provide Petitioner with a legal avenue not previously available toward the litigation of his potentially meritorious legal claims on their merits.   It would be appropriate to proceed in a fashion similar to *Hearn v. Dretke*, 376 F.3d 447 (5th Cir. 2004), where Hearn sought the appointment of counsel, funding, and sufficient time in which to develop and litigate a claim based on *Atkins v. Virginia*, 536 U.S. 304 (2002)(execution of the mentally retarded violates the Eighth Amendment) as a successor petition.   Hearn had urged his former counsel to raise his *Atkins* claim, without success, and the statute of limitations had run.  *Id*. at 454.   The Court granted equitable tolling of Hearn's by now

191

belated claim, in the amount of six months, as well as appointment of counsel, and remanded

to the district court so that Hearn could seek funding with which to prepare his claim. *Id.* at

458.[108] Petitioner therefore respectfully suggests that the most efficient and equitable way to

remedy his situation would be:

(a)    To grant Petitioner's outstanding Motions for funding and for the release of the

entirety of his former attorneys' and investigator's files; [109]

(b)    To grant Petitioner six months in which to amend his Petition, to commence on

receipt of funding for investigative and other resources, or at the time of Petitioner's

receipt of the entirety of his former attorneys' and investigator's files, whichever date

is later, so that undersigned counsel may identify and develop such claims as would

already be ready to file, had state habeas counsel done his duty to his client;

(c )    To entertain a motion for equitable tolling regarding new claims filed in an amended

petition as to which the statute of limitations would otherwise have run;

(d)    To schedule an evidentiary hearing on those claims that require it;

(e)    To issue a writ of habeas corpus so that Petitioner may be discharged from his

unconstitutional conviction and sentence of death; and

---

[108]Petitioner will almost certainly also seek equitable tolling for additional claims, but such a request would currently be premature, since Petitioner has not yet been able to identify or develop all his potential claims.

[109] *See* Motion for Leave to File an *ex Parte* Sealed Request for Necessary Funds for Expert and Investigative Assistance (Document # 10) and Motion for Order to Release Petitioner's Files to His Current Counsel (Docket No. 24).

(f)     Grant such other relief as law and justice require.


Respectfully submitted,


*Hilary Sheard*

HILARY SHEARD
Texas Bar # 50511187
7301 Burnet Road, # 102-328
Austin, TX 78757
Phone/Fax: (512) 524 1371
HilarySheard@Hotmail.com

*Counsel for Christopher Chubasco Wilkins, Petitioner*

193

## VERIFICATION

I, Hilary Sheard, attorney for Christopher Chubasco Wilkins, Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2012.

HILARY SHEARD

## CERTIFICATE OF SERVICE

I certify that on May 21, 2012, a copy of the foregoing pleading was served on counsel for the Respondent by First Class U.S. Mail:

Jeremy Greenwell Esq.
Office of the Texas Attorney General
Postconviction Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548.

HILARY SHEARD
Counsel for Petitioner.

194